**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAHLON KIRWA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:17-cv-01793 |
| ) | The Honorable Ellen Segal Huvelle |
| UNITED STATES DEPARTMENT OF ) | |
| DEFENSE and JAMES MATTIS, in his ) | |
| official capacity as Secretary of Defense, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 2

A.    Overview of MAVNI program ......................................................................................... 2

B.    Recent changes to the MAVNI program .......................................................................... 4

C.    Procedural history ............................................................................................................. 8

STANDARD OF REVIEW ........................................................................................................ 10

ARGUMENT ............................................................................................................................. 10

I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR
CLAIMS ........................................................................................................................ 11

A.    Plaintiffs' challenge to any active-duty requirement for honorable-service
certification is moot in light of DoD's new policy .......................................................... 11

B.    Plaintiffs' claims lack merit ............................................................................................ 14

        1.    Plaintiffs fail to state a claim under the APA because the decision whether
to certify a soldier as having served honorably is committed to agency
discretion by law .................................................................................................. 14

        2.    Plaintiffs cannot succeed on their § 706(1) claim because § 1440(a) does
not impose a clear legal obligation to certify members of the Selected
Reserve as having served honorably prior to their attendance in basic
military training or other active-duty status ......................................................... 19

        3.    Because DoD's current honorable-service certification policy is not
contrary to law, Defendants are entitled to judgment on Plaintiffs' §
706(2) claim ......................................................................................................... 23

                a.    DoD's current honorable-service certification policy is not
contrary to law ......................................................................................... 23

                b.    The relief Plaintiffs seek is not available under the APA ......................... 26

        4.    Plaintiffs cannot state a claim for mandamus relief ............................................. 29

II.    PLAINTIFFS HAVE NOT ESTABLISHED THE EXISTENCE OF
IRREPARABLE HARM ................................................................................................ 30

III.   THE BALANCE OF THE EQUITIES WEIGHS AGAINST ISSUING A
PRELIMINARY INJUNCTION .................................................................................... 35

CONCLUSION .......................................................................................................................... 37

i

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Abdullah v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ............................................................ 10

*Am. Ass'n of Retired Pers. v. EEOC*,
   823 F.2d 600 (D.C. Cir. 1987) ............................................................. 20

*Am. Bar Ass'n v. FTC*,
   671 F. Supp. 2d 64 (D.D.C. 2009), *vacated and remanded on other grounds*,
   636 F.3d 641 (D.C. Cir. 2011) ............................................................. 26

*Am. Fed'n of Gov't Empls., Local 1872 v. Stetson*,
   No. 77-2146, 1979 WL 1919 (D.D.C. July 24, 1979) .......................... 18

*Beshir v. Holder*,
   10 F. Supp. 3d 165 (D.D.C. 2014) ...................................................... 21

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ............................................................................ 15

*Brodie v. HHS*,
   715 F. Supp. 2d 74 (D.DC. 2010) ...................................................... 31

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................................ 30

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984) ............................................................. 20, 23, 24

*Citizens for Responsibility and Ethics in Washington v. SEC*,
   916 F. Supp. 2d 141 (D.D.C. 2013) ................................................... 19

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013) ....................................................................... 23, 24

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000) ............................................................................ 12

*Clarke v. United States*,
   915 F.2d 699 (D.C. Cir. 1990) ....................................................... 12, 13

*Covelo Indian Cmty. v. Watt*,
   551 F. Supp.366 (D.D.C. 1982), *aff'd as modified* (Dec. 21, 1982),
   *vacated as moot* (Feb. 1, 1983) .................................................... 20, 29

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ........................................................................ 10

*Dilley v. Alexander*,
   603 F.2d 914 (D.C. Cir. 1979) .......................................................................... 28

*District No. 1, Pac. Coast Dist., Maritime Engineers' Beneficial Ass'n v. Maritime Admin.*,
   215 F.3d 37 (D.C. Cir. 2000) ............................................................................ 17

*Drake v. FAA*,
   291 F.3d 59 (D.C. Cir. 2002) ............................................................................ 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs*. Inc.,
   528 U.S. 167 (2000) .......................................................................................... 12

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) .............................................................................................. 37

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..................................................................................... 14, 15

*In re Cheney*,
   406 F.3d 723 (D.C. Cir. 2005) .......................................................................... 29

*Jones v. D.C.*,
   177 F. Supp. 3d 542 (D.D.C. 2016) .............................................................. 31, 33

*Kerr v. U.S. Dist. Court for N. Dist. Cal.*,
   426 U.S. 394 (1976) .......................................................................................... 30

*Local 2855, AFGE (AFL-CIO) v. United States*,
   602 F.2d 574 (3d Cir. 1979) ............................................................................. 17

*Mt. Emmons Mining Co. v. Babbitt*,
   117 F.3d 1167 (10th Cir. 1997) ........................................................................ 30

*Munaf v. Geren*,
   553 U.S. 674 (2008) .......................................................................................... 10

*N. Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852 (D.C. Cir. 2012) .......................................................................... 27

*National Federation of Federal Employees v. United States*,
   905 F.2d 400 (D.C. Cir. 1990) .......................................................................... 17

*Nio v. DHS*,
   --- F.Supp.3d ---, 2017 WL 3917006 (D.D.C. Sept. 6, 2017) ...................... 5, 9, 32, 36

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 36

*Norton v. Southern Utah Wilderness,*
    542 U.S. 55 (2004) ....................................................................... 19, 20

*Old Colony R. Co. v. Comm'r of Internal Revenue,*
    284 U.S. 552 (1932) ......................................................................... 26

*Orloff v. Willoughby,*
    345 U.S. 83 (1953) ........................................................................... 18

*Orlov v. Howard,*
    523 F. Supp. 2d 30 (D.D.C. 2007) .................................................. 21

*Palisades Gen. Hosp. Inc.* v. Leaveitt,
    426 F.3d 400 (D.C. Cir. 2005) ........................................................ 27

*Pharmachemie B.V. v. Barr Labs., Inc.,*
    276 F.3d 627 (D.C. Cir. 2002) ........................................................ 12

*Power v. Barnhart,*
    292 F.3d 781 (D.C. Cir. 2002) ........................................................ 29

*Pub. Citizen Health Research Grp. v. FDA,*
    740 F.2d 21 (D.C. Cir. 1984) .......................................................... 20

*Pub. Util. Comm'n of Cal. v. FERC,*
    100 F.3d 1451 (9th Cir. 1996) ........................................................ 12

*Save Jobs USA v. DHS,*
    105 F. Supp. 3d 108 (D.D.C. 2015) ................................................ 10

*Schlesinger v. Ballard,*
    419 U.S. 498 (1975) ......................................................................... 36

*Sierra Club v. EPA,*
    551 F.3d 1019 (D.C. Cir. 2008) ...................................................... 20

*Solorio v. United States,*
    483 U.S. 435 (1987) ......................................................................... 36

*Sossamon v. Lone Star State of Tex.,*
    560 F.3d 316 (5th Cir. 2009) .......................................................... 14

*Steenholdt v. FAA,*
    314 F.3d 633 (D.C. Cir. 2003) ........................................................ 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................................... 10, 35

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .................................................................................. 30, 31

## Statutes

5 U.S.C. § 701 ............................................................................................................... 14

5 U.S.C. § 702 ............................................................................................................... 14

5 U.S.C. § 706 ..................................................................................................... 8, 27, 29

8 U.S.C. § 1440 ...................................................................................................... *passim*

10 U.S.C. § 504 ............................................................................................................... 3

28 U.S.C. § 1361 ........................................................................................................... 29

## Legislative Material

S. 7280, 108th Cong., 1st Sess. (June 4, 2013) ............................................................ 22

## Administrative and Executive Materials

8 C.F.R. § 329.2 ........................................................................................................ 4, 26

Executive Order No. 13269, Expedited Naturalization of Aliens and Noncitizen Nationals
Serving in an Active-Duty Status During the War on Terrorism,
  67 Fed. Reg. 45,287 (July 3, 2002) ............................................................................. 3

## Other Authorities

Army Reg. 601-210 ¶ 4-2  ............................................................................................. 3

**INTRODUCTION**

The Military Accessions Vital to the National Interest ("MAVNI") program carried out by Defendants, the Department of Defense ("DoD") and DoD Secretary James Mattis, in his official capacity, permits foreign persons legally present in the United States but without permanent residency status to seek expedited naturalization in exchange for military service in areas deemed to be critical to the national interest.  Although the Department of Homeland Security ("DHS") is the executive agency that adjudicates naturalization applications, as part of that process, DoD has been tasked by Congress with the role of certifying that qualifying soldiers have served honorably.  Following a period of review of its standards for making such certifications, DoD last week issued formal guidance for honorable-service certifications, setting forth criteria for various categories of MAVNI recruits.  The policy now applicable to the Plaintiffs in this case requires them to be free of any legal or disciplinary issues, to successfully complete the background investigation and security screening applicable to all MAVNI soldiers, and to serve for a period of time in the Selected Reserve.  There is no requirement that they have any active-duty service.

Plaintiffs, three individuals who enlisted in the Army via the MAVNI program and who are currently serving in the Selected Reserve of the Ready Reserve, bring this challenge to DoD's policy and have requested that the Court enter preliminary injunctive relief.  Despite not yet having completed background investigations or security screening, Plaintiffs contend that DoD has a ministerial, non-discretionary duty to certify their service as honorable and that DoD's current policy is contrary to law.  Plaintiffs are not entitled to a preliminary injunction on these claims.  To begin, Plaintiffs' central objection to DoD's honorable-service certification process was a requirement that a MAVNI recruit have some active-duty experience, but the

provision of the new policy applicable to Plaintiffs contains no such requirement.  Plaintiffs'
claims are accordingly moot.

Even if the claims were not moot, Plaintiffs cannot demonstrate that they are likely to
succeed on the merits in this case.  DoD's decisions about whether and when to certify a solider
as having served honorably is a decision committed to agency discretion by law and is thus not
reviewable by courts.  Even if such decisions were reviewable, no ministerial, non-discretionary
obligation to certify members of the Selected Reserve before they attend initial entry training
exists, and DoD's policy is within the scope of its statutory authority.  Nor can Plaintiffs prevail
on their request for mandamus relief, for similar reasons.

The remaining factors in the preliminary injunction analysis likewise weigh against
granting Plaintiffs' motion.  Because the new policy does not contain any active-duty service
requirement about which Plaintiffs had complained, they are not suffering any irreparable harm,
nor have they demonstrated that they are threatened by any other potential harm.  In addition,
given the importance to DoD of making honorable-service determinations only once DoD has
complete information about a MAVNI recruit, the balance of the equities weighs heavily in favor
of permitting DoD to make its determination following the completion of a background
investigation and security screening.  For all of these reasons, Plaintiffs' motion for a preliminary
injunction should be denied.

## BACKGROUND

### A.      Overview of MAVNI program

First begun in 2008, the MAVNI pilot program provides an exception to the general rule
that individuals desiring to enlist in the military be U.S. citizens or lawful permanent residents
("LPRs").  *See Nio, et al. v. DHS, et al.* ("*Nio*"), 17-cv-998-ESH (D.D.C. 2017), Decl. of

Stephanie Miller ¶¶ 3-4, ECF No. 19-7 ("First Miller Decl.") (attached as Exhibit 2).  The

program was created pursuant to DoD's authority to enlist individuals who do not meet these

residency requirements when their enlistment is deemed to be "vital to the national interest," *see*

10 U.S.C. § 504(b)(2), as well as its authority to enlist non-LPRs during periods in which the

United States is engaged in military operations involving armed conflict with a hostile foreign

force, as determined by the President, *see* 8 U.S.C. § 1440(a).  The United States has been

engaged in a qualifying armed conflict since the attacks of September 11, 2001.  *See* Executive

Order No. 13269, 67 Fed. Reg. 45,287 (July 3, 2002).

  The MAVNI program is specifically designed to recruit health care professionals and

persons who possess critical foreign language skills.  *See* First Miller. Decl. ¶ 4.  Among other

requirements, MAVNI recruits must meet the minimum enlistment standards applicable to all

military recruits, including medical screening, physical fitness, and moral conduct/criminal

activity screening.  *Id.* ¶¶ 8-9.  Also like all recruits, MAVNI enlistees must undergo a "military-

service determination" (also known as a "suitability-for-service determination").  *Id.* ¶ 10.  This

assessment is an analysis of whether, "based on all available information, there is no reasonable

basis for doubting the person's loyalty to the Government of the United States."  *Id.* (quoting

DoD 5200.2-R ¶ C2.1.3).  Included in this assessment is a review of the soldier's "criminal

history (regardless of disposition) or questionable conduct character."  *Id.* (quoting Army Reg.

601-210 ¶ 4-2(e)(1)).  Since the beginning of the MAVNI program, DoD has intended for the

suitability-for-service determination to be completed prior to a recruit assessing into initial entry

training (colloquially known as "boot camp").  *Id.* ¶¶ 9, 11.

  One of the key features of the MAVNI program is that it permits foreign persons who

lack lawful permanent residence in the United States to obtain U.S. citizenship on an expedited

basis. *Id.* ¶ 9.  As provided by statute, "[a]ny person who, while an alien or a noncitizen national of the United States, has served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the military, air, or naval forces of the United States" during qualifying periods of time "may be naturalized" if certain conditions are met.  8 U.S.C. § 1440(a).  The statute further makes explicit mention of DoD's role in this process, stating that "[t]he executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions . . . ."  *Id*; *see also id.* § 1440(b)(3) (stating that "service in the military, air or naval forces of the United States shall be proved by a duly authenticated certification from the executive department under which the applicant served or is serving, which shall state whether the applicant served honorably in an active-duty status during" a qualifying period).  DoD makes this certification on a Form N-426, Request for Certification of Military or Naval Service ("N-426"), a U.S. Citizenship and Immigration Services ("USCIS") form, and DoD and its military branches are the only federal agencies that make this certification.  First Miller Decl. ¶ 6.  DoD's honorable-service certification constitutes a necessary part of a recruit's application for naturalization with DHS, *see* 8 C.F.R. § 329.2 (b), and DoD contemplates that MAVNI recruits will submit their application for naturalization at the time they arrive at initial entry training, following the successful completion of security screening (discussed below) and a favorable suitability-for-service determination, *see* First Miller Decl. ¶ 11; *see also* The 2016 MAVNI Information Paper at 5-6, ECF No. 11-15 ("The Army, along with [USCIS] has implemented expedited citizenship processing for all non-citizens at each of the Army's Basic Combat Training (BCT) locations."; further directing "DO NOT MAIL YOUR CITIZENSHIP PACKET BEFORE YOU SHIP TO BCT").

**B.      Recent changes to the MAVNI program**

The MAVNI program is subject to ongoing review and reauthorization, *see* First Miller

Decl. ¶ 4, and DoD has made changes to the program in recent years in response to national

security concerns.  Specifically, program reviews revealed there to be counter-intelligence,

security, and insider-threat concerns with the MAVNI program, including MAVNI enlistees

engaging in pre-accession criminal activity or posing significant counter-intelligence security

threats.[1]  *Id.* ¶¶ 10, 15.  To help manage these threats, DoD currently requires MAVNI recruits to

undergo enhanced security screening prior to their suitability-for-service determinations (and

prior to their shipment to initial entry training).  *Id.* ¶ 10.  This enhanced security screening

currently consists of a Tier 3 or Tier 5 background check, a National Intelligence Agency Check

("NIAC"), a counter-intelligence focused security review, and an issue-oriented interview, if

necessary.  *See* First Miller Decl. ¶ 14.  In addition, in April 2017, senior leaders from DoD

informed USCIS that it was concerned about the naturalization of individuals for whom

background checks and counterintelligence security reviews had not yet been completed.  *Id.*

¶ 17-18.

Most relevant to this case, DoD also recently reassessed its honorable-service

certification for members of the Army's Delayed Training Program ("DTP").  *See Nio*, Second

Decl. of Stephanie P. Miller in Resp. to July 19, 2017 Order of the Court at 6, ECF No. 25-2

("Second Miller Decl.") (attached as Exhibit 2).  DoD in July 2017 announced that, as an interim

policy, it would not certify MAVNI recruits as having served honorably until they attend initial

---

[1]This Court has previously recognized that these security concerns are significant.  *See Nio v. DHS*, --- F.Supp.3d ----2017 WL 3917006, at *10 (D.D.C. Sept. 6, 2017) (recognizing that enlistment of foreign nationals in the military implicates national security concerns which can bear on a MAVNI soldier's good moral character, attachment to the Constitution, and disposition towards the United States.).

entry training, following the completion of their background checks and receipt of a favorable

suitability-for-service determination.  *See id.* at 7.  On August 17, 2017, the Commanding

General of the U.S. Army Reserve issued a memo reinforcing the practice of requiring MAVNI

soldiers to have initial entry training in order to receive N-426 certification.  *See* Mem. from

Charles D. Luckey, Lieutenant General, U.S. Army Chief of Army Reserve/Commanding

General, U.S. Army Reserve Command, Re: Certification of Honorable Service Pursuant to 8

U.S. Code § 1440 (Aug. 17, 2017), ECF No. 11-10 (withholding the "authority to certify the

honorable service (N-426) of Soldiers who have not yet attended Initial Entry Training").  These

changes were an interim measure, as DoD undertook an approximately three-months-long

evaluation of its procedures for making honorable-service determinations.  *See Nio*, Defs.'

Weekly Status Rep. for the Week of Sept. 30, 2017 to Oct. 7, 2017, ¶ 8, ECF No. 56; *see also*

Second Miller Decl. at 7 (noting ongoing review to "establish[] [] revised criteria for all future

N-426 certifications").  During that time period, DoD did not certify any new N-426s for

MAVNI soldiers.  *See* First Miller Decl. ¶ 19.

     Upon completion of its review, DoD issued a memo setting forth formal guidance for N-

426 certification on October 13, 2017.  *See* Mem. from A.M. Kurta, Acting Under Secretary of

Defense for Personnel and Readiness to Secretaries of the Military Departments Commandant of

the Coast Guard (Oct. 13, 2017) (attached as Ex. 3) ("Oct. 13 Kurta Memo").[2]  The new policy

divides MAVNI recruits into three groups, the first of which ("Section I") consists of recruits

---

[2] In addition to the formal guidance for N-426 certifications, DoD on October 13 also issued
policies concerning military suitability determinations for foreign nationals who are lawful
permanent residents, *see Nio*, ECF No. 52-2, and vetting and other security screening
requirements for MAVNI soldiers, *see id.*, ECF No. 52-3, as well as an order from Army
requiring the correction of records for MAVNI soldiers in the Delayed Entry Program ("DEP")
who recently received relief from the Army Board for Correction of Military Records, *see id.*,
ECF No. 52-4.

who enlisted or accessed on or after October 13, 2017.  For those recruits, DoD will certify them as having served honorably provided three conditions are met:  (1) they are not the subject of any pending disciplinary action or pending adverse administrative action or proceeding, and are not the subject of a law enforcement or command investigation; (2) they have completed applicable screening and suitability requirements; and (3) they have served in a capacity, for a period of time, that permits DoD to make "an informed determination" as to whether such service was honorable.  *Id.* at 2-3.  For members of the Selected Reserve without active-duty status in a hazardous-duty area, the service required for the third criterion is the successful completion of basic training (initial entry training) and one year of satisfactory service towards non-regular retirement as a member of the Selected Reserve.  *Id.* at 3.

The second group ("Section II") consists of MAVNI recruits who enlisted or accessed prior to October 13, 2017 and requires the completion of the three same criteria for an honorable-service certification:  not being the subject of any pending legal or disciplinary matters, the completion of all applicable screening and suitability requirements, and a period of required service.  *Id.*  MAVNI recruits in the Selected Reserve falling into this category must serve for a period of time and in a manner that permits an informed determination that the member has served honorably in the Selected Reserve.  *Id.*  Unlike with recruits who fall into the Section I category, for Section II there is no requirement to successfully complete initial entry training or any other type of active-duty requirement.  *See id.*  Because Plaintiffs all enlisted prior to October 13, the procedures outlined in Section II apply to them.

Section III of the new policy concerns the revocation of honorable-service certifications for certain MAVNI recruits, *see id.* at 4, which is not applicable in this case.  The new policy also sets forth a process for requesting exceptions to or clarifications of the new policy.  *Id.*

7

Plaintiffs and the Court have been on notice that DoD was reconsidering its honorable-certification policy as early as July. *See* Second Miller Decl. at 7 (referencing "review of the existing standards for certifying approximately 400 existing N-426s" and "the establishment of revised criteria for all future N-426 certifications"). Multiple status reports filed by the Government in *Nio* also made reference to the development of a new policy. *See Nio*, Defs.' Weekly Status Rep. for the Week of Sept. 30, 2017 to Oct. 7, 2017, ¶ 8, ECF No. 56 ("DoD is still in the process of evaluating the procedures for issuance of any new Form N-426s."); Defs.' Weekly Status Rep. for the Week of Sept. 23, 2017 to Sept. 29, 2017, ¶ 4, ECF No. 54 (same).

## C.    Procedural history

Plaintiffs, three MAVNI enlistees who are currently serving in the Selected Reserve of the Ready Reserve, initiated the instant action on September 1, 2017. Compl., ECF No. 1, ¶¶ 2-3. All three Plaintiffs allege that they have requested honorable-service certification for purposes of the N-426 form but were denied because they do not yet have qualifying service. *Id.* ¶¶ 57-62. According to Plaintiffs, "DoD has a mandatory, non-discretionary duty" to certify honorable service for MAVNI soldiers, including Plaintiffs, who are in the Selected Reserves, and that DoD is unlawfully withholding this duty. *Id.* ¶ 52. Plaintiffs further assert that DoD requires active-duty status for any honorable-service certification and claim that such a policy "lack[s] rationality, coherence, and consistency." *Id.* ¶¶ 5, 53. Plaintiffs seek relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1) and § 706(2), and they request various types of declaratory and injunctive relief. *Id.* ¶¶ 82-99. They also request the issuance of a writ of mandamus to compel DoD to comply with its purportedly ministerial obligation to certify Plaintiffs and other MAVNI soldiers in the Selected Reserve as having served honorably. *Id.* ¶¶ 100-05.

The instant action has been designated as a related case to *Nio v. DHS*, which is also pending before this Court. *See* Notice of Related Case, ECF No. 2. In *Nio*, several MAVNI enlistees who had been certified as having served honorably but who had not yet been naturalized as U.S. citizens challenged USCIS's decision to place the plaintiffs' naturalization applications on hold pending the outcome of the new enhanced security screening requirements, and DoD's requirement that an enlistee have active-duty service before receiving honorable-service certification. *See Nio*, 2017 WL 3917006, at *1. Plaintiffs moved for a preliminary injunction, which the Court denied on September 6, 2017. *Id.* In particular, the Court concluded that the *Nio* plaintiffs were not being harmed by any actions of DoD because they had already received honorable-service certifications on their N-426 forms and that they were unlikely to succeed on the merits of their claims against DHS. *Id.* at *8-*13.

Plaintiffs in this case also have also moved for a preliminary injunction, filing a motion with the Court less than three weeks after filing the complaint. *See* Pls.' Mot. for a Prelim. Inj., ECF No. 11 ("Pls.' Mot."). Defendant moved for an extension of time, noting that the DoD policy for the DTP now permits members of the Selected Reserve like Plaintiffs to stay in DTP for up to three years. *See* Def.'s Mot. for Extension of Time ¶ 6, ECF No. 13. Under this policy, Plaintiffs are eligible to remain in DTP until December 2018, February 2019, and June 2019, respectively. *Id.* (citing Decl. of Alicia M. Glanz ¶ 5). The Court then issued an order consolidating Plaintiffs' preliminary injunction motion with summary judgment and resetting the briefing schedule. *See* Sept. 25, 2017 Order, ECF No. 16.

In compliance with this schedule, Defendants filed their opposition to Plaintiffs' motion and cross-moved for summary judgment on October 10. *See* ECF Nos. 17, 18. Plaintiffs filed their reply in support of their motion on the evening of October 13, 2017, *see* Pls.' Reply Mem.

of Point and Authorities In Supp. of Pls.' Mot. ("Pls.' Reply"), ECF No. 19, following DoD's

issuance of the new honorable-service certification policy.  The next day, the Court entered an

order stating that, in light of Section II of the new policy, the Court could no longer treat

Plaintiffs' motion as one for summary judgment and would be treating it instead as a motion

seeking a preliminary injunction.  *See* 10/14/17 Minute Order.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy" that is "never awarded

as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008).  A party seeking such relief "must

establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in

the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an

injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The party requesting preliminary relief "bears the burden to show that all four factors, taken

together, weigh in favor of the injunction."  *Abdullah v. Obama*, 742 F.3d 1023, 1028 (D.C. Cir.

2014) (citation omitted).  Although these four factors are sometimes evaluated using a sliding-

scale approach, *see Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009),

it is well established that if a "if a party makes no showing of irreparable injury, the court may

deny the motion for injunctive relief without considering the other factors," *Save Jobs USA v.

DHS*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015) (citation omitted).

## ARGUMENT

No preliminary injunction is warranted in this case because Plaintiffs cannot demonstrate

the existence of any of the factors necessary for such relief, let alone all three.  To begin,

Plaintiffs cannot demonstrate a likelihood of success on the merits.  Under the new policy, the

Plaintiffs in this case are not required to have any active-duty status in order to receive an

10

honorable-service certification; their claims challenging an active-duty requirement are accordingly moot.  Even if not moot, Plaintiffs' claims also fail as a matter of law because DoD's decision about whether and when to certify honorable service is a decision committed to agency discretion by law and is thus unreviewable under the APA.  DoD, moreover, has no ministerial, non-discretionary duty under § 1440 to certify honorable service for members of the Selected Reserve by a certain point in time.  In addition, DoD's view that completion of a background investigation and security screening should be required for such certifications is a reasonable construction of its role in the naturalization process, as outlined by § 1440; even if it were not, Plaintiffs would still not be entitled to the relief they seek in this case.  Nor do Plaintiffs have a valid claim for mandamus.

Plaintiffs fare no better on the remaining factors of the preliminary-injunction test. Plaintiffs cannot show that they are being irreparably harmed by an active-duty requirement because the provision of DoD's new policy applicable to Plaintiffs contains no such new requirement, nor have Plaintiffs demonstrated that they are being irreparably harmed in any other way.  DoD, and the Executive Branch more broadly, by contrast, would suffer significant harm if DoD were required to certify as having served honorably MAVNI recruits for whom DoD had not yet completed background investigations and other relevant security screening.  Thus, the balance of the equities likewise weighs against issuing an injunction in this case.

## I.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Plaintiffs are unlikely to succeed on the merits of their claims because (A) their claims are moot in light of the new policy and (B) their claims fail as a matter of law.  Each point is addressed in turn below.

**A.    Plaintiffs' challenge to any active-duty requirement for honorable-service certification is moot in light of DoD's new policy**

DoD's new policy makes Plaintiffs' claims in this case moot.  The mootness doctrine

limits Article III courts to deciding "actual, ongoing controversies."  *Clarke v. United States*, 915

F.2d 699, 700–01 (D.C. Cir. 1990) (quotation omitted).  "A case is moot when the issues

presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *City

of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  An intervening event may render a claim moot

if "(1) there is no reasonable expectation that the conduct will recur and (2) interim relief or

events have completely and irrevocably eradicated the effects of the alleged violations."

*Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002).  But a "defendant's

voluntary cessation of a challenged practice does not deprive a federal court of its power to

determine the legality of the practice."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*,

528 U.S. 167, 189 (2000).  In order for this exception to apply, "the defendant's voluntary

cessation must have arisen because of the litigation."  *Pub. Util. Comm'n of Cal. v. FERC*, 100

F.3d 1451, 1460 (9th Cir. 1996).

As the Court has recognized, *see* 10/14/17 Minute Order, the landscape in this case has

changed in light of the new policy.  Plaintiffs' central complaint is that DoD would not provide

them with an honorable-service certification for their N-426s until they have a period of active-

duty service.  *See* Compl. ¶ 5 ("Defendants have implemented a new policy by which they are

refusing to issue Form N-426s to Plaintiffs and other similarly-situated eligible soldiers on the

grounds that the soldiers have not yet served in an active-duty status."); Pls.' Reply at 3

(asserting that "DoD's policy of requiring active-duty status before issuing N-426s to Selected

Reservists is contrary to law").  Under the new policy, Plaintiffs are not subject to any such

requirement.  Instead, the new policy sets forth three criteria for receipt of an honorable-service

determination for MAVNI recruits who, like Plaintiffs, enlisted into the military prior to October

13, 2017:  (1) the absence of any pending legal or disciplinary actions against the individual,

(2) the completion of all required background investigations and security screening; and (3)

service "in a capacity, for a period of time" and in a manner that permits a determination that the

member has served honorably in the Ready Reserve.  *See* Oct. 13 Kurta Mem. at 3.  There no

longer exists an active-duty requirement for Plaintiffs to challenge.

The voluntary cessation doctrine, moreover, does not preclude a mootness finding here.

DoD was in the process of evaluating its standards for N-426 honorable-service certifications

since July 2017, more than one month before Plaintiffs filed this lawsuit.  *See* Second Miller

Decl. at 7; *see also* Tr. of 8/23/17 Continued Oral Argu. On Prelim. Inj. Mot. at 11:17-21 ("THE

COURT:  But can you get an N-426 if you're not in active duty?  MR. KISOR:  I think that those

criteria are being developed now, and the answer to that is that it is not known yet.").  DoD's

revision of its policy therefore arose out of a re-examination of the MAVNI program overall, *see*

Second Miller Decl. at 7, not in response to the claims in this case.  Nor is there any reasonable

expectation that the active-duty policy challenged by Plaintiffs is reasonably likely to recur.  The

October 13 policy marks the culmination of an extended period of review of more than three

months, and there is no evidence that DoD intends to require active-duty service from any

MAVNI soldiers, including Plaintiffs, who are subject to the requirements of Section II of the

new policy.

Any claim of voluntary cessation in this case is further undermined by the fact the

coordinate branches of government are presumed to act in good faith when altering their conduct

or changing policies or laws and have accordingly declined to apply the voluntary cessation

exception to mootness in such cases.  *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir.

1990) (en banc) (observing that the voluntary cessation doctrine was designed to "prevent[] a private defendant from manipulating the judicial process by voluntarily ceasing the complained of activity, and then seeking a dismissal of the case, thus securing freedom to 'return to his old ways'"); *see also Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 324–25 (5th Cir. 2009) (dismissing case as moot and stating that "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties.  Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing").  In light of the above considerations, the voluntary cessation doctrine does not apply, and Plaintiffs' claims should be dismissed as moot.

## B.      Plaintiffs' claims lack merit

Even if they are not moot, Plaintiffs still cannot demonstrate a likelihood of success on the merits because their claims in this case lack merit.

### 1.      Plaintiffs fail to state a claim under the APA because the decision whether to certify a soldier as having served honorably is committed to agency discretion by law

As an initial matter, both Plaintiffs' § 706(1) claim and § 706(2) claim must fail because the decision whether and when to certify that a soldier has served honorably is committed to agency discretion by law.  The APA grants a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  It withdraws that cause of action, however, "to the extent that . . . agency action is committed to agency discretion by law."  *Id.* § 701(a)(2). "Agency action is committed to agency discretion by law when 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of

14

discretion.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  Review under the APA is thus unavailable when "'statutes are drawn in such broad terms that in a given case there is no law to apply.'"  *Heckler*, 470 U.S. at 830 (citation omitted).

As the Supreme Court has explained, "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  A court thus draws guidance from the text of the statute, from "specific legislative history that is a reliable indicator of congressional intent," and from "inferences of intent drawn from the statutory scheme as a whole." *Id*. at 349.  Similarly, in determining whether action is committed by law to agency discretion, courts consider "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002).

In this case, "Plaintiffs have challenged whether DoD's policy of refusing to issue N-426 Forms to Selected Reservists who have not served in an active-duty status," claiming that such a policy is "contrary to the express statutory language of" § 1440(a).  Pls.' Reply at 4.  Plaintiffs are not subject to any active-duty requirement under the new policy, so their concerns in this regard are moot, as discussed above.

To the extent Plaintiffs try to challenge the new policy under the APA, those claims would still be barred because DoD's honorable-service certifications are committed to agency discretion by law.  The statute governing DoD's honorable-service certifications sets forth no meaningful standard to evaluate either *whether* DoD should certify a soldier as having served

honorably or *when* DoD should so certify.  The relevant provision states that "[t]he executive

department under which such person [seeking naturalization] served shall determine whether

persons have served honorably in an active-duty status, and whether separation from such service

was under honorable conditions."  8 U.S.C. § 1440(a).  This language contains no further

guidance or instruction as to what constitutes "honorable" service for purposes of certification,

leaving it completely up to the relevant military branch—here, the Department of the Army—to

make that determination.  Notably, the statute does provide some guidance as to what does *not*

constitute honorable service, *see id.* (stating that persons who have been separated on account of

alienage or, who were conscientious objectors who "performed no military, air, or naval duty

whatever or refused to wear the uniform" cannot be certified as having served honorably), but it

is within DoD's discretion to determine, as an affirmative matter, what type of service suffices as

"honorable."  Indeed, to the extent the statute offers any guidance regarding what type of service

should be certified as "honorable," it suggests that a soldier must have completed active-duty

status, *id.* (instructing the relevant branch of the military to "determine whether persons have

served honorably in an active-duty status"), which none of the Plaintiffs have done.  Congress's

silence as to what type of conduct should be deemed "honorable" signals that such a

determination is left to the prerogative of DoD.[3]

    Nor did Congress provide any standard for determining when DoD should certify that a

soldier has served honorably.  The relevant statutory language is written in the past tense, *see id.*

(instructing DoD to determine whether such persons "have served honorably"), which suggests

---

[3] Plaintiffs assert that DoD's reading of § 1440(a) "wholly cancels out" the reference in the first sentence of that section to the Selected Reserve.  *See* Pls.' Reply at 5.  But this is not the case under Section II of the new policy.  To the contrary, Section II expressly states that qualifying service can be either "as a member of the Selected Reserve of the Ready Reserve or a member of an active component of the military or naval force of the United States . . . ."  Oct. 13 Kurta Memo at 3.

that certification need not necessarily occur concurrent with a soldier's enlistment.  Further to

this point, the statute even permits DoD to make an honorable service determination following a

soldier's separation from the military.  *See id.* (instructing DoD to determine whether a person

has served honorably, "and whether separation from such service was under honorable

conditions").  Having imposed no time restrictions for DoD to abide by in certifying honorable

service, § 1440(a) leaves the pace of certifications within the discretion of DoD.

The conclusion that DoD's honorable-service certifications are committed to agency

discretion is further compelled by the judicial branch's recognition that "[t]he existence of broad

discretionary power in an agency often suggests that the challenged decision is the product of

political, military, economic, or managerial choices that are not really susceptible to judicial

review."  *See Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574, 579 (3d Cir. 1979).

In *National Federation of Federal Employees v. United States*, for example, the D.C. Circuit

held that DoD's closing of certain military bases and reassigning of troops was not subject to

judicial review under § 701(a)(2).  905 F.2d 400, 405-06 (D.C. Cir. 1990).  The court reasoned

that, although DoD's statutory authority to close bases contained a set of criteria for making

those decisions, judicial review of the closings and reassignments "would necessarily involve

second-guessing the Secretary's assessment of the nation's military force structure and the

military value of the bases within that structure."  *Id.* at 406 (concluding that "the federal

judiciary is ill-equipped to conduct reviews of the nation's military policy" and that "[s]uch

decisions are better left to those more expert in issues of defense").  Other military decisions

courts have determined to be non-reviewable include the transfer of registry of maritime vessels,

*see District No. 1, Pac. Coast Dist., Maritime Engineers' Beneficial Ass'n v. Maritime Admin.*,

215 F.3d 37, 42 (D.C. Cir. 2000) ("Were we to decide whether the [defendant's decision to

transfer] is reasonable, we would necessarily be 'second guessing' not only the Executive's determinations regarding the military value of the eight vessels but also its judgments on questions of foreign policy and national interest." (citation omitted)); and the reassignment, downgrading, and termination of civil servants in reductions in force, *see Am. Fed'n of Gov't Empls., Local 1872 v. Stetson*, No. 77-2146, 1979 WL 1919, at *5 (D.D.C. July 24, 1979) (holding that such a decisions are "managerial, and committed to agency discretion"); *see also Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953) ("The military constitutes a specialized community governed by a separate discipline from that of the civilian.  Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.").[4]

The honorable-service certifications at issue in this case likewise concern the military's judgment about how best to oversee its personnel and evaluate a soldier's fitness.  Such decisions are especially sensitive in light of the results of DoD's internal reviews of the MAVNI program, which revealed the existence of counter-intelligence, security, and insider-threat concerns within the program, including recruits engaging in criminal activity before being accessed to active-duty status as well as other counter-intelligence and security concerns.  *See* First Miller Decl. ¶¶ 15-17.  Notably, Plaintiffs have not objected to DoD's assertion that it needs to wait for the results of a MAVNI soldier's background investigation and security screening before making an

---

[4] Plaintiffs' reliance on an unpublished decision from the District Court in Maryland is misplaced.  That case concerns a discrete decision by the Department of the Navy to rescind and nullify a N-426 previously issued to the plaintiff.  *See Cody v. Caterrisano*, CV No. 09-MJG-00687 (D. Md.), at 10-11, ECF No. 19-1.  The court rejected Navy's rescission of the N-426 based on its finding that it was done "for the purposes of improving the defense litigating position."  *Id.* at 11.  Plaintiffs in this case, of course, are not challenging the rescission of any previously issued N-426s, and DoD's decision on Plaintiffs' request for N-426 certification occurred well prior to this inception of this lawsuit.  Moreover, the bulk of the court's opinion in that case involved an analysis of whether the plaintiff had active-duty status, *id.* at 11-14, not how and when DoD must decide whether someone in the Selected Reserve has served honorably.

honorable-service determination.  Given the military's expertise in this area, DoD is uniquely situated to make the qualitative determination about which MAVNI recruits have served honorably and when such certifications should be made.

    2.    <u>Plaintiffs cannot succeed on their § 706(1) claim because § 1440(a) does not impose a clear legal obligation to certify members of the Selected Reserve as having served honorably prior to their attendance in basic military training or other active-duty status</u>

Even if the Court concludes that honorable-service certifications are not committed to agency discretion by law, Defendants are entitled to judgment on Plaintiffs' claim under § 706(1) because § 1440(a) imposes no clear legal obligation on DoD.[5]  Plaintiffs' sole contention in support of this claim is that any policy requiring active-duty status constitutes an unlawful withholding.  *See* Pls.' Reply at 14 ("The only question presented to the Court is whether such 'withholding' [until a soldier has active-duty service] is 'unlawful.'").  But Plaintiffs are not subject to any such requirement under the new policy, so the concerns animating their § 706(1) claim have been addressed.

Even if Plaintiffs persist with their § 706(1) claim, they cannot succeed on this claim. Under § 706(1), courts have the authority to "compel agency action unlawfully withheld or unreasonably delayed."  As the Supreme Court explained in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), "the only agency action that can be compelled under the APA is action legally required," 542 U.S. 55, 63 (2004), that is, "when the agency has failed to act in response to a clear legal duty," *Citizens for Responsibility and Ethics in Washington v. SEC*, 916 F. Supp. 2d 141, 148 (D.D.C. 2013) (citing *SUWA*, 542 U.S. at 63–64).  The D.C. Circuit has further

---

[5] Defendants' original response to Plaintiffs' motion explained why, even if DoD had a clear obligation to certify their N-426s, any delay experienced by Plaintiffs was not unreasonable.  *See* ECF No. 17 at 16-19.  Plaintiffs have since clarified that they are not bringing an unreasonable delay claim in this case.  *See* Pls.' Reply at 15.

explained that "[w]hen agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates." *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984).  But such injunctive relief is only appropriate "if the court's study of the statute and relevant legislative materials cause[s] it to conclude that the defendant official ha[s] failed to discharge a duty that Congress intended him to perform." *Covelo Indian Cmty. v. Watt*, 551 F. Supp. 366, 381 (D.D.C. 1982), *aff'd as modified* (Dec. 21, 1982), *vacated as moot* (Feb.1, 1983).

Requiring a "clear statutory duty" before the court may compel agency action is akin to  the inquiry at *Chevron* step one, where, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837, 842–43 (1984).  Thus, as in the context of *Chevron*, in inquiring whether Congress's intent is clear, this Court should "examine the meaning of certain words or phrases in context and also exhaust the traditional tools of statutory construction, including examining the statute's legislative history to shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (citation omitted).  Critically, "Section 706[(1)] does not provide a court with a license to substitute its discretion for that of an agency merely because the agency is charged with having unreasonably withheld action." *Am. Ass'n of Retired Pers. v. EEOC*, 823 F.2d 600, 605 (D.C. Cir. 1987). Rather, in order for a court to order an agency to act, there must exist a "ministerial or non-discretionary act" that the agency has failed to take.  *SUWA*, 542 U.S. at 64-65.

No such ministerial, non-discretionary obligation exists in this case.  Section 1440(a) states that DoD "shall determine" whether foreign persons or non-citizen nationals "have served honorably," but it contains no instruction as to when such a determination must be made.  Given the absence of any Congressional guidance as to the pace of making honorable-service determinations, DoD is not obligated to act within any particular amount of time.  *See Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014) ("Because no guidelines compel USCIS to adjudicate adjustment applications by or within a certain time, plaintiff plainly cannot assert that USCIS has failed to adjudicate her application [for adjustment of status to that of a lawful permanent resident] within a time period in which it was required to do so." (citing *Orlov v. Howard*, 523 F. Supp. 2d 30, 34 (D.D.C. 2007)); *Orlov*, 523 F. Supp. 2d at 34 ("If Congress intended to constrain the USCIS to adjudicate an application within a specific amount of time, this Court believes it would have provided a time limitation [in the statutory language].").  Further demonstrating the lack of any required timeline, § 1440(a) permits DoD to certify honorable service even *after* a soldier has separated from military service.  *See* 8 U.S.C. § 1440(a) (directing DoD to determine "whether separation from such service was under honorable conditions").

Nor is there any compulsory language in the statute that pertains to persons in the Selected Reserve of the Ready Reserve, as Plaintiffs seem to suggest.  Although the first sentence of § 1440(a) states that any "alien or a noncitizen national of the United States" who has served honorably in the Selected Reserve or in active-duty status may be naturalized, the second sentence—which specifically addresses the role of DoD—provides that the relevant executive branch shall determine whether such a person "ha[s] served honorably in an *active-duty status*" and makes no mention of members of the Selected Reserve.  Section 1440(b)(3) also

refers to DoD's role in the naturalization process, and it similarly is silent with respect to

Selected Reserve service.  *See* 8 U.S.C. § 1440(b)(3) ("[S]ervice in the military, air or naval

forces of the United States shall be proved by a duly authenticated certification from the

executive department under which the applicant served or is serving, which shall state whether

the applicant served honorably in an active-duty status . . . .").[6]  Thus, to the extent § 1440 can be

read as imposing a ministerial obligation on DoD—which it does not—that obligation is imposed

with respect to soldiers in active-duty status only.  The statute contains no clear directive to DoD

to honorably certify members of the Selected Reserve or to certify them prior to the completion

of their background investigations and security screening.[7]

 The legislative history of § 1440 likewise confirms the absence of mandamus-like duty

imposed on DoD.  As Plaintiffs correctly note, the first sentence of § 1440(a) was amended in

2004 to add the reference to members of the Selected Reserve.  Senator Edward Kennedy, who

co-sponsored the bill, explained in debate on the bill that the purpose of this language was to

---

[6] Congress's use of the word "shall" in both § 1440(a) and § 1440(b)(3) does not establish the existence of a mandatory, non-discretionary duty to act by DoD.  To the contrary, the word "shall" can fairly be read as differentiating DoD's role in the naturalization process from that of DHS by making clear that DoD, not DHS, "shall" be the part of the Executive Branch tasked with making honorable-service certifications.

[7] Plaintiffs cite to a statement in the Government's brief in *Nio*, claiming that it constitutes an admission that DoD has a ministerial obligation to certify honorable service.  *See* Pls.' Mot. at 14 (quoting *Nio*, Defs.' Mem. of Law in Opp'n. to Pls.' Mot. for Prelim. Inj. at 36, ECF No. 19 ("[T]he fact that DoD serves a ministerial role in determining if an individual is serving honorably does not prevent from USCIS using its own judgement to determine that it needs to specific, additional information" in processing naturalization applications).  This statement came in the context of discussing DHS's decision to wait until the completion of background checks before adjudicating a naturalization application, *see Nio*, Defs.' Mem. of Law in Opp. to Mot. for Prelim. Inj. at 32-37, and thus cannot be read to constitute any sort of admission on behalf of DoD for purposes of § 706(1).  At most, the passage quoted by Plaintiffs stands for the proposition that DoD retains the discretion to determine the criteria for making honorable-service certifications and control over the timing of the process, but that once such a determination has been made, DoD has an obligation to share its determination with DHS by completing the relevant section of a N-426 form.

"provide[] expedited naturalization for members of the Selected Reserves [sic] during military conflicts."  S. 7280, 108th Cong., 1st Sess. (June 4, 2003).  At no point during the debate does any member of the Senate attempt to define for DoD what "honorable service" consists of or to suggest that DoD should make its certifications by a particular point in time.  The legislative history is thus silent regarding any ministerial duty being imposed on DoD.

      3.      <u>Because DoD's current honorable-service certification policy is not contrary to law, Plaintiffs are not likely to succeed on the merits of their § 706(2) claim</u>

In addition to their claim under § 706(1), Plaintiffs also assert a claim under § 706(2), claiming that DoD's honorable-service certification policy is contrary to law.  *See* Compl. ¶ 29; Pls.' Mot. at 15.  As with their other claims, Plaintiffs' § 706(2) claim challenges only a requirement that a soldier have active-duty status in order to receive an honorable-service certification.  *See* Pls.' Reply at 17-18.  But no such requirement applies to Plaintiffs under the new policy, so the foundation for this claim no longer exists.  Furthermore, any § 706(2) challenge Plaintiffs might bring to Section II of the new policy also must fail, for the reasons discussed below.

      a.      *DoD's current honorable-service certification policy is not contrary to law*

DoD's interim policy of requiring MAVNI soldiers who enlisted prior to October 13, 2017 to have completed background investigations and security screening in order to be eligible for honorable-service certification is a reasonable construction of its authority under § 1440.  When reviewing an agency's interpretation of its authority under a particular statute, courts apply the familiar two-part test from *Chevron*.  At the first step, "applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress.'" *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842-43). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id*. (quoting *Chevron*, 467 U.S. at 843).

DoD should prevail at the first step of the *Chevron* test for reasons similar to those discussed above. Stated simply, § 1440 imposes no obligation to certify a non-citizen's service as honorable within a specific time period, nor does the statute purport to give DoD any criteria about what makes service "honorable." The statute makes two references to DoD's role in the naturalization process, and, in both places, Congress explicitly referred only to certifications for active-duty status. *See* 8 U.S.C. § 1440(a) ("The executive department under which such person served shall determine whether persons have served honorably in an active-duty status . . . ."); § 1440(b)(3) ("[S]ervice in the military, air or naval forces of the United States shall be proved by a duly authenticated certification from the executive department under which the applicant served or is serving, which shall state whether the applicant served honorably in an active-duty status . . . ."). "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion," *City of Arlington*, 569 U.S. at 296, and here, Congress left both the timing of and criteria used for honorable-service certifications within the absolute discretion of DoD, electing not to provide DoD either criteria by which service should be judged as "honorable" or a deadline for making certifications. DoD's requirement that MAVNI soldiers have completed background checks and security screening in order to receive honorable-service certification is accordingly consistent with the express language of § 1440.

To the extent the Court concludes that the language of § 1440 is ambiguous, however, relief under § 706(2) would still not be warranted because DoD's current honorable-service certification policy is a reasoned and permissible construction of the statute.  Although the first sentence of § 1440(a) states that persons who have served honorably in the Selected Reserve may be naturalized, the two specific references to DoD's role in the certification process refer only to "active-duty status," as noted above.  Given that DoD was given discretion to determine what constitutes "honorable" service and control over the timing of the process, it reasonably concluded that such determinations should be made following completion of background investigations and security screening.  This policy change followed a period of internal review of the MAVNI program, during which DoD became aware of security concerns about the program, including the fact that some MAVNI enlistees may have engaged in pre-accession criminal activity and that some enlistees pose a significant counter-intelligence security threat.  *See* First Miller Decl. ¶ 15.  In response to this review, DoD instituted enhanced security screening measures for MAVNI enlistees, including the completion of a Tier 3 or Tier 5 background check, a NIAC, a counter-intelligence focused security review, and an issue-oriented interview, if necessary, before making a suitability-for-service determination.  *Id*. ¶¶ 14-15.  Even with these heightened reviews, DoD was concerned that MAVNI recruits were being naturalized as citizens prior to the completion of their background checks and security reviews.  *Id*. ¶ 18.  DoD has decided that, at a minimum, its decision whether to certify a MAVNI recruit as having served honorably should be made following completion of these security reviews. *See* Oct. 13, 2017 Kurta Mem. at 2-3.  Notably, the alignment of the honorable-service certification with basic military training is consistent with DoD's guidance to MAVNI recruits to wait until they attend basic military training to apply for naturalization.  *See* Second Miller Decl. at 6; *see also* 2016

MAVNI Information Paper at 3.  Significantly, Plaintiffs have made no objection to DoD waiting until it has the results of a soldier's background investigation and security screening before making an honorable-service determination.  *See generally* Pls.' Reply.

Plaintiffs rely heavily on the fact that DHS issued a regulation mirroring the "Selected Reserve of the Ready Reserve or in an active duty status" language from the first sentence of § 1440(a), but this regulation does not make DoD's present policy contrary to law.  DHS's regulation implementing § 1440(a) is, by its own terms, limited to the criteria for the naturalization eligibility of alien and non-citizen soldiers.  *See* 8 C.F.R. § 329.2 (listing the criteria for a soldier "[t]o be eligible for naturalization under [8 U.S.C. § 1440(a)]," including that the applicant has served honorably as a member of the Select Reserve of the Ready Reserve or in an active-duty status).  The regulation does not purport to define for DoD what constitutes "honorable" service, nor does it state that a soldier must receive honorable-service certification by a certain point in time.  Rather, the regulation merely states that, for purposes of DHS's adjudication of naturalization applications, certification of honorable service in either the Select Reserve or in active-duty status is sufficient.  DoD still retains the discretion to determine what constitutes "honorable" service and when such a determination should be made.  Plaintiffs' contention that DoD's policy is discordant with the DHS regulation is simply incorrect.[8]

b. *The relief Plaintiffs seek is not available under the APA*

---

[8] Even if there is a direct conflict between DHS's regulation and DoD's current policy, that still would not mean that Plaintiffs should prevail on their § 706(2) claim here.  *See Am. Bar Ass'n v. FTC*, 671 F. Supp. 2d 64, 81 (D.D.C. 2009) ("[I]n the end, as instructive as it might be, one agency's interpretation of a congressional statute is not controlling on another agency's interpretation of that same statute." (citation omitted)) *vacated and remanded on other grounds*, 636 F.3d 641 (D.C. Cir. 2011); *see also Old Colony R. Co. v. Comm'r of Internal Revenue*, 284 U.S. 552, 562 (1932) (holding that the rules of accounting enforced by the Interstate Commerce Commission are not binding upon the IRS).

Even if the Court were to conclude that Plaintiffs should prevail on their claim under § 706(2), Plaintiffs would still not be entitled to the relief that they seek, which is incompatible with well-established principles of administrative law.  Unlike where it hears a "garden variety civil suit," a district court's role in reviewing a final agency action is different because the court "does not perform its normal role, but instead sits as an appellate tribunal."  *Palisades Gen. Hosp. Inc. v. Leaveitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (citation omitted).  Accordingly, "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with correct legal standards." *Id.* (citation omitted); *see also N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").  A district court lacks authority to order specific relief where it finds a § 706(2) violation. *Palisades Gen. Hosp.*, 426 F.3d at 403.

Much of Plaintiffs' requested relief in this case exceeds the scope of a court's authority under the APA.  Rather than simply asking that the Court invalidate DoD's current policy, Plaintiffs request that the Court enter various types of specific relief, including that the Court require DoD to complete N-426 forms for members of the Selected Reserve, *see* Pls.' Mot. at 2 (asking the Court to "preliminarily restrain Defendants from refusing to sign and issue Form N-426s to members of the Selected Reserve"); issue criteria for DoD's honorable-service determinations, *see id.* ("restrain Defendants from refusing to certify honorable service to members of the Selected Reserve, except as related to the conduct of an individual Plaintiff or

27

Class member as reflected in that soldier's service record and based on sufficient grounds generally applicable to all members of the military"); preclude DoD from discharging or separating non-naturalized MAVNI soldiers except on terms dictated by the Plaintiffs, *see id.* ("restrain Defendants from discharging or separating Plaintiffs or members of the Class pending completion of their N-426 Forms and processing of their naturalization applications, except as related to the conduct of an individual soldier and based on sufficient grounds generally applicable to members of the military for discharge from service"); and micromanage DoD's MAVNI program, *see id.* ("compel Defendants to provide weekly reports to the Court, Plaintiffs, and the Class" regarding the status of individual honorable service certifications and any plans to discharge certain individuals).[9]

Not only does Plaintiffs' requested relief exceed the power conferred on a court by the APA, but it furthermore fails to account for the inherently individualized, context-specific nature of most military personnel decisions. Plaintiffs are effectively asking this Court to craft a one-sized-fits-all standard for both the honorable-service certifications and discharge of MAVNI soldiers who have not received honorable-service certifications. *See id.* Yet both of those decisions require assessments that are unique and specific to particular individuals. Handcuffing DoD by dictating the terms by which it certifies a soldier as having served honorably and requiring those certifications to occur by a particular point in time would intrude on area where courts have historically given the military the most deference. *See, e.g.*, *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979) ("[G]iven the special circumstances in which the military must

---

[9] Plaintiffs further request that the Court enter an order "plac[ing] and maintain[ing] the parties in the pre-dispute status quo," Pls.' Mot. at 2, but it is not clear what form this relief would take. Plaintiffs had not received honorable-service certifications prior to the initiation of this lawsuit, so the pre-dispute status quo has not changed. In any event, under Section II of the new policy, Plaintiffs' position vis-à-vis DoD has returned to the status quo, as interpreted by Plaintiffs. *See* Pls.' Reply 25 n.14.

operate, the courts are ill-equipped to resolve controversies arising from the use of discretionary powers specifically designed to provide military authorities with the freedom and flexibility needed to establish and maintain a well-trained and well-disciplined armed force.").  The Court cannot, and should not, award Plaintiffs this type of relief.

       4.     <u>Plaintiffs cannot state a claim for mandamus relief</u>

      For largely the same reasons discussed above, Plaintiff also cannot invoke the mandamus statute as a basis for their claims here.  Many courts have treated the standards for mandamus and relief under 5 U.S.C. § 706(1) as indistinguishable.  *See, e.g., Covelo Indian Cmty.*, 551 F. Supp. at 381 ("Mandatory injunctive relief under § 706(1) or 28 U.S.C. § 1361 is appropriate if the court's study of the statute and relevant legislative materials cause[s] it to conclude that the defendant official ha[s] failed to discharge a duty that Congress intended him to perform." (citation omitted)).  To the extent the mandamus action is distinct, the requirements necessary for the issuance of a writ of mandamus are even more onerous than those under the APA.  As described by the D.C. Circuit:

> The remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances. Mandamus is available only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff.

*Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (citations omitted).  Even if a plaintiff can carry its burden of satisfying these three elements, "whether mandamus relief should issue is discretionary."  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc).

      Here, Plaintiff has met none of those elements.  First, for the reasons discussed above in Section B, Plaintiff does not have a clear right to relief, nor does DoD have a "clear duty to act." The statutory text at issue makes it clear that DoD has no ministerial, non-discretionary

obligation to certify members of the Selected Reserve as having served honorably or to do so within a particular amount of time.

Moreover, Plaintiffs cannot establish that they have no other available remedy.  Indeed, Plaintiffs' mandamus claim is entirely duplicative of their § 706(1) claim under the APA. *Compare* Compl. ¶¶ 94-96 (§ 706(1) claim), *with id*. ¶¶ 100-05 (request for mandamus).  The two counts seek virtually identical relief, and are premised on the same underlying legal theories. *Id.*  Thus, whatever judicial review Plaintiffs are entitled to here, there is no question that Plaintiffs have the ability to seek that review through the APA.  When a plaintiff has alternative means of obtaining its desired relief, then by definition there are no extraordinary circumstances warranting the drastic remedy of mandamus.  *See Kerr v. U.S. Dist. Court for N. Dist. Cal.*, 426 U.S. 394, 402-03 (1976) ("As a means of implementing the rule that the writ [of mandamus] will issue only in extraordinary circumstances, we have set forth various conditions for its issuance. Among these are that the party seeking issuance of the writ have no other adequate means to attain the relief he desires[.]"); *see also Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) ("The availability of a remedy under the APA technically precludes [the plaintiff's] alternative request for a writ of mandamus[.]").  Thus, any claims under the mandamus statute are meritless.

## II.   PLAINTIFFS HAVE NOT ESTABLISHED THE EXISTENCE OF IRREPARABLE HARM

Plaintiffs' request for a preliminary injunction should be denied for the additional reason that they have not established that they will be irreparably harmed in the absence of an injunction.  Their inability to do so, in and of itself, constitutes a sufficient basis for denying their preliminary injunction motion.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (stating that the "failure to show any irreparable harm is . . . grounds

for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief").

The D.C. Circuit "has set a high standard for irreparable injury," *id*. at 297, and the alleged injury forming the basis for the request for relief "must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curium). Furthermore, the injury must be "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation omitted) (emphasis in original). Plaintiffs must also provide proof of their claimed harm; conjecture and speculation do not suffice. *See id.* ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future."); *Jones v. D.C.*, 177 F. Supp. 3d 542, 548 (D.D.C. 2016) ("Conjecture and 'vague and unsupported' assertions of harm are not sufficient." (quoting *Brodie v. HHS*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010)).

In this case, Plaintiffs cannot establish that there is a clear and present need for emergency relief. First and foremost, under the new policy, Plaintiffs are not subject to any active-duty service requirement, a requirement that is the gravamen of their complaint in this case. Plaintiffs cannot be said to be suffering any irreparable harm where their claims in this case are now moot.

Nor do Plaintiffs face any other threat of irreparable harm. All three Plaintiffs in this case are currently members of the Selected Reserve of the Army Reserve Delayed Training Program. *See* Glanz Decl. ¶ 4. By statute, the Army must prepare all such members to deploy in combat within two years of their enlistment; however, due to the enhanced security screening

measures and the need to complete this screening prior to a soldier attending initial entry

training, it has not been possible to train MAVNI soldiers like Plaintiffs as soon as they enlist.

*Id*. ¶ 3.  As such, the Secretary of the Army approved an extension of this time period so that

MAVNI recruits in the Selected Reserve now have three years to be placed into initial entry

training.  *Id*.  The Plaintiffs in this case enlisted in December 2015 (Kirwa), February 2016

(Meenhallimath), and June 2016 (Viswanathan).  *Id*. ¶ 4.  Accordingly, Plaintiffs have until

December 2018, February 2019, and June 2019 to enter initial military training.  *Id*. ¶ 5.  The

new policy, moreover, does nothing to alter the date by which Plaintiffs must access into initial

entry training.

Given the fact that Plaintiffs are able to remain in DTP for an additional extended period

of time, the circumstances of this case stand in stark contrast to what the Court examined in *Nio*.

There, the Court highlighted the fact that four of the plaintiffs—who, unlike the Plaintiffs here,

had their N-426s certified by DoD and were waiting for DHS to adjudicate their naturalization

applications—had lost their lawful immigration status during the delay in processing their

applications and had no assurances that they would not be subject to removal proceedings.  *See*

*Nio*, 2017 WL 3917006, at *9.  The *Nio* plaintiffs, moreover, had received honorable-service

certification from DoD and were expecting that their naturalization applications would be

processed "quickly and without [] extensive delay."  *Id*.  Here, by contrast, Plaintiffs are able to

remain in DTP for more than one year, and once their enhanced security screening is completed

and absent any unforeseen circumstances, they will meet all of the criteria under the new policy

to receive an honorable-service determination from DoD.  Plaintiffs have not provided any

evidence of loss of immigration status, nor can they share the same alleged expectation of an

expedited naturalization process as the *Nio* plaintiffs because they lack certified N-426s.[10]  The

purported harm to Plaintiffs in this case is thus markedly different than the harm described by the

Court in *Nio*.

Plaintiffs' motion and supporting documents likewise make plain that they face no

irreparable harm in this case.  Many of Plaintiffs' contentions about irreparable harm consist of

the type of speculation and generalized assertions that courts have held to be an insufficient basis

for issuing a preliminary injunction.  Plaintiff Meenhallimath, for instance, expresses general

concern that his lack of an honorable-service certification "will negatively affect [his]

employment in the United States," yet he offers no details about any purportedly negative

repercussions.  *See* Decl. of Santhosh Meenhallimath ¶ 14, ECF No. 11-22.  Similarly, Plaintiff

Ashok Viswanathan complains that he is "unable to plan for a future in the United States, which

has been very stressful" and that he had hoped to purchase a home in Minnesota but has held off

due to the uncertainty.  *See* Decl. of Ashok Viswanathan ¶¶ 14-15, ECF No. 11-23; *see also*

Decl. of Mahlon Kirwa ¶ 16, ECF No. 11-21 ("I am concerned that my immigration status and

even perhaps my ability to stay in the United States is in jeopardy.").  Such conjecture and

guesswork falls well short of demonstrating an imminent injury that demonstrates a "clear and

present" need for relief to prevent immediate harm.  *See Jones*, 177 F. Supp. 3d at 545.

Plaintiffs also contend that DoD's honorable-certification policy deprives them of a

"lawful presence" status that would accompany a pending naturalization application, *see* Kirwa

Decl. ¶ 17, Meenhallimath Decl. ¶ 18, Viswanathan Decl. ¶ 17, but Plaintiffs' concerns in this

regard are misguided.  As the Government has made clear in the *Nio* litigation, as a general

matter, ICE does not initiate removal proceedings against MAVNI recruits so long as they can

---

[10] It is possible that some or all of the plaintiffs in *Nio* will have their N-426s decertified pursuant
to the new policy. *See* Oct. 13 Kurta Mem. at 4.

demonstrate active participation in the MAVNI program and have a pending naturalization application with USCIS.  *Nio*, Decl. of Nathalie Asher ¶ 5, ECF No. 31-1.  That being said, *any* alien without legal immigration status in the United States is subject to removal and may be placed in removal proceedings for failure to maintain status or for any other violation of immigration laws that would make the person removable.  *Id*.  Participation in DTP, furthermore, does not confer legal immigration status.  *Id*. ¶ 6.  In other words, having a pending naturalization application with USCIS does not bestow a valid immigration status on a MAVNI recruit; instead, ICE has merely indicated that its current practice is not to initiate removal proceedings against such individuals.  The honorable-service certification policy is accordingly not depriving Plaintiffs of any special immigration protection because no such special protection exists.

Nor can Plaintiffs satisfy the irreparable harm showing based on their contentions about interruptions in their plans for the future, including travel plans.  DoD's MAVNI Information Paper makes clear that "[w]hen you enlist in the Army, there is always a chance you may be discharged" and that "[i]f you are discharged from the Army before you become a citizen, you may no longer have a valid immigration status."  2016 MAVNI Information Paper at 3 (further encouraging MAVNI enlistees to "consider this risk before signing your enlistment contract").[11] The Paper also instructs MAVNI recruits that they "must maintain a valid immigration status until you ship to BCT" because, if they do not, they "run the risk of being picked up by Immigration and Customs Enforcement."  *Id*. at 8.  Plaintiffs' complaints about not being able to travel are also without merit.  The Information Paper does not preclude MAVNI soldiers from traveling internationally but does note that MAVNI recruits embark on such travel at their own

---

[11] All three Plaintiffs signed a prior version of the MAVNI Information Paper when they enlisted that has similar language to that of the 2016 Information Paper.  *See* Ex. 4.

risk because DoD cannot assist the recruits with obtaining a visa to return to the country.  *Id*. at

5.  Plaintiffs were thus put on notice of the very risks of joining the MAVNI program that they

now claim are causing them harm, and they accepted these risks when they enlisted.

In addition, Plaintiffs' concerns about currently not being able to join any certified class

in *Nio* is irrelevant to the irreparable harm analysis.  The fact that the class in *Nio* is limited to

MAVNI soldiers who have already received honorable-service certification on their N-426s is

the result of a litigation decision by Plaintiffs' counsel and was not something compelled either

by Court order or by law.  *See Nio* Tr. of 8/23/17 Status Conf. Hr'g. Continued Oral Arg. On

Prelim. Inj. Mot. at 56:12-14, ECF No. 37 ("We're not trying to include anyone who doesn't

receive an N-426, we're just trying to include people who get the N-426 . . . . "); *id.* at 56:20-22

("The intention is to define the class as individuals who have an N-426 and have filed for

naturalization.").  Moreover, briefing of Plaintiffs' motion for class certification in *Nio* was

completed recently on September 22, 2017, *see Nio*, ECF No. 52, and the Court has not yet ruled

on that motion.  Plaintiffs cannot be irreparably harmed by their purported inability to join a

class that is not yet (and may never be) in existence.

The October 13 policy does nothing to change this analysis.  That policy has no effect on

Plaintiffs' current status as members of the Selected Reserve of the Army Ready Reserve in

DTP, nor does it change the date by which they must attend initial entry training (December

2018, February 2019, and June 2019).  Nor does the new policy alter the terms of Plaintiffs'

enlistment contracts, change Plaintiffs' immigration status, or trigger removal proceedings

against them.  Indeed, the main effect of the new policy is to *remove* the main barrier to receipt

of an honorable-service determination about which Plaintiffs had complained:  the requirement

to have active-duty status.  If anything, Plaintiffs are now in an improved position following the

issuance of the new policy, as they are eligible to receive an honorable-service determination

once their background checks and security screening have been completed and do not need to

wait to be accessed into initial entry training.

## III.   THE BALANCE OF THE EQUITIES WEIGHS AGAINST ISSUING A PRELIMINARY INJUNCTION

Finally, Plaintiffs have not met their burden of "establish[ing] . . . that the balance of

equities tips in [their] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at

20.  Where the Federal Government is the defendant, these factors "merge" into one.  *Nken v.

Holder*, 556 U.S. 418, 435 (2009).  Any harm that Plaintiffs may suffer by having their

honorable-service certification occur at a later point in time than what they would otherwise

desire is minimal compared to the significant military interests at stake.  As the October 13

policy makes clear, DoD's honorable-service certifications are now designed to occur following

the completion of a MAVNI recruit's background investigation and suitability screening.  Given

that the "enlistment of foreign nationals in the military implicates national security concerns,"

*Nio*, 2017 WL 3917006, at *10, these screening measures are of paramount importance to ensure

that DoD is aware of any derogatory information about a particular MAVNI recruit.  Requiring

DoD to make an honorable-service determination prior to the completion of this screening would

force DoD to characterize a recruit's service without having all of the necessary information to

make that determination.

Moreover, because a MAVNI recruit's failure to pass a background check would lead to

that recruit's discharge from the military, *see* First Miller Decl. ¶ 18, the relief Plaintiffs seek

would put DoD in the untenable position of having to certify a MAVNI recruit's honorable

service to another part of the Executive Branch for purposes of that recruit becoming a U.S.

citizen when later-obtained information might reveal that the same individual must be discharged

from service.  Forcing DoD to make characterizations about what constitutes honorable service
in this manner is antithetical to the great deference courts have traditionally afforded military
decisions.  *See, e.g.*, *Solorio v. United States*, 483 U.S. 435, 448 (1987) ("[W]e have adhered to
this principle of deference in a variety of contexts where, as here, the constitutional rights of
servicemen were implicated."); *Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("[I]t is the
primary business of armies and navies to fight or be ready to fight wars should the occasion arise
[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that
business rests with Congress [] and with the President."); *Gilligan v. Morgan*, 413 U.S. 1, 10
(1973) (noting that, due to "[t]he complex subtle, and professional decisions as to the
composition, training, equipping, and control of a military force," "it is difficult to conceive of
an area of governmental activity in which the courts have less competence").  It also defies
common sense to impose a requirement that DoD certify certain MAVNI soldiers as having
served honorably prior to the military having complete information about the fitness of those
soldiers to serve.

Entering relief for Plaintiffs would also undermine the Government's ability to conduct
an orderly and efficient naturalization process.  Requiring DoD to make premature honorable-
service certifications prior to the completion of background investigations and screening—
thereby enabling the recipients of such certifications to apply for naturalization with DHS—
would almost certainly result in one of three scenarios, none of which would well serve the
public interest:  (1) the processing of naturalization applications based on incomplete information
(i.e., prior to the completion of DoD's security screening); (2) a necessary delay in the
processing of naturalization applications while DHS waits for the results of DoD's investigation
and security screening (as happened in *Nio*); or (3) the revocation of honorable-service

certifications by DoD upon the later discovery of unmitigated derogatory information about certain MAVNI soldiers.  DoD's new policy marks an effort to provide a reasonable approach and set standards for a naturalization process that has been greatly challenged by national security threats.  Enjoining this policy and thereby requiring DoD to make honorable-service certifications based on incomplete information, by contrast, would only serve to disrupt this process and undercut the public interest it is meant to serve.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.


Dated: October 16, 2017              Respectfully submitted,

                                     CHAD A. READLER
                                     Acting Assistant Attorney General

                                     ANTHONY J. COPPOLINO
                                     Deputy Branch Director
                                     Federal Programs Branch

                                     */s/ Nathan M. Swinton*
                                     NATHAN M. SWINTON
                                     Trial Attorneys
                                     U.S. Department of Justice
                                     Civil Division, Federal Programs Branch
                                     20 Massachusetts Avenue, NW
                                     Washington, DC 20530
                                     Tel: (202) 305-7667
                                     Fax: (202) 616-8470
                                     Email: Nathan.M.Swinton@usdoj.gov

                                     *Attorneys for Defendants*