# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAHLON KIRWA,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-1793(ESH)** |
| **UNITED STATES DEPARTMENT OF DEFENSE,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are three non-citizens serving in the United States Army's Selected Reserve of the Ready Reserve ("Selected Reserve") who enlisted under the United States Department of Defense's Military Accessions Vital to the National Interest ("MAVNI") program. Each wants to apply for citizenship pursuant to 8 U.S.C. § 1440, which provides an expedited path to citizenship for soldiers who serve during specified periods of military hostilities. Each, however, has been unable to apply because the military has refused to give them a signed Form N-426, which is a form that certifies an applicant's qualifying military service and must be submitted to the United States Citizenship and Immigration Services ("USCIS") in order to apply for naturalization based on military service. Plaintiffs bring this action against the United States Department of Defense ("DOD") and Secretary James Mattis, claiming that the military's refusal to issue them N-426 forms is unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

Before the Court is plaintiffs' motion for preliminary injunctive relief, brought on behalf

of themselves and similarly-situated MAVNI soldiers.  For the reasons stated herein, the Court

will provisionally certify a class and grant the motion for a preliminary injunction.


## BACKGROUND

The issues in this case overlap with a related case before this Court, *Nio v. United States*

*Department of Homeland Security*.  *See Nio v. United States Dep't of Homeland Sec.*, No. 17-cv-

0998, 2017 WL 3917006 (D.D.C. Sept. 6, 2017).  That case involves MAVNI enlistees who have

already received a completed Form N-426, but have brought similar challenges to DOD's recent

change in its N-426 policy.  In addition, the *Nio* plaintiffs are challenging the Department of

Homeland Security's ("DHS") and USCIS's decision to put their naturalization applications on

hold pending DOD's completion of the enhanced security screening ("DHS/USCIS Security

Screening Requirement") it now requires for MAVNI enlistees prior to initial entry training

("IET") or active-duty service.  The parties concede that filings in both the instant suit and *Nio*

bear on the preliminary injunction inquiry before the Court, and thus, the Court may rely on

records in both cases.

## I.      FACTUAL BACKGROUND

### A.      Military Service as a Path to Citizenship

Since at least the Civil War, special naturalization provisions have applied to non-citizens

who serve in the United States military.  *See* USCIS Policy Manual, Vol. 12, Part I, Ch. 3, § A.

Currently, the requirements for naturalization based on military service are found in Section 328

and 329 of the Immigration and Nationality Act, *as amended*, 8 U.S.C. § 1101, *et seq.*  Section

328, codified at 8 U.S.C. § 1439, applies during peacetime; Section 329, codified at 8 U.S.C.

§ 1440, applies during designated "periods of military hostilities."  For present purposes, § 1440

is the only relevant statutory provision because on July 3, 2002, President George W. Bush

signed an Executive Order declaring that a period of military hostilities had begun on September

11, 2001, and that Executive Order remains in effect as of today.  *See* Exec. Order No. 13269, 67

Fed. Reg. 45, 287 (July 3, 2002).

### 1.    Section 1440

Section 1440 applies to "[a]ny person who, while an alien or a noncitizen national of the

United States, has served honorably as a member of the Selected Reserve of the Ready Reserve

or in an active-duty status in the military, air, or naval forces of the United States" during a

designated period of military hostilities.  8 U.S.C. § 1440(a); *see also* 8 C.F.R. § 329.2(a).  Prior

to 2003, § 1440 applied only to persons who had served in an "active-duty status," but it was

amended in 2003 to insert "as a member of the Selected Reserve of the Ready Reserve or" after

"has served honorably."[1]  National Defense Authorization Act for Fiscal Year 2004, § 1702, P.L.

108-136, 117 Stat. 1392 (Nov. 24, 2003) ("NDAA").[2]  "[A]ll soldiers enlisted through the Army

Reserve Delayed Training Program (DTP) . . . are attached to a unit in the U.S. Army Reserve,"

---

[1] The "reserve components of the armed forces" are: (1) The Army National Guard of the United States; (2) The Army Reserve; (3) The Navy Reserve; (4) The Marine Corps Reserve; (5) The Air National Guard of the United States; (6) The Air Force Reserve; and (7) The Coast Guard Reserve. 10 U.S.C. § 10101.  Each reserve component has a "Ready Reserve, a Standby Reserve, and a Retired Reserve."  10 U.S.C. § 10141.  The "Ready Reserve consists of units or Reserves, or both, liable for active duty."  *Id.* § 10142.  The "Selected Reserve" are units, or Reserves, within the Ready Reserve, "trained as prescribed."  *Id.* § 10143. The prescribed training for Selected Reserve status is to "(1) participate in at least 48 scheduled drills or training periods during each year and serve on active duty for training of not less than 14 days (exclusive of travel time) during each year," *id.* § 10147(a)(1), or to "(1) assemble for drill and instruction, including indoor target practice, at least 48 times each year; and (2) participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year." *Id.* § 502.

[2] At the same time, Congress reduced the period of service required for military naturalization based on peacetime service from three years to one year.  NDAA § 1701(a), 117 Stat. at 1691.

and "[t]hey are members of the Selected Reserve of the Ready Reserve."[3] (Decl. of Alicia M. Glanz Decl., Sept. 21, 2017 ("Glanz Decl."), ¶ 2 (citing Army Regulation 601-210).)

In relevant part, § 1440 provides that persons honorably serving in the Selected Reserve or in active-duty status "may be naturalized as provided in this section if . . . at the time of enlistment . . . such person shall have been in the United States, . . . whether or not he has been lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1440(a). To apply for naturalization under § 1440 requires compliance with most of the standard requirements for naturalization, *see* 8 U.S.C. § 1427; 8 C.F.R. §§ 316.1–316.14, but the path to citizenship is eased in at least three ways: (1) service members may be naturalized "regardless of age"; (2) "no period of residence or specified period of physical presence within the United States or any State or district of the Service in the United States shall be required"; and (3) "no fee shall be charged or collected from the applicant for filing a petition for naturalization or for the issuance of a certificate of naturalization" granted under this section. 8 U.S.C. § 1440(b)(1), (2), (4); *see also* 8 C.F.R. § 329.2(e). In addition, no minimum period of military service is required. *See* 8 U.S.C. § 1440; *see also* S. Rep. No. 1268-1292, at 5 (2d Sess. 1968) ("the wartime serviceman has no minimum required").[4]

---

[3] The Army Reserve's Delayed Training Program ("DTP") "allows . . . members of the Selected Reserve to attend drill periods for pay and benefits, known as Inactive Duty for Training (IDT) during the period prior to assignment to initial military training (also known as basic training)." (2d Miller Decl. ¶ A4.) While in the DTP, enlistees are "on a delayed training status and are considered in this status until they have a valid reservation date to ship to Initial Active Duty Training (IADT) (Basic Combat Training and Advanced Individual Training)." (Glanz Decl. ¶ 2.) The Army Reserve's DTP has existed since at least 2002. *See* USAREC Regulation 601-95, Personnel Procurement: Delayed Entry and Delayed Training Programs (Aug. 15, 2002).

[4] A DOD regulation requires that "each qualifying alien shall be advised of the liberalized naturalization provisions of [8 U.S.C. 1440], *i.e.*, that the usual naturalization requirements concerning age, residence, physical presence, court jurisdiction and waiting periods are not applicable, and will be given appropriate assistance in processing his naturalization application . . . ." 32 C.F.R. § 94.4.

"The executive department under which such person served shall determine whether persons have served honorably," and such service "shall be proved by a duly authenticated certification from the executive department under which the applicant served or is serving." 8 U.S.C. § 1440(a), (b)(3); 8 C.F.R. §§ 329.1, 329.4.[5] "Citizenship granted pursuant to [§ 1440] may be revoked . . . if the person is separated from the Armed Forces under other than honorable conditions before the person has served honorably for a period or periods aggregating five years." 8 U.S.C. § 1440(c). Since October 1, 2001, USCIS has naturalized 109,321 members of the military. USCIS, Naturalization Through Military Service: Fact Sheet at 3 (June 12, 2017) ("USCIS Fact Sheet").[6]

## 2.    USCIS Form N-426

Although 8 U.S.C. § 1440 applies to persons serving in the military's Selected Reserve or in an active-duty status, the statute is part of the Immigration and Nationality Act and it is administered by DHS and USCIS. To determine if an applicant is eligible for naturalization pursuant to § 1440, USCIS requires any such applicant to submit, along with their application for naturalization (Form N-400), a Form N-426 that certifies their qualifying military service. *See* 8 C.F.R. § 329.4; USCIS Policy Manual, Vol. 12, Part I, Ch. 5, § A ("The Request for Certification of Military or Naval Service confirms whether the applicant served honorably in an active duty status or in the Selected Reserve of the Ready Reserve."). The N-426 form in effect during the relevant time period includes the following direction:

Persons who are serving or have served under specified conditions in the U.S.

---

[5] Earlier versions of military naturalization statutes required that military service "shall be proven by duly authenticated copies of records of the executive departments having custody of the records of such service." The Nationality Act of 1940, Pub. L. No. 76-853, § 324, 54 Stat. 1137, 1149–1150 (1940).

[6] Available at https://www.uscis.gov/news/fact-sheets/naturalization-through-military-service-fact-sheet.

Armed Forces are granted certain exemptions from the general requirements for naturalization. To establish eligibility, the law requires the department with custody of the service record to certify whether the service member served honorably, and whether each separation from the service was under honorable conditions. USCIS requests certification of the service member's military service.

(Pls.' Mot. for a Preliminary Injunction ("PI Mot.") Ex. 3, Sept. 19, 2017, ECF No. 11.)[7] The applicant fills out and signs the first part of the N-426, which asks for personal information; enlistment date and location; and all periods of military service, by branch, dates of service, and "type of service"—either "Active Duty" or "Selected Reserve of the Ready Reserve." (PI Mot. Ex. 3.); *see also* USCIS Policy Manual, Vol. 12, Part I, Ch. 3, § B ("Qualifying military service is honorable service in the Selected Reserve of the Ready Reserve or active duty service . . . ."). "One day of qualifying service is sufficient in establishing eligibility." USCIS Policy Manual, Vol. 12, Part I, Ch. 3, § A.

A "certifying official" must then complete the second part of the form, indicating, by checking either "Yes" or "No," "whether the requestor served honorably or is currently serving honorably for each period of military service the requestor served." (PI Mot. Ex. 3.) If the answer is "No," the certifying official is directed to provide details in the "Remarks" section, specifically to "[p]rovide any **derogatory information** in your records relating to the service member's character, loyalty to the United States, disciplinary action, convictions, other than honorable discharges, or other matters concerning his or her fitness for citizenship." (PI Mot. Ex. 3.) Once a noncitizen soldier obtains an executed N-426 and submits an application for naturalization, it is the policy of the Bureau of Immigration and Customs Enforcement ("ICE") not to initiate removal proceedings solely based on a lack of lawful status. (*Nio*, Decl. of

---

[7] The N-426 Form used during the period of time relevant to the present litigation expired on August 31, 2017. (PI Mot. Ex. 3.) The current version, which is essentially the same, expires on July 31, 2019. (PI Mot. Ex. 4.)

Nathalie R. Asher, Aug. 10, 2017, ECF No. 31-1 ("Asher Decl."), ¶ 5; Tr. of PI Hr'g at 57, Oct.

18, 2017, ECF No. 27 ("10/18/2017 Tr.") at 57–58.)  In a May 23, 2016 guidance document

from ICE, ICE reiterated its position that "submitting this [MAVNI] application provides the

enlistee continued lawful presence in the United States while the application is pending."  (PI

Mot. Ex. 14, at 2.)

Until very recently, DOD had no official guidance that applied to the execution of N-

426s.  (10/18/2017 Tr. at 16–17, 24, 45, 66.)  However, since at least 2005 and through April

2017, the United States Army Human Resources Command published a document entitled "The

Soldier's Guide to Citizenship Application," which "explains the procedures for Soldiers to

apply for citizenship," noting that "[t]he goal is to streamline and expedite the handling of their

applications."  (Pls.' Reply re PI Mot., ECF No. 22 ("PI Reply"), Ex. 7, at 4 (2017 version); *see*

*also id*. Ex. 8 (2011 version); *id*. Ex. 9 (2005 version).)  In that publication, it states:

> As a general rule, a Soldier is considered to be serving honorably unless a
> decision has been made, either by the Soldier's commander or a court martial, to
> discharge him/her under less than honorable conditions.
>
> In the rare cases where the character of a Soldier's service is questionable, ONLY
> the Soldier's commander can decide this issue, and the sole criterion for the
> decision is: If the Soldier were being discharged today, based on his/her record,
> what type of discharge would the Soldier receive? If Honorable or General or
> Under Honorable Conditions, the character of service on the N-426 will read
> "honorable".  If Under Less than Honorable Conditions, the N-426 character of
> service item will NOT read "honorable".

(PI Reply Ex. 7, at 11; *see also id*. Ex. 8, at 11; *id*. Ex. 9, at 10.)  The Army publication also

provides that the N-426 service data can be verified and the form signed by someone in a

Military Personnel Division or Military Personnel Offices.  (PI Reply Ex. 7, at 11; *see also id*.

Ex. 8, at 11; *id*. Ex. 9, at 10; PI Mot. Ex. 5 (USCIS letter dated March 31, 2017, to plaintiff

advising him that he had not properly signed his N-426, and that once he did that, he should

"[t]ake the N-426 to your personnel office, administrative unit, command, or human resources department where your service record can be verified and certified").)  The Navy has a similar publication, entitled "U.S. Navy Guide to Naturalization Applications Based upon Qualifying Military Service."  (PI Reply Ex. 12.)  It instructs applicants to "submit the partially competed Form N-426 to their local service record holder," and then instructs that the certifying official "must complete all pertinent blocks" and "<u>MUST</u> sign" the document.  (PI Reply Ex. 12 at 3–4.)  In another publication, the Navy instructs the "local service record holder" to certify the N-426 after checking existing and past service records.  (PI Reply Ex. 11.)  Similar presentations by the Army to health care professionals who enlisted in MAVNI instructed them to have their chain of command sign their N-426 "after 1 drill is completed."  (PI Mot. Ex. 7.)

The unrebutted evidence of DOD's past practice in certifying N-426s demonstrates that the honorable service determination consisted of a cursory records check to determine if the enlistee (1) was in the active duty or the Selected Reserves, (2) had valid dates of service, and (3) had no immediately apparent *past* derogatory information in his service record.  Thus, DOD's past practice was to determine whether a person had served honorably based on an examination of his service record at the time the N-426 was submitted for execution.  This conclusion was further confirmed by the information relevant to the length of time the certification process took for seven of the named *Nio* plaintiffs, each of whom had their N-426s certified within one day after they submitted the forms.  (*Nio*, PI Mot., June 28, 2017, ECF No. 17, Exs. 26–32.)

### 3.     USCIS's Naturalization at Basic Training Initiative

In August 2009, USCIS, in conjunction with the Army, adopted a "Naturalization at Basic Training Initiative" in order to provide expedited processing of naturalization applications

for non-citizen enlistees once they arrived at IET.[8]  *See* USCIS Fact Sheet at 2;[9] (*see also Nio*, Decl. of Daniel Renaud, ECF No. 19-6, July 7, 2017 ("1st Renaud Decl."), ¶ 13.)  "Under this initiative, USCIS conducts all naturalization processing including the capture of biometrics, the naturalization interview, and administration of the Oath of Allegiance on the military base." USCIS Fact Sheet at 2.  The goal, which was generally achieved, was for the naturalization process to be completed by the end of IET.  (Decl. of Stephanie P. Miller, July 7, 2017 ("1st Miller Decl."), ¶ 9; *Nio*, 1st Renaud Decl. ¶ 13.)

### B.     The MAVNI Program

#### 1.     Establishment

In 2008, pursuant to 10 U.S.C. § 504(b)(2), the Secretary of Defense authorized the creation of the MAVNI Pilot Program, which allowed non-citizens who were not lawful permanent residents to enlist in the United States military if it was determined that enlistment would be vital to the national interest because they were "health care professionals" in certain specialties or possessed "critical foreign language skills." (1st Miller Decl. ¶ 4; Secretary of Defense Memorandum dated Nov. 25, 2008 (cited in PI Mot. Ex. 6).)  The program was reauthorized several times, most recently in September 2016, when it was extended through September 30, 2017.  (*See Nio*, PI Mot. Ex. 10, ECF No. 17-10 ("9/30/2016 DOD Memorandum").)

#### 2.     Enhanced Security Screening (9/30/2016 DOD Memorandum)

Over the years of the MAVNI program, DOD increased the security screening

---

[8] IET encompasses "basic training," also referred to as "basic combat training" (BCT).  DOD considers IET to be active duty. (10/18/2017 Tr. at 28–29.)

[9] Since 2009, USCIS has expanded the initiative to the Navy, Air Force, and in 2013, to the Marine Corps, giving enlistees of all branches an equal opportunity to leave IET as U.S. citizens. USCIS Fact Sheet at 2.

requirements for MAVNI enlistees.  (1st Miller Decl. ¶¶ 12–17.)[10]  From June to September

2016, DOD engaged in a review of the MAVNI program that led it to conclude MAVNI

screening "was not being implemented adequately."  (1st Miller Decl. ¶ 15; *see also id.* ¶¶ 15–

17.)  On September 30, 2016, citing national security concerns, DOD implemented enhanced

security screening requirements for MAVNIs and required that the screening be successfully

completed before a MAVNI enlistee would get a "military suitability determination" and be

allowed to go to IET.  (9/30/2016 DOD Memorandum, attach. 1, at 3; 1st Miller Decl. ¶¶ 10, 14–

18; *Nio*, Tr. of PI Hr'g (Part I), July 19, 2017, ECF No. 34 ("*Nio*, 7/19/2017 Tr.") at 21–22.)

DOD's enhanced security screening for MAVNI enlistees included: (1) a Tier 3 or Tier 5

background investigation—Tier 5 was formerly known as a Single Scope Background

Investigation ("SSBI"); (2) a National Intelligence Agency Check ("NIAC"); (3) a counter-

intelligence focused security review ("CI Review"); and (4) an "issue-oriented interview and/or

issue-oriented polygraph, if needed to resolve any foreign influences or foreign preference

concerns."  (1st Miller Decl. ¶ 14; 9/30/2016 DOD Memorandum, attach. 1, at 3–5.)  Despite the

reference to the possibility of a Tier 3 background investigation for some MAVNIs (a much less

in-depth and time-consuming endeavor (*see* Decl. of Stephanie P. Miller, July 28, 2017 ("2d

Miller Decl."), ¶ A2), DOD's current position is that *all* MAVNIs are subjected to a Tier 5

_____

[10] In 2014, the Army Reserve published a MAVNI Information Paper which advised MAVNI
foreign language recruits that

> As a condition for participation in the MAVNI program, all MAVNI applicants will be
> subject to enhanced security screening measures which will occur while you are in the
> Army Reserve Delayed Training Program (DTP) before you ship to BCT.  You will be
> required to remain in the DTP for at least 180 days to allow for the completion of the
> security checks.  If results are not returned prior to ship date, the ship date will be
> renegotiated.

(PI Opp. Ex. 4, at 7 ("MAVNI Information Paper").)

investigation because "every MAVNI applicant inherently has derogatory information" due to the fact they are citizens of foreign governments. (10/18/2017 Tr. at 11–12.)  Currently, the estimated time for completion of the Tier 5 investigation is over 400 days, and that is just one part of the enhanced security screening.  (10/18/2017 Tr. at 13; 2d Miller Decl. ¶ A2.)

If the investigation reveals unmitigable derogatory information—such as "undue foreign influence"—the military suitability determination will be unfavorable and DOD can discharge the MAVNI enlistee under "other than honorable conditions," such as an "uncharacterized" discharge.  (*Nio*, Tr. of PI Hr'g (Part II), Aug. 23, 2017, ECF No. 37 ("*Nio*, 8/23/2017 Tr.") at 37–38.); PI Mot. Ex. 9 ("May 2017 Action Memo"); 1st Miller Decl. ¶ 14 (negative outcome "could result in an applicant's administrative discharge from the Armed Forces under any administrative characterization of service, including 'other than honorable' conditions"); 2d Miller Decl. ¶ A5; *Nio*, Defs.' Resp. to the Court's Aug. 24, 2017 Order Exs. A & B, Aug. 30, 2017, ECF No. 39.)  An uncharacterized discharge also means that the individual would no longer be eligible to become a naturalized citizen.  (*Nio*, 8/23/2017 Tr. at 24–25.)

### C. MAVNI Program in the Army Reserve

The Army Reserve began implementing the MAVNI Program in 2009 due to "critical shortages of high-quality, multi-lingual, ethnically and culturally diverse recruits, and healthcare professionals . . . ."  (PI Mot. Ex. 6 (Army Memorandum dated 3/24/2009 re "AR [MAVNI] Pilot Program Implementation Guidance").)[11]  This litigation concerns MAVNIs who enlisted in the Army Reserve's Selected Reserve of the Ready Reserve and who are in the DTP.

---

[11] When it was first adopted, only health care professionals were allowed to enlist in the Army Reserve; all applicants with foreign language skills had to enlist in the regular Army.  (PI Mot. Ex. 6, at 2.)

### 1. Path to Citizenship

MAVNIs in the Army Reserve's Selected Reserve are eligible for naturalization under § 1440. Indeed, the standard enlistment contract for a MAVNI enlistee in the Army Reserve's Selected Reserve includes an addendum, signed by the enlistee and a DOD official, which states: "[i]n exchange for being permitted to enlist in the Army, I agree to apply for U.S. citizenship as soon as the Army has certified my honorable service." (*See, e.g.*, Defs.' Notice of Supp. Filing Exs. 1–3, attach. 1, at 3, Oct. 19, 2017, ECF No. 25-1 (copy of plaintiff Kirwa's enlistment contract).) But, their path to citizenship has been dramatically prolonged by DOD's enhanced security screening requirements.

### a. Before 9/30/2016

From the inception of the MAVNI Program until September 30, 2016, what typically happened to a MAVNI in the Army's Selected Reserve is that the enlistee would sign the enlistment contract and go to IET in approximately 180 days. (10/18/2017 Tr. at 32, 108; *see also* MAVNI Information Paper ("you will apply for citizenship during Basic Combat Training (BCT). The Army, along with USCIS has implemented expedited citizenship processing for all non-citizens at each of the Army's BCT. DO NOT MAIL YOUR CITIZENSHIP PACKET BEFORE YOU SHIP TO BCT. All documentation including the N-426 will be signed at BCT. Your recruiter or Reserve commander does not need to sign or mail anything for you.") If MAVNIs did not have certified N-426s before they entered IET, they would receive one and apply for citizenship at IET. (10/18/2017 Tr. at 22–23.) IET would be completed in ten to twelve weeks, and by the end of IET, USCIS would have adjudicated their N-400 naturalization applications, and the MAVNIs would be granted citizenship. (1st Miller Decl. ¶ 9; 1st Renaud Decl. ¶ 13.)

### b.    After 9/30/2016

After the 9/30/2016 DOD Memorandum, MAVNIs in the DTP began to experience

significant delays in being sent to IET.  (10/18/2017 Tr. at 32 (statement by DOD counsel: "I

think it's pretty clear that the process as it was originally contemplated was intended to move

more quickly than what it currently does.").)  In fact, the enhanced screenings were taking so

long that MAVNIs were starting to be discharged because they had exceeded the allowable time

of two years in the DTP.  (*See, e.g.*, *Nio*, Pls.' Supp. Reply Ex. 2, Aug. 18, 2017, ECF No. 33-2.)

On July 27, 2017, in an attempt to ameliorate this problem, the then-Acting Secretary of the

Army issued a memorandum that waived the requirement to attend IET within 24 months of

accession and extended the period to 36 months for the 2,513 soldiers then in the DTP on the

ground that the "waiver is necessary to accommodate the additional security screening."  (*Nio*,

Defs.' Notice of Supp. Documentation, ECF No. 26.)

Not having any idea how long it might take to get to IET, at least 500 MAVNIs in the

DTP sought and received signed N-426s before starting IET and submitted naturalization

applications.  (*See* 10/18/2017 Tr. at 21–22; *see also* May 2017 Action Memo at 2.)  But USCIS

has refused to process their immigration applications until DOD's enhanced security screening is

completed.  *See Nio*, 2017 WL 3917006, at *4.

However, starting sometime in the spring of 2017, the Army began to change its practice

and began to decline requests for N-426s to MAVNIs still in the DTP on the ground that they

were not serving on "active duty."  (*See, e.g.*, PI Mot. Ex. 13 (email to MAVNIs from Army

Reserve administrator stating "I have found out that we cannot certify [an N-426] unless you are

on Active Duty").)  On July 7, 2017, DOD told this Court that it was "undertaking a review of . .

. the standards for certifying approximately 400 existing N-426s" (the *Nio* plaintiffs), and that it

was "not certifying any new MAVNI N-426s" (the *Kirwa* plaintiffs) because it "viewed IET

[active duty] as a necessary precondition of an honorable service determination." (1st Miller Decl. ¶¶ 19–20; 2d Miller Decl. ¶ A4.) On August 17, 2017, the Army formerly ordered that no more N-426s were to be issued while its review was ongoing unless the person had served on "active duty." (PI Mot. Ex. 10 (Aug. 17, 2017 Department of the Army Memorandum) ("Effective immediately, I withhold authority to certify the honorable service (N-426) of Soldiers who have not yet attended Initial Entry Training.").) That left MAVNIs who were currently drilling in the DTP—approximately 2000—unable to receive an N-426 and, as a consequence, they are ineligible to apply for naturalization.

### 2. October 13, 2017 N-426 Guidance

On October 13, 2017, DOD issued its "new" and "first" "formal policy guidance" pertaining to the "certification of honorable service of members of the Selected Reserve of the Ready Reserve . . . for purposes of naturalization" under § 1440 in the form of a memorandum from the Office of the Secretary of Defense to the Secretaries of the Military Departments. (Defs.' Opp. to PI Mot., ECF No. 20 ("PI Opp.") Ex. 3 ("10/13/2017 Guidance"); 10/18/2017 Tr. at 17.) Section II of the memorandum applies to persons who enlisted prior October 13, 2017, who do not already have an N-426 (the *Kirwa* plaintiffs). It states the following:

> *Standards and Procedures Applicable to Cases in which the Date of the Member's Enlistment or Accession in either the Active or Reserve Component was Prior to the Date of this Memorandum.*
>
> The Military Department concerned may certify such a Service Member's service as honorable for purposes of supporting the member's naturalization application only if all of the following criteria are met:
>
> 1. <u>Legal and Disciplinary Matters</u>: The Service Member is not the subject of pending disciplinary action or pending adverse administrative action or proceedings, and is not the subject of a law enforcement or command investigation; **AND**
>
> 2. <u>Background Investigation and Suitability Vetting</u>: The Service member has completed applicable screening and suitability requirements as set forth in Section

I, paragraph 2 above; **AND**

3. <u>Military Training and Required Service</u>: The Service Member has served in a capacity, for a period of time, and in a manner that permits an informed determination that the member has served honorably as a member of the Selected Reserve of the Ready Reserve or member of an active component of a military or naval force of the United States, as determined by the Secretary of the Military Department concerned.

(10/13/2017 Guidance at 3.)  For MAVNIs, the "screening and suitability requirements" are set forth in Section I, paragraph 2(a) and are as follows:

a completed National Intelligence Agency Check (NIAC); Tier 3 or Tier 5 Background  Investigation, as applicable; counterintelligence-focused security review; counterintelligence  interview; and a Military Service Suitability Determination (MSSD), favorably adjudicated in accordance with Office of the Under Secretary of Defense for Personnel and Readiness (OUSD(P&R)) memorandum of September 30, 2016, Military Accessions Vital to the National Interest Pilot Program Extension, and OUSD(P&R) memorandum of October 13, 2017, Military Accessions Vital to the National Interest Pilot Program.

(10/13/2017 Guidance at 2.)[12]

## D.    Plaintiffs

Plaintiffs each enlisted in the Army Reserve's Selected Reserve of the Ready Reserve via the MAVNI Program before September 30, 2016.  (Defs.' Notice of Supp. Filing Exs. 1–3, Oct. 19, 2017, ECF No. 25 (Enlistment Ks).)  Plaintiff Kirwa enlisted on December 7, 2015 (ECF No. 25-1); plaintiff Meenhallimath enlisted on February 4, 2016 (ECF No. 25-2); and plaintiff Viswanathan enlisted on June 24, 2016 (ECF No. 25-3).  Each signed a contract in which they agreed to apply for citizenship "as soon as the Army has certified my honorable service."  (*See, e.g.*, ECF No. 25-1.)  None has completed the enhanced screening required after September 30,

---

[12] According to the 10/13/2017 Guidance, any N-426s already issued to a person who "has not completed all applicable screening and suitability requirements as set forth in Section I, paragraph 2" will be "recall[ed] and decertif[ied]."  (10/13/2017 Guidance at 4.)  This applies to the *Nio* plaintiffs.

2016, so none has been assigned a date for their IET.[13]  (Decl. of Mahlon Kirwa, Sept. 12, 2017 ("Kirwa Decl."), ¶ 6; Decl. of Santhosh Meenhallimath, Sept. 11, 2017 ("Meenhallimath Decl."), ¶ 8; Decl. of Ashok Viswanathan, Sept. 11, 2017 ("Viswanathan Decl."), ¶ 12.)  Each is currently serving in the Army Reserve DTP and has attended Reserve training since 2016, or January 2017, in the case of plaintiff Meenhallimath.  (Kirwa Decl. ¶ 5; Meenhallimath Decl. ¶ 5; Viswanathan Decl. ¶ 5; Glanz Decl. ¶ 4.)  Each has filled out and signed their part of an N-426 form, but the military has refused to complete the form.  (Kirwa Decl. ¶¶ 8–9; Meenhallimath Decl. ¶¶ 6–10; Viswanathan Decl. ¶¶ 7–11; PI Mot. Exs. 12–13.)  Initially, the refusal to execute plaintiffs' N-426 forms was attributable to DOD's hold during its N-426 policy review (*see* 1st Miller Decl. ¶¶ 19–20; PI Mot. Ex. 5; Compl. ¶ 5),[14] but the refusal is now mandated by DOD's October 13th Guidance.

Plaintiffs' inability to obtain signed N-426s means that they cannot apply for naturalization, which in turn deprives them of any benefit from ICE's policy of not instituting removal proceedings against MAVNIs in the DTP with pending naturalization applications.  In addition, DOD's action extends plaintiffs' time of living in a period of uncertain immigration status—with the concomitant limitations that places on their actions—and delays their ability to realize the benefits of citizenship.  (Kirwa Decl. ¶¶ 13–18; Meenhallimath Decl. ¶¶ 12–22; Viswanathan Decl. ¶¶ 13–21; *see also Nio*, 2017 WL 3917006, at *8–9 (finding that the hold on

---

[13] DOD has represented to the Court that their screenings are "underway" but has not provided any further information.  (10/18/2017 Tr. at 29.)

[14] On September 6, 2017, the Court issued its opinion denying the preliminary injunction in *Nio*. As to DOD, the Court refused to grant a preliminary injunction against DOD for its N-426 review because DOD had yet to revoke any of the *Nio* plaintiffs N-426s, and thus, "plaintiffs failed to establish that they w[ould] suffer any irreparable harm absent an injunction."  *Nio*, 2017 WL 3917006, at *8.  That situation has now changed and the *Nio* plaintiffs have renewed their motion for a preliminary injunction.

processing of citizenship applications was causing irreparable harm). The parties agree that there are approximately 2000 MAVNIs in the same situation as the three named *Kirwa* plaintiffs.[15] (10/18/2017 Tr. at 114.)

## II. PROCEDURAL HISTORY

Plaintiffs filed a complaint on September 1, 2017, challenging DOD's refusal to complete their N-426 Forms and certify their honorable service in the Selected Reserve as unlawfully imposing an "active-duty" requirement in violation of § 1440. 8 U.S.C. § 1440(a) (non-citizen is eligible for citizenship if he "has served honorably as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status" (emphasis added)). Plaintiffs bring substantive claims under the APA, 5 U.S.C. § 706(1) and (2) (Count III), and for mandamus, 28 U.S.C. § 1361 (Count IV).[16] (Compl. ¶¶ 82–105.)

On September 19, 2017, plaintiffs moved for a preliminary injunction on their own behalf and on behalf of similarly-situated MAVNIs. (PI Mot. at 1.) Simultaneously, they filed a motion for class certification, seeking to certify a class that would include: (1) MAVNI enlistees, (2) who have served in the Selected Reserve, and (3) who have not received a completed Form N-426. (Pls.' Mot. for Class Certification, Sept. 19, 2017, ECF No. 12.) For purposes of the preliminary injunction motion, plaintiffs seek provisional certification of the class.

During a conference call on September 25, 2017, the parties agreed that, given DOD's position that "active duty" was required for certification of honorable service on an N-426, there

---

[15] The Army "maintain[s] a roster that accounts for the assignment and duty status of all individuals enlisted under the MAVNI program." (Glanz Decl. ¶ 1.)

[16] Count I is a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, which is not a stand-alone cause of action. *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 28 (D.D.C. 2014). Count II is a claim for preliminary and permanent injunctive relief, but it does not include a distinct cause of action.

were no facts in dispute, and the Court could collapse the preliminary injunction into a hearing on the merits. (10/18/2017 Tr. at 4–5.) Accordingly, the Court directed defendants to respond only to the merits of plaintiffs' substantive claims, set a hearing on the merits for October 18, 2017, and deferred defendants' obligation to respond to the motion for class certification. (Order, Sept. 25, 2017, ECF No. 16.) On October 10, 2017, defendants filed their response and a cross-motion for summary judgment on the "active duty" issue. (*See* Defs.' Summ. J. Opp. and Cross-Motion, Oct. 10, 2017, ECF Nos. 17 & 18). Plaintiffs filed a reply on October 13, 2017. (Pls.' Summ. J. Reply, Oct. 13, 2017, ECF No. 19.)

In the meantime, the legal landscape shifted dramatically. As the Court learned from the weekly status report filed in *Nio* at the end of the day on October 13, 2017 (*see Nio*, ECF No. 58), DOD had just issued its new N-426 policies for when it would certify that a MAVNI currently in the Selected Reserve was "serving honorably;" it retreated from any express requirement of "active-duty" service, but instead imposed the numerous additional requirements set forth in its October 13th Guidance. In light of this significant and abrupt change by DOD, the case was no longer about a single legal issue. The Court therefore concluded that it could no longer collapse the preliminary injunction hearing with the hearing on the merits. (10/18/2017 Tr. at 6.) Accordingly, it ordered full briefing on the preliminary injunction motion to be completed by October 17, 2017 (*see* Minute Order, Oct. 14, 2017), so that it could hold the hearing as scheduled on October 18, 2017. In response to the Court's request at the October 18th hearing, the parties filed additional materials on October 19, 2017. (*See* Notices of Supplemental Filing, ECF Nos. 23–25.) The Court is now in a position to rule on the plaintiffs' motion for preliminary injunctive relief.

# ANALYSIS

## I.    LEGAL STANDARD

A preliminary injunction grants "intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. United States,* 325 U.S. 212, 220 (1945). It is an extraordinary remedy only "awarded upon a clear showing that the plaintiff is entitled" to it. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Where the government is the opposing party, as here, these final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Finding that plaintiffs have carried their burden as to all requirements, the Court grants plaintiffs' motion for preliminary injunctive relief.

## II.    THE MERITS

Plaintiffs bring claims under the APA and also a mandamus claim. "Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief." *McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995); s*ee also Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

### A.    Reviewability of Defendants' N-426 Policy

Defendants argue that plaintiffs' claims under the APA fail as a matter of law because DOD's decision about whether and when to certify honorable service is a decision committed to agency discretion by law or because 8 U.S.C. § 1440 otherwise precludes judicial review. The

Court disagrees.

The APA does withdraw judicial review to the extent that "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and where "an agency action is committed to agency discretion by law," *id.* § 701(a)(2). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). To determine "whether a matter has been committed solely to agency discretion, we consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (citation omitted). "[I]f the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," then it is unreviewable. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). But "there is a strong presumption that agency action is reviewable," and Congress rarely draws statutes in terms so broad that there is no meaningful standard. *Twentymile Coal Co.*, 456 F.3d at 156.

Here, the nature of the administrative action involved, as well as 8 U.S.C. § 1440's statutory and regulatory regime, provide a meaningful standard for judging DOD's N-426 certification decisions. *See Block*, 467 U.S. at 345; *Twentymile Coal Co.*, 456 F.3d at 156. The statute covers "[a]ny person who . . . has served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the military." 8 U.S.C. § 1440(a). This specifically refers to *past service*, not to DOD's possible future suitability determinations. Moreover, the statute provides for revocation should "the person [be] separated from the Armed Forces under other than honorable conditions before the person has served honorably for a period

or periods aggregating five years." *Id.* § 1440(c).  And, under the applicable regulations, DOD is to certify honorable service for Selected Reserve members based on past service.  *See* 8 C.F.R. § 329.2.  Therefore, eligibility for naturalization under the MAVNI program, means that an applicant is eligible if, *inter alia*, he or she "*[h]as served* honorably in the Armed Forces of the United States as a member of the Selected Reserve of the Ready Reserve or in an active duty status."  8 C.F.R. § 329.2(a) (emphasis added).

Until the spring of 2017, DOD's practice aligned with these dictates.  MAVNI enlistees had Form N-426s certified within days of submission.  The certifying official confirmed that the enlistee (1) was serving, or had served in the Selected Reserves or in active duty, and (2) had at least one day of qualifying service, such as attendance at a drill.  (PI Mot. Ex. 3.)  The certifying official checked "yes" or "no" to "[s]tate whether the [enlistee] served honorably or is currently serving honorably for each period of military service the requestor served."  (PI Mot. Ex. 3 at 2.)

From the unrebutted evidence the Court can conclude that DOD officials were making the certification determination based on an enlistee's service record as it existed on the day he submitted the N-426.  Again, in "The Soldier's Guide to Citizenship Application"—a document used by U.S. Army Human Resources Command to assist MAVNI enlistees in completing their naturalization applications—the Army clearly explained the meaning of "honorable":

> As a general rule, a Soldier is considered to be serving honorably unless a decision has been made, either by the Soldier's commander or a court martial, to discharge him/her under less than honorable conditions.
>
> In the rare cases where the character of a Soldier's service is questionable, ONLY the Soldier's commander can decide this issue, and the sole criterion for the decision is: If the Soldier were being discharged today, based on his/her record, what type of discharge would the Soldier receive? If Honorable or General or Under Honorable Conditions, the character of service on the N-426 will read "honorable".  If Under Less than Honorable Conditions, the N-426 character of service item will NOT read "honorable".

(PI Reply Ex. 7, at 11.)  The military has multiple regulations to judge an enlistee's honorable service, which make clear that the determination concerns an analysis of the existing military record.  For instance, Army Regulation 135-178 states:

> The characterization of service upon separation is of great significance to the Solider.  It must accurately reflect the nature of service performed. . . . The type of discharge and character of service will be determined *solely by the military recording during the current enlistment or period of service* . . . .

AR 135-178, § 2-8 "General considerations"; *see also generally* 10 U.S.C. § 12685 (defining character of a Selected Reservist's discharge); AR 135-178; AR 600-8-24; AR 635-200.

In addition to the statutory and regulatory regime and DOD's past practice, one court has reviewed how DOD has treated past service in certifying Form N-426s.  In *Cody v. Casterisano*, the court reviewed issues surrounding a petitioner-enlistee's Form N-426 where, the government purported to (1) rescind and nullify a previously-issued Form N-426 certifying honorable service for a foreign student attending the U.S. Naval Academy on the grounds of administrative error because the student's service did not truly qualify as active-duty service; and then (2) issue a new N-426 after litigation commenced stating that the student had not served honorably because the service did not qualify as active-duty service.  No. 09-cv-00687, at *1–4, 9–13 (D. Md. May 12, 2009) (unpublished).  The federal district court, finding that the petitioner-enlistee was eligible for naturalization, did not defer to the N-426 issued after the beginning of litigation, but instead it concluded that it could either (1) consider itself bound by the N-426 issued prior to litigation, or (2) consider the petitioner's factual circumstances in light of 8 U.S.C. § 1440 and relevant regulations/policy guidance to find that the plaintiff was eligible for naturalization.  *Id.* at 13–16.  The government protested that the petitioner could not have served honorably for naturalization purposes because he was not inducted into active duty, but the court noted that it could find the plaintiff to "have been 'constructively inducted' into active-duty in the Navy based on his rank

of 'midshipman' and his performing the duties of a service member." *Id.* at 13. Thus, the court independently determined the petitioner's honorable service under 8 U.S.C. § 1440(a) for naturalization purposes, even if the Navy's views differed.[17] *See also Petition of Delgado*, 57 F. Supp. 460, 461–62 (N.D. Cal. 1944) (concluding that a non-citizen Coast Guard Reservist was "serving honorably in the naval forces of the United States, [was] properly vouched for as provided by law, and [was] therefore entitled to citizenship").

Finally, because it is a ministerial duty, certification of honorable service for purposes of immigration and naturalization is unlikely to be committed to DOD's sole discretion or to be otherwise unreviewable. *See, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (referring to courts' power to compel an agency to perform a ministerial act); *Kitchen v. CSX Transp., Inc.*, 6 F.3d 727, 732 (11th Cir. 1993) ("A ministerial act is one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.") (internal quotation marks omitted). Indeed, DOD has conceded that certifying Form N-426s is merely ministerial. Counsel for DOD in *Nio* represented to the Court that "DOD serves a ministerial role in determining if an individual is serving honorably." (*Nio v. United States Dep't of Homeland Sec.*, Defs.' Resp. to Pls.' Mot. for a Prelim. Inj., June 7, 2017, ECF No. 19, at 36.)[18] Accordingly, DOD's N-426 policy is subject to review as a ministerial task not committed to agency discretion, for there are meaningful standards by which

---

[17] The government did not appeal this portion of the district court's decision, but the petitioner later appealed the district court's denial of his motion for attorney's fees. *Cody v. Caterisano*, 631 F.3d 136, 141 (4th Cir. 2011). The Fourth Circuit appeared to recognize that the district court could make a meaningful determination of petitioner's past honorable service for purposes of naturalization by analyzing applicable statutes, regulations, the factual circumstances of the case, and analogous cases. *See id.* at 142–144.

[18] DOD is arguably judicially estopped from changing its position based on a change in litigation interests. *See New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

the Court can judge agency action in this context.

**B.       Claims under APA § 706(2)**

Because plaintiffs have established that DOD's actions are reviewable, the Court will

proceed to consider whether plaintiffs can demonstrate a likelihood of success in showing that

DOD's October 13th Guidance is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2)(A).[19]

**1.       Arbitrary and Capricious**

DOD concedes that prior to its October 13th Guidance, it had no formal written guidance

on the meaning of "honorable service" for purposes of certifying N-426s.  (10/18/2017 Tr. at 16–

17, 24, 45, 66.)  In the past, some DOD officials appear to have waited until enlistees entered

IET to certify N-426s, while others certified N-426s before IET based on a Selected Reservist's

qualifying drill periods.  But in all cases, certification decisions were based on enlistees' service

as of the time they submitted an N-426.  Early in the *Nio* and *Kirwa* litigation, DOD represented

to this Court that it planned to change its N-426 policy to only permit certification for MAVNI

enlistees who were serving in an active-duty status.  On the eve of the October 18th hearing,

DOD, facing the probability that such a policy would be found to violate 8 U.S.C. § 1440(a),

changed course yet again, offering a new set of criteria that would allow it to further prolong

certification of Selected Reservists' N-426s.

DOD offered no reasoned explanation for this change, thereby suggesting that DOD's

decision was an arbitrary and capricious one.  *See, e.g.*, *Am. Wild Horse Pres. Campaign v.*

*Perdue*, No. 15-5332, 2017 WL 4385259, at *5–10 (D.C. Cir. Sept. 29, 2017); *Jicarilla Apache*

---

[19] Defendants do not contest that DOD's current N-426 policy represents final agency action.
5 U.S.C. § 704.

*Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) ("[W]e have never approved an agency's decision to completely ignore relevant precedent"). "A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign*, 2017 WL 4385259, at *5. Specifically, the D.C. Circuit has long required a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (citation omitted). "Failing to supply such analysis renders the agency's action arbitrary and capricious." *Id*.

At the October 18th hearing, defendants made the curious argument that its October 13th Guidance was not subject to judicial review and required no explanation because no formal policy existed before October 13, 2017. (10/18/2017 Tr. at 41, 45.) On the contrary, "the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). For purposes of arbitrary-and-capricious review, the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." *Id.*; *see also Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (an agency's "interpretation [of a statute], whether old or new, must be consistent with the statute"); *Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009) (explaining that courts review a policy change under the same standards as a "policy drafted on a blank slate"). Whether DOD is taking an initial agency action or changing a longstanding policy, or practice, it still must provide a reasoned explanation for its action.

In an attempt to explain the change, defendants' counsel repeated the now-familiar refrain that DOD has made the change for "national security" purposes. (10/18/2017 Tr. at 60–

61.) But DOD's Guidance is not justified by any national security concerns. As the Court recognized in *Nio*, national security issues *may* justify enhanced security screening, *see Nio*, 2017 WL 3917006, at *8, 11, 13, but N-426 certification is not related to that process. Importantly, DHS/USCIS is holding all MAVNI naturalization applications pending DOD's enhanced security screening so no MAVNI enlistee will naturalize until DOD completes the screening. And, even if a MAVNI enlistee were to slip through the cracks and obtain citizenship before screening had been completed, 8 U.S.C. § 1440(c) provides for revocation of citizenship if a person is separated under other than honorable conditions. Moreover, DOD fully controls what these enlistees do and have access to before the enhanced security screening is complete. Therefore, DOD has given no reasoned justification why certifying a form N-426 for immigration and naturalization purposes implicates our national security.

Furthermore, despite its assertions to the contrary, DOD does not control the naturalization process. (*See* PI Opp. at 38 ("DOD's new policy marks an effort to . . . set standards for a naturalization process that has been greatly challenged by national security threats.").) So DOD's unfounded attempt to control criteria for naturalization does not constitute a reasonable explanation for the October 13, 2017 policy change here.

### 2. Retroactivity

The October 13th Guidance also suffers from another potential flaw: It retroactively changes standards and procedures applicable to service members who enlisted prior to October 13, 2017. When plaintiffs enlisted, the government told them that they would receive N-426s either after just one day of qualifying service (e.g., a drill with their Selected Reserve unit), or within around 180 days when they shipped to basic training. At that point, they would be able to apply for naturalization. The process to receive an N-426 was to take approximately 180 days.

Now, DOD says that it will certify plaintiffs as having served honorably only if three new conditions are met: (1) they are not the subject of any pending disciplinary action or pending adverse administrative action or proceeding, and are not the subject of a law enforcement or command investigation; (2) they have completed applicable screening and suitability requirements; and (3) they have served in a capacity, for a period of time, that permits DOD to make "an informed determination" as to whether such service was honorable. (10/13/2017 Guidance at 3.)  These open-ended requirements will double and possibly even triple the time it takes for plaintiffs to receive N-426s, for the Tier 5 investigation, just one step in the screening process, will take over 400 days.  DOD represented to plaintiffs that they would naturalize, or at least have the protection of being in the process of pursuing *expedited* citizenship, shortly after enlistment.  Instead, the October 13th Guidance stands in stark contrast since the new projected timetable deprives the enlistees of their right to apply for an expedited path to citizenship.[20]

Admittedly, the jurisprudence relevant to retroactivity in the context of administrative law involves either rulemaking by notice and comment or adjudications, but the principles that govern these cases are also relevant to DOD's Guidance.  DOD has consummated its decisionmaking process and seeks to apply its decision in a concrete way that determines legal

---

[20] In exchange for enlisting in the military for a total of 8 years' service, DOD promised MAVNI enlistees the right to apply for an expedited path to citizenship.  The MAVNI Information Paper, signed by plaintiffs and a DOD official at the time of enlistment, provided that "The Army, along with [USCIS] has implemented *expedited* citizenship processing."  (MAVNI Information Paper at 3 (emphasis added).)  Furthermore, the legislative history to 8 U.S.C. § 1440 explains that it was meant to "provide[] expedited naturalization for members of the Selected Reserves during military conflicts."  National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, 117 Stat 1443, S7280 (2003). USCIS's Policy Guidance confirms this.  *See* USCIS Policy Manual, Vol. 12, Part I, Ch. 1, § A ("Members of the U.S. armed forces and their families are eligible for naturalization and ensure that qualified applicants are naturalized expeditiously through the military provisions.")  Therefore, DOD is depriving enlistees of their lawful right to apply for expedited citizenship.

rights and obligations of plaintiffs and similarly-situated individuals.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

"Generally, an agency may not promulgate retroactive rules without express congressional authorization."  *Arkema, Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).  At the very least, precedent explains that a retroactive agency action is impermissible if it is arbitrary and capricious.  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010).  As previously explained, plaintiffs are likely to succeed in proving that the October 13th Guidance is arbitrary and capricious.[21]

In arguing against retroactivity, defendants claim that they have only interpreted 8 U.S.C. § 1440.  However, even interpretations can be impermissibly retroactive if they "change[] the legal landscape."  *Arkema*, 618 F.3d at 7; *see also Nat'l Min. Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002).  Under D.C. Circuit precedent, a new rule or policy changes the legal landscape if it "is 'substantively inconsistent' with a prior agency practice and attaches new legal consequences to events completed before its enactment."  *Arkema*, 618 F.3d at 7 (citation omitted). "Even where a rule merely narrows 'a range of possible interpretations' to a single 'precise interpretation,' it may change the legal landscape in a way that is impermissibly retroactive."  *Id.*; *see also Nat'l Min. Ass'n*, 292 F.3d at 859.  Put another way, if the new rule

---

[21] As now Justice Gorsuch explained,

> [T]he more an agency acts like a legislator—announcing new rules of general applicability—the closer it comes to the norm of legislation and the stronger the case becomes for limiting application of the agency's decision to future conduct. The presumption of prospectivity attaches to Congress's own work unless it plainly indicates an intention to act retroactively. That same presumption, we think, should attach when Congress's delegates seek to exercise delegated legislative policymaking authority: their rules too should be presumed prospective in operation unless Congress has clearly authorized retroactive application.

*De Niz Robles v. Lynch*, 803 F.3d 1165, 1172 (10th Cir. 2015).

"effects a substantive change from the agency's prior regulation or practice," then it is impermissibly retroactive. *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 14 (D.C. Cir. 2011) (citation omitted). There can be no dispute that the October 13th Guidance changes the legal landscape: DOD has never applied the criteria listed therein to MAVNI enlistees before now. By promulgating the October 13th Guidance, DOD attaches new legal meaning to the concept of honorable service in the Selected Reserve. Assuming *arguendo* that DOD has authorization to interpret an immigration statute, DOD's "interpretation" of 8 U.S.C. § 1440 clearly marks a substantive change from its past practice of certifying a Form N-426 based on an enlistee's past service at the time he submits the N-426 for certification.

Furthermore, "if the separation of powers doesn't forbid this form of decisionmaking outright, . . . second-order constitutional protections sounding in due process and equal protection, as embodied in our longstanding traditions and precedents addressing retroactivity in the law" might otherwise constrain retroactive application. *De Niz Robles v. Lynch*, 803 F.3d 1165, 1171–72 (10th Cir. 2015) (Gorsuch, J.). Any retroactive policy must have "sufficiently significant statutory interests" to counterbalance any "resulting inequities" from the retroactive agency action. *Chadmoore Commc'ns, Inc. v. FCC*, 113 F.3d 235, 240 (D.C. Cir. 1997); *see also Garvey v. Nat'l Transp. Safety Bd.*, 190 F.3d 571, 584 (D.C. Cir. 1999) ("An agency is also barred from applying a new rule in the adjudication in which it is announced if doing so would work a 'manifest injustice.'") (citation omitted). Before the October 13th Guidance MAVNI enlistees had a right to apply for an expedited path to citizenship and DOD's new procedures rob plaintiffs of this opportunity. The Court is therefore convinced that DOD's application of the October 13th Guidance could result in serious inequities that are not

counterbalanced by any significant statutory interests.

## C. Claims under APA § 706(1)

Plaintiffs also claim DOD's N-426 policy violates 5 U.S.C. § 706(1), which authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* To show that DOD has unlawfully withheld issuance of the N-426s, plaintiffs must demonstrate that DOD "failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64. "This standard reflects the common law writ of mandamus, which the APA 'carried forward' in § 706(1)." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (citing *Norton*, 542 U.S. at 63). "Thus, § 706(1) grants judicial review only if a federal agency has a 'ministerial or non-discretionary' duty amounting to 'a specific, unequivocal command.'" *Id.* (citing *Norton*, 542 U.S. at 63–64).

As explained in Part III.A, defendants have a ministerial duty to certify Form N-426s. Under 8 U.S.C. § 1440, certification of Form N-426s is a non-discretionary duty to the extent that it references *past* honorable service. 8 U.S.C. § 1440(a); *see Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015). Defendants have refused to take any action on plaintiffs' N-426s. Based on the record and for the reasons discussed herein, the Court concludes that plaintiffs are likely to succeed in proving—at least for MAVNI enlistees who have enlisted prior to October 13, 2017, and who completed sufficient service in the Selected Reserve—DOD must expeditiously certify or deny their N-426s based on their existing military records.

## D. Claim under Mandamus Act

"To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d

183, 189 (D.C. Cir. 2016). Having found that plaintiffs are likely to succeed on the merits of at least one of their APA claims, the Court need not reach plaintiffs' mandamus claim. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 379 (2004) (noting that "mandamus may not issue so long as alternative avenues of relief remain available").

## III.    IRREPARABLE HARM

Irreparable harm requires "sufficient evidence that the [movant's] purported injury is certain, great, actual, imminent, and beyond remediation." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112–13 (D.D.C. 2015); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (describing the standard for irreparable harm). The record shows that DOD's N-426 policy is causing irreparable harm to plaintiffs.

Prior to 2017, DOD certified N-426s for MAVNI enlistees on the same day, or the day after, the N-426s were filed. (*See Nio* PI Exs. 26–32.) With N-426 in hand, MAVNI enlistees could pursue their promised path to expedited citizenship. Each named plaintiff is a MAVNI enlistee, serving in the Selected Reserve, who has attended drills with their units, and been compensated for that participation. (Kirwa Decl. ¶ 5; Meenhallimath Decl. ¶ 5; Viswanathan Decl. ¶ 5.) Since April 2017, plaintiffs have requested that DOD certify their Form N-426s, but DOD has refused. (Kirwa Decl. ¶¶ 8–9; Meenhallimath Decl. ¶¶ 6–10; Viswanathan Decl. ¶¶ 7–11; PI Mot. Exs. 12–13.) DOD cannot indefinitely delay certification of plaintiffs' Form N-426s without lawful justification, which, as discussed *supra* Part II.A, they have not provided.

As held in *Nio*, delaying naturalization applications after applicants have been promised an expedited path to citizenship constitutes irreparable harm. *Nio*, 2017 WL 3917006, at *9; *see also Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 51 (D.D.C. 2008); *Vargas v. Meese*, 682 F. Supp. 591, 595 (D.D.C. 1987). And, this Court is not the only one to recognize that undue delay in the

naturalization context is harmful.  *See, e.g.*, *Roshandel v. Chertoff*, 554 F. Supp. 2d 1194, 1200–

01 (W.D. Wash. 2008) (granting class certification of a class of naturalization applicants seeking

injunctive relief to end delay in application processing arising from pending FBI name checks,

and noting that plaintiffs were statutorily "entitled to a naturalization decision by USCIS"),

*amended in part*, No. C07-1739, 2008 WL 2275558 (W.D. Wash. June 3, 2008).[22]  Defendants

argue that plaintiffs are not harmed because they can still file for naturalization after they receive

their N-426s.  This argument is nothing short of illogical.  The government represented to

plaintiffs that, in exchange for 8 years of military service, they would be able to pursue an

expedited path to citizenship shortly after enlistment.  Now that time has been extended by two

or three years.

Furthermore, every day of delay leaves plaintiffs in limbo and in fear of removal.

(Compl. ¶¶ 8–9.)[23]  Plaintiffs live in constant fear that they will lose their work or student visas,[24]

_____

[22] In the context of constitutional deprivations, irreparable harm may be presumed simply
because of a delay in the ability to exercise constitutional rights.  *Aziz v. Trump*, 234 F. Supp. 3d
724, 737 (E.D. Va. 2017) ("As a matter of law, the threat of an Establishment Clause violation in
and of itself constitutes irreparable harm.") (citing *Newsom v. Albermarle Cnty. Sch. Bd.*, 354
F.3d 249, 261 (4th Cir. 2003)); *Hill v. Williams*, No. 16-cv-02627, 2016 WL 8667798, *9 (D.
Col. Nov. 4, 2016) (unpublished) ("Where First Amendment rights are at issue, 'the loss of First
Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable
injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)).  "[I]t is well-established that
acts by Government agencies in derogation of statutory rights of the public or certain individual
members of the public can constitute irreparable injury."  *Gates v. Schlesinger*, 366 F. Supp. 797,
800 (D.D.C. 1973).  Here the delay "violates a statutory right to timely decision making," *see
Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015), and that delay
cannot be repaired by damages awarded later or by further adjudication.

[23] DOD has informed MAVNI enlistees "[i]f you are discharged from the Army before you
become a citizen you may no longer have a valid immigration status."  (PI Mot. Ex. 15, at 2.)

[24] Defendants do not dispute that military enlistment exhibits an intent to immigrate, which can
jeopardize any non-immigrant visa status.  For example, Current DHS guidance indicates that
"compensation during Reserve duty . . . marks the beginning of employment and the [Designated
School Officials] must terminate the [Student and Exchange Visitor Information System] SEVIS
record."  (PI Mot. Ex. 14, at 3; *see also* Kirwa Decl. ¶ 2 (entered US on a student visa).)

or be discharged, deported, and subject to harsh punishment in their country of origin for joining a foreign military. (Compl. ¶ 72.) Defendants maintain that a fear of deportation is too speculative to establish irreparable harm. It is true that some courts have found, in some circumstances, that a risk of deportation is too speculative to show irreparable harm, *see Carlsson v. U.S. Citizenship & Imm. Servs.*, No. 12-7893, 2012 WL 4758118, at *9 (C.D. Cal. Oct. 3, 2012) (unpublished), but that is not the issue here for plaintiffs suffer from more than mere fear. *See Vargas*, 682 F. Supp. at 595 ("[T]o deny plaintiffs the right of filing in this country is to deny them of the benefits of protection from deportation and work authorization, as well as the right to travel outside this country without forfeiting these benefits.") DOD is blocking access to an existing legal avenue for avoiding removal. *See Santillan v. Ashcroft*, No. 04-2686, 2004 WL 2297990, at *12 (N.D. Cal. Oct. 12, 2004) (unpublished) (granting class certification to persons pursuing lawful permanent resident status "to whom USCIS ha[d] failed to issue evidence of registration"). By preventing plaintiffs from submitting valid naturalization applications to USCIS, defendants are depriving plaintiffs of "lawful presence" for purposes of ICE enforcement. (*See Nio*, Declaration of Rachel Canty, July 28, 2017, ECF No. 25-3, ¶ 6 (explaining that lawful presence "describes the result of notifying an alien that DHS has made a non-binding decision to forbear from pursuing his removal for a period of time.").) Pretending otherwise ignores ICE's own representations: (1) "Generally ICE does not initiate removal proceedings against individuals in the [MAVNI] program if they have no valid immigration status, *so long as they* can demonstrate active participation in the MAVNI program and *have a naturalization application pending with [USCIS]*," (Asher Decl. ¶ 5 (emphasis added)), and the submission of a MAVNI "application provides the enlistee continued lawful presence in the United States while the application is pending." (PI Mot. Ex. 14, at 2.) While it is true that

plaintiffs are not guaranteed that they will not be discharged before attaining citizenship, the threat of removal proceedings, which plaintiffs face without certified N-426s, is a serious one. *See Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (describing "[t]he severity of deportation" as "the equivalent of banishment or exile").

In sum, defendants' refusal to certify plaintiffs' N-426s based on their past honorable service causes irreparable injury to plaintiffs and the proposed class.

## IV.    HARM TO DEFENDANTS/PUBLIC INTEREST/BALANCE OF THE EQUITIES

Finally, the Court concludes that the balance of equities favors plaintiffs.  As explained in Part III, plaintiffs are suffering, and will continue to suffer, irreparable harm due to DOD's inaction, and as explained *supra* Part II.B.1, defendants have not offered sufficient justification for their policy change.

## V.    PROVISIONAL CLASS CERTIFICAITON

For purposes of preliminary injunctive relief, plaintiffs seek provisional class certification of a proposed class of (1) MAVNI enlistees, (2) who have served in the Selected Reserve, and (3) have not received a completed Form N-426.  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015).  In granting provisional class certification "the Court must still satisfy itself that the requirements of Rule 23 have been met.  Its analysis is tempered, however, by the understanding that 'such certifications may be altered or amended before the decision on the merits.'" *Id.* at 180 (internal citations omitted).  After reviewing the record, the Court has concluded that the requirements of Rule 23 have been met, and defendants have failed to offer any meritorious reasons as to why provisional class certification is not appropriate.  The Court will, however, modify the class to only include MAVNI enlistees who enlisted before October 13, 2017 because the October 13th Guidance has different criteria for MAVNI enlistees who

enlisted on October 13, 2017 and after.

**CONCLUSION**

For the reasons stated above, the Court grants plaintiffs' motion for a preliminary injunction and provisional class certification.  A separate order, ECF No. 28, accompanies this Memorandum Opinion.

/s/    *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   October 25, 2017