## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAHLON KIRWA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:17-cv-01793 |
| | ) The Honorable Ellen Segal Huvelle |
| UNITED STATES DEPARTMENT OF | ) |
| DEFENSE and JAMES MATTIS, in his | ) |
| official capacity as Secretary of Defense, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

   I.   THE MAVNI PROGRAM .......................................................................................... 3

   II.  REASSESSMENT OF THE MAVNI PROGRAM AND THE OCTOBER 13, 2017, POLICY ............................................................................................................... 4

   III. PROCEDURAL HISTORY........................................................................................ 6

   IV. ALLEGATIONS REGARDING DEFENDANTS' COMPLIANCE ACTIONS .............. 7

STANDARD OF REVIEW ................................................................................................ 8

ARGUMENT .................................................................................................................... 9

   I.   PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED AND CANNOT DEMONSTRATE THAT THE OCTOBER 13 POLICY VIOLATES THE APA ............ 9

      A.  Plaintiffs' APA claims fail because the decision whether to certify a soldier as having served honorably is committed to agency discretion by law ........................ 10

      B.  Plaintiffs cannot prevail under § 706(1) because § 1440(a) does not preclude Defendants from requiring soldiers to complete background investigations and serve for a period of time prior to obtaining honorable-service certifications.............. 18

      C.  Plaintiffs' separate claims under APA § 706(2) are meritless because the October 13 Policy  implements a reasonable mechanism for facilitating honorable-service certifications .................................................................................. 22

         1.  The October 13 Policy is not contrary to law or in excess of DoD's statutory authority.................................................................................... 23

         2.  The October 13 Policy is not arbitrary and capricious ............................... 25

         3.  The October 13 Policy is not impermissibly retroactive ............................ 28

         4.  Plaintiffs cannot obtain many types of the relief they seek through their § 706(2) claim.......................................................................................... 32

   II.  PLAINTIFFS' CLAIM FOR "CONSTITUTIONAL VIOLATIONS" FAILS............... 33

   III. PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF (COUNTS I AND II) ARE  DERIVATIVE OF THEIR SUBSTANTIVE CLAIMS, AND THEIR CLAIM FOR MANDAMUS RELIEF (COUNT IV) IS IMPROPER ....... 36

CONCLUSION........................................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
No. 10-0804 (PLF), 2010 WL 8917910 (D.D.C. June 4, 2010) ................................................. 9

*Am. Ass'n of Retired Pers. v. EEOC*,
823 F.2d 600 (D.C. Cir. 1987) ................................................................................................. 19

*Am. Bar Ass'n v. FTC*,
671 F. Supp. 2d 64 (D.D.C. 2009) ........................................................................................... 24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................................................... 9

*Anglers Conservation Network v. Pritzker*,
809 F.3d 664 (D.C. Cir. 2016) ................................................................................................. 21

*Arkema, Inc. v. EPA*,
618 F.3d 1 (D.C. Cir. 2010) ............................................................................................... 29, 31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................... 8

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) ................................................................................................ 25, 26, 27, 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................................. 8, 28

*Beshir v. Holder*,
10 F. Supp. 3d 165 (D.D.C. 2014) ........................................................................................... 21

*Bi-Metallic Inv. Co. v. State Board of Equalization*,
239 U.S. 441 (1915) .................................................................................................................. 35

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987) .................................................................................................................. 25

*Chan v. Reno*,
113 F.3d 1068 (9th Cir. 1997) ................................................................................................. 30

*Chevron, U.S.A., Inc. v. NRDC*,
467 U.S. 837 (1984) ............................................................................................................ 11, 12

*Citizens for Responsibility and Ethics in Wash. v. SEC*,
916 F. Supp. 2d 141 (D.D.C. 2013) ......................................................................................... 18

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ........................................................................................... 23

*Cody v. Caterisano*,
   631 F.3d 136 (4th Cir. 2011) ............................................................................. 16

*Conyers v. Rossides*,
   558 F.3d 137 (2d Cir. 2009) ............................................................................... 17

*County of Los Angeles v. Shalala*,
   192 F.3d 1005 (D.C. Cir. 1999) ......................................................................... 37

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*,
   718 F.3d 974 (D.C. Cir. 2013) ........................................................................... 10

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ........................................................................................... 17

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Maritime Admin.*,
   215 F.3d 37 (D.C. Cir. 2000) ............................................................................. 17

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................... 25

*Flores v. City of Baldwin Park*,
   No. CV 14-9290-MWF (JCx), 2015 WL 756877 (C.D. Cal. Feb. 23, 2015) ........... 33

*Hamandi v. Chertoff*,
   550 F. Supp. 2d 46 (D.D.C. 2008) ..................................................................... 38

*Heartland Regional Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.D.C. 2009) .............................................................................. 37

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
   751 F.3d 629 (D.C. Cir. 2014) ........................................................................... 22

*Johnson v. Interstate Mgmt. Co.*,
   849 F.3d 1093 (D.C. Cir. 2017) ........................................................................... 8

*Julius v. Kirk*,
   No. 10 0009, 2010 WL 27404 (D.D.C. Jan. 6, 2010) ........................................ 33

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ....................................................................................... 20

*Kirwa v. U.S. Dep't of Def.*,
   No. 17-1793 (ESH), 2017 WL 4862763 (D.D.C. Oct. 25, 2017) ................. passim

*Korab v. Fink*,
  797 F.3d 572 (9th Cir. 2014) ............................................................. 33

*L. Xia v. Tillerson*,
  865 F.3d 643 (D.C. Cir. 2017) ........................................................... 13

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) .......................................................................... 29

*Lopez v. Davis*,
  531 U.S. 230 (2001) .......................................................................... 21

*Marsh v. Ore. Nat. Res. Council*,
  490 U.S. 360 (1989) .......................................................................... 25

*Merida Delgado v. Gonzales*,
  428 F.3d 916 (10th Cir. 2005) ........................................................... 17

*Morris Commc'ns, Inc. v. FCC*,
  566 F.3d 184 (D.C. Cir. 2009) ........................................................... 31

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................ 30

*Mt. Emmons Mining Co. v. Babbitt*,
  117 F.3d 1167 (10th Cir. 1997) ......................................................... 38

*N. Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012) ........................................................... 32

*Nat'l Coal. for the Homeless v. U.S. Veterans Admin.*,
  Civ. No. 88-2503-OG, 1988 WL 136958 (D.D.C. Dec. 15, 1988) .......... 37

*Nat'l Fed'n of Fed. Emps. v. United States*,
  905 F.2d 400 (D.C. Cir. 1990) ........................................................... 17

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
  630 F.3d 145 (D.C. Cir. 2010) .......................................... 28, 29, 30, 31

*New Amsterdam Cas. Co. v. Waller*,
  323 F.2d 20 (4th Cir. 1963) ............................................................... 17

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) .......................................................................... 16

*Nio v. U.S. Dep't of Homeland Sec.*,
  No. 17-998 (ESH), 2017 WL 3917006 (D.D.C. Sept. 6, 2017) .............. 16, 34, 36

*Norton v. S. Utah Wilderness All. ("SUWA")*,
   542 U.S. 55 (2004) .................................................................................. 18, 19

*Office of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ...................................................................................... 31

*Old Colony R. Co. v. Comm'r*,
   284 U.S. 552 (1932) ...................................................................................... 24

*Orlov v. Howard*,
   523 F. Supp. 2d 30 (D.D.C. 2007) .......................................................... 21, 37

*Oryszak v. Sullivan*,
   576 F.3d 522 (D.C. Cir. 2009) ...................................................................... 17

*Palisades Gen. Hosp. Inc. v. Leavitt*,
   426 F.3d 400 (D.C. Cir. 2005) ...................................................................... 32

*Pub. Citizen Health Research Grp. v. FDA*,
   740 F.2d 21 (D.C. Cir. 1984) ........................................................................ 19

*Pub. Citizen v. FERC*,
   839 F.3d 1165 (D.C. Cir. 2016) .................................................................... 19

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*,
   130 F. Supp. 3d 81 (D.D.C. 2015) ................................................................. 9

*Roberts v. Napolitano*,
   792 F. Supp. 2d 67 (D.D.C. 2011) ................................................................ 11

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996) ............................................................................ 16

*Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr., Inc.*,
   191 F. Supp. 3d 13 (D.D.C. 2016) ..................................................... 9, 15, 31

*Shawnee Trail Conservancy v. Nicholas*,
   343 F. Supp. 2d 687 (S.D. Ill. 2004) ............................................................ 19

*Sierra Club v. Van Antwerp*,
   719 F. Supp. 2d 77 (D.D.C. Aug. 20, 2010) ................................................. 37

*Sierra Club v. Jackson*,
   648 F.3d 848 (D.C. Cir. 2011) ...................................................................... 10

*Steenholdt v. FAA*,
   314 F.3d 633 (D.C. Cir. 2003) ...................................................................... 10

*Styrene Info. & Research Ctr., Inc. v. Sebelius*,
  944 F. Supp. 2d 71 (D.D.C. 2013) ........................................................................ 10

*Tunica-Biloxi Tribe of La. v. United States*,
  577 F. Supp. 2d 382 (D.D.C. 2008) ...................................................................... 25

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
  No. 95-1231 (RCL), 2007 WL 851871 (D.D.C. Mar. 14, 2007) ............................ 16

*Wagafe v. Trump*,
  No. C17-0094-RAJ, 2017 WL 2671254 (W.D. Wash. June 21, 2017) .................... 33

*Wash. Hosp. Ctr. v. Bowen*,
  795 F.2d 139 (D.C. Cir. 1986) .............................................................................. 11

*Wells v. Hense*,
  235 F. Supp. 3d 1 (D.D.C. 2017) ...................................................................... 8, 15

*Young Am.'s Found. v. Gates*,
  560 F. Supp. 2d 39 (D.D.C. 2008) ........................................................................ 18

## **Statutes**

5 U.S.C. § 701(a) ...................................................................................................... 10

5 U.S.C. § 706(1) ...................................................................................................... 34

5 U.S.C. § 706(2)(A), (C) ........................................................................................ 22

8 U.S.C. § 1103 ........................................................................................................ 34

8 U.S.C. § 1423(a)(2) ............................................................................................... 35

8 U.S.C. § 1424 ........................................................................................................ 35

8 U.S.C. § 1427(a) .................................................................................................... 35

8 U.S.C. § 1440 .................................................................................................. 10, 19

8 U.S.C. § 1440(a) ............................................................................................. passim

8 U.S.C. § 1440(b)(3) ......................................................................................... 20, 21

8 U.S.C. § 1447(b) .................................................................................................... 15

10 U.S.C. § 504(b)(1) ................................................................................................. 3

10 U.S.C. § 504(b)(2) ................................................................................................. 3

10 U.S.C. § 10210 ................................................................................................................ 7, 8

28 U.S.C. § 1361 .................................................................................................................. 37

The Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952) ......................... 12

The Nationality Act of 1940, Pub. L. No. 76-853, 54 Stat. 1137 ................................................ 12

**Rules**

Fed. R. Civ. P. 8(a) .............................................................................................................. 33

Fed. R. Civ. P. 56(d) .............................................................................................................. 9

Fed R. Civ. P. 56(a) ............................................................................................................... 8

**Regulations**

8 C.F.R. § 329.2 ................................................................................................................... 24

**Other Authorities**

AR 635-200, § 3-7(c) (2016) ................................................................................................. 14

Exec. Order No. 13,269, 67 Fed. Reg. 45,287 (July 3, 2002) .................................................... 3

# INTRODUCTION

The Military Accessions Vital to the National Interest ("MAVNI") pilot program allows foreign-born individuals who are in the United States on non-immigrant visas the opportunity to seek naturalization in exchange for qualifying military service. Congress delegated to Defendants, the Department of Defense and Defense Secretary James Mattis (sued here in his official capacity) (collectively "DoD"), the responsibility for certifying that a MAVNI enlistee's service has been "honorable." This certification, made on a form known as U.S. Citizenship and Immigration Services ("USCIS") Form N-426, Request for Certification of Military or Naval Service ("N-426"), is a necessary part of the application process, and each military branch completes its own certifications. Although DoD always intended for MAVNI enlistees to complete all requisite suitability screening procedures prior to being so certified, it recently discovered inconsistencies across the various military branches in how certifications were being made for MAVNI enlistees. Following a period of careful review and analysis, during which time no certifications were made, DoD on October 13, 2017, issued a policy setting forth a standardized process for N-426 certification to apply across all military branches. Most relevant here, the policy states that individuals who enlisted prior to October 13 must complete specified suitability screening measures, including a background check performed and adjudicated by DoD, before receiving an N-426 certification of honorable service.

Plaintiffs, three individuals who enlisted in the MAVNI program and are currently members of the Army's Selected Reserve of the Ready Reserve, filed suit challenging the decision by DoD to temporarily suspend N-426 certifications and ultimately implement the new policy. Plaintiffs allege that the new policy, which imposes commonsense screening and evaluative requirements before a noncitizen soldier may obtain an honorable-service determination, violates

§§ 706(1) and 706(2) of the Administrative Procedure Act ("APA") as well as the Fifth Amendment's Due Process Clause.

Plaintiffs' claims are meritless. To begin, the statute delegating honorable-service-certification responsibility to DoD does not specify any criteria for making certifications, nor does it require that DoD certify N-426s by a particular point in time. DoD's certification role is therefore committed to agency discretion by law. For similar reasons, DoD has no ministerial, non-discretionary obligation to certify N-426s for individuals who, like Plaintiffs, are members of the Selected Reserve of the Ready Reserve and who have yet to access into initial entry training. Plaintiffs' claim under § 706(1) accordingly fails. Furthermore, the new N-426 policy is the product of a deliberative process pursuant to which agency decision-makers exercised their judgment based on evidence showing that uninformed N-426 certifications are inconsistent with Congress's goals as outlined in § 1440. While noncitizen soldiers who serve honorably are entitled to expedited naturalization proceedings, Congress plainly did not require that benefit to extend to enlistees whose backgrounds would *preclude* honorable service. The new N-426 policy serves the important purpose of ensuring that DoD does not vouch for the honorable service of enlistees who may never serve and, indeed, who would not even be permitted to enlist if the military had complete information about their backgrounds at the time of recruitment.

The APA forbids agency action that is unlawfully withheld or is arbitrary and capricious; it does not hamstring an agency to its past inconsistent conduct. Plaintiffs have not plausibly alleged, and certainly cannot prove, that DoD's new policy is anything other than a reasoned solution to an acknowledged problem. This Court should grant Defendants' motion and either dismiss Plaintiffs' claims with prejudice under Rule 12(b)(6) or enter judgment as a matter of law in Defendants' favor under Rule 56.

# BACKGROUND

## I.     THE MAVNI PROGRAM

The Court is by now familiar with the history of the MAVNI program and the policies of DoD and the Military Departments with respect to both MAVNI enlistment and N-426 certification.  To briefly recap:  although ordinarily a person desiring to serve in the Armed Forces must satisfy citizenship or residency requirements, *see* 10 U.S.C. § 504(b)(1), Congress carved out an exception, authorizing DoD to enlist nonresidents if DoD "determines that such enlistment is vital to the national interest," § 504(b)(2).  Congress also provided an incentive for nonresident soldiers who enlist under this authority.  Where such soldiers have "served honorably" in the "Selected Reserve of the Ready Reserve or in an active-duty status in the military, air, or naval forces" during any period that the "President by Executive order shall designate as a period in which Armed Forces . . . are or were engaged in . . . armed conflict with a hostile foreign force," such soldiers may be naturalized as U.S. citizens.  8 U.S.C. § 1440(a).  The Armed Forces have been in a state of such conflict since September 11, 2001.  *See* Exec. Order No. 13,269, 67 Fed. Reg. 45,287 (July 3, 2002).

In 2008, DoD implemented the MAVNI pilot program, authorizing the Military Departments to enlist noncitizen healthcare professionals and persons fluent in critical foreign languages.  Decl. of Stephanie P. Miller ¶ 4, ECF No. 20–1 ("First Miller Decl.").  The program was reauthorized in 2012, 2014, and 2016.  *Id.*  A MAVNI enlistee must satisfy minimum standards that apply to all military recruits and must undergo a standard suitability-for-service determination.  *Id.* ¶¶ 9–10.  Moreover, due to "counter-intelligence, security, and insider threat concerns," MAVNI enlistees are subject to an additional tier of scrutiny, and the "DoD's policy intention since 2008 was for [such] vetting to be completed prior to accessions."  *Id.* ¶¶ 10–11.

Under § 1440(a) and E.O. 13,269, a MAVNI enlistee—like any other nonresident soldier—is entitled to expedited naturalization if a military official certifies that the soldier has served honorably (or, if separated, that the discharge was under honorable circumstances).  Military officials perform this certification function using USCIS Form N-426.  *Id.* ¶ 6.  Historically, DoD contemplated that N-426 certifications would occur no earlier than upon the MAVNI enlistee's arrival at initial entry training ("IET," also known as "basic training" or "basic combat training").  *See* U.S. Army Reserve, *Enlisted Military Accessions Vital to the National Interest (MAVNI) Information Paper* 3–4 (2014) (ECF No. 20–4) ("DO NOT MAIL YOUR CITIZENSHIP PACKET BEFORE YOU SHIP TO BCT. . . . All documentation including the N-426 will be signed at BCT.").[1]

## II.   REASSESSMENT OF THE MAVNI PROGRAM AND THE OCTOBER 13, 2017, POLICY

In response to security concerns, DoD has periodically strengthened the background investigation and suitability requirements for MAVNI enlistees.  In 2010, for instance, DoD issued a memorandum stipulating that all MAVNI enlistees would be subject to a Single Scope Background Investigation (now called a Tier 5 investigation) and counterintelligence-focused security review.  First Miller Decl. ¶ 12.  In 2016, DoD added new requirements, including a National Intelligence Agency Check ("NIAC") and an issue-oriented interview and/or polygraph.

---

[1] As the Court recognized in its Memorandum Opinion of October 25, 2017, delays attributable to heightened screening requirements for MAVNI enlistees (discussed below) have prolonged the period during which MAVNI enlistees remain in the Army Reserve Delayed Training Program, an inactive status that allows participants to attend drill periods while awaiting orders to ship to IET.  *See* Second Decl. of Stephanie P. Miller at 9–10, ECF No. 20–2.

*Id.* ¶ 14.  A MAVNI enlistee who fails to satisfy one of these security screens may be subject to discharge from the Armed Forces under other than honorable circumstances.  *Id.*

Despite these efforts, a mid-2016 review revealed that some MAVNI enlistees had been permitted to access into military service without completing the requisite background checks and that the Military Departments had not adequately tracked enlistees post-accession.  *Id.* ¶ 15. Following consultations between DoD and USCIS, new MAVNI enlistments were suspended, and DoD placed a temporary hold on N-426 certifications as of summer 2017.  *Id.* ¶¶ 17–19.

On October 13, 2017, DoD issued a Memorandum for Secretaries of the Military Departments, titled "Certification of Honorable Service for Members of the Selected Reserve of the Ready Reserve and Members of the Active Components of the Military or Naval Forces for Purposes of Naturalization."  ECF No. 20–3 ("October 13 Policy")[2].  The October 13 Policy set forth new guidance for N-426 certification as applied to three discrete groups of nonresident soldiers:  those without certifications who enlisted/accessed *on or after* October 13, 2017 (Section I); those without certifications who enlisted/accessed *before* October 13, 2017 (Section II); and those whose forms had already been certified (Section III).  *Id.* at 2-4.

Only Section II of the new policy is at issue in this case.  Section II provides that the appropriate Military Department may certify a nonresident soldier's service as honorable only if three criteria are met: first, the soldier must not be the subject of pending disciplinary action or a criminal investigation; second, the soldier must satisfy all applicable screening and suitability requirements; and third, the soldier must have "served in a capacity, for a period of time, and in a manner that permits an informed determination that the [soldier] has served honorably."  *Id.* at 3.

---

[2] The October 13 Policy is included in the Administrative Record for the case at AR 0004-07.

### III.     PROCEDURAL HISTORY

Plaintiffs, three MAVNI enlistees serving in the Selected Reserve of the Ready Reserve, filed a putative class action on September 1, 2017 (before the October 13 Policy issued), challenging the temporary hold on N-426 certifications.  Compl., ECF No. 1.  Plaintiffs alleged violations of the Administrative Procedure Act ("APA") and sought various forms of equitable relief.  On September 19, 2017, Plaintiffs filed a Motion for a Preliminary Injunction, ECF No. 11, and a Motion for Class Certification and Appointment of Class Counsel, ECF No. 12.

Following promulgation of the October 13 Policy and further briefing by both parties, the Court heard argument on the preliminary injunction request on October 20, 2017.  Five days later, the Court granted Plaintiffs' request for preliminary injunctive relief and provisionally certified a class comprising MAVNI enlistees who have served in the Selected Reserve and have not received a completed Form N-426.  *See Kirwa v. U.S. Dep't of Def.*, No. 17-1793 (ESH), 2017 WL 4862763 (D.D.C. Oct. 25, 2017).  The Court entered an Amended Order on October 27, 2017, clarifying that Defendants should "use their best efforts to certify or deny Form N-426s . . . within two business days of receipt."  *See* Am. Order at 2, ECF No. 32.  The Court also directed Plaintiffs' counsel to file an amended pleading that accounts for recent developments, including the October 13 Policy.  *See* Order, ECF No. 31.

In their Amended Complaint, Plaintiffs restate many of their prior allegations.  They again allege that DoD is violating the APA (Count III), and they seek declaratory, injunctive, and mandamus relief (Counts I–II, IV).  With respect to the October 13 Policy in particular, Plaintiffs allege—without support in the policy itself—that MAVNI enlistees in their class (i.e., those who enlisted prior to October 13, 2017) are required to complete "the same type of 'military training and required service' requirements as post-October 13 enlistees."  Am. Compl. ¶ 61, ECF No. 33.

Plaintiffs also allege that the new policy defines "honorable" service in a manner contrary to unspecified "laws and regulations" and that it imposes improper capacity, residency, physical presence, and background check requirements.  *Id.*

Counts I through IV of Plaintiffs' Amended Complaint mirror the counts in the prior pleading, and Plaintiffs have added a fifth count alleging "Constitutional Violations."  Though unclear, Plaintiffs appear to claim that DoD's policy of deferring honorable-service determinations until after the Military Departments have completed suitability screening and obtained sufficient information to make meaningful determinations somehow violates Article I, Section 8 and the Due Process Clause of the Fifth Amendment.  Am. Compl. ¶ 129.

## IV.    ALLEGATIONS REGARDING DEFENDANTS' COMPLIANCE ACTIONS

The Amended Complaint also makes unwarranted and unsubstantiated allegations about Defendants' purported failure to comply with the Court's preliminary injunction motion.  For example, Plaintiffs claim that certain guidance promulgated by DoD and Army following entry of the October 27, 2017, Amended Order does "not comply with the PI Order," *id.* ¶ 75, though Plaintiffs do not explain why they believe the guidance (which expressly requires immediate implementation of the injunction) is noncompliant.  *See* Memorandum from the Office of the Under Sec'y of Def. to the Sec'ys of the Military Dep'ts (Oct. 27, 2017) (attached hereto as Exhibit A); Memorandum from the Office of the Assistant Sec'y, Manpower & Reserve Affairs, Dep't of the Army, to the Chief, Army Reserve (Oct. 27, 2017) (attached hereto as Exhibit B).[3]  On the

---

[3] Plaintiffs further allege that Defendants "failed to take reasonable and necessary steps to communicate the PI Order to members of the class, despite their 'best efforts' obligations imposed by the PI Order and their independent statutory obligations, under 10 U.S.C. § 10210[,] to communicate such information to members of the Selected Reserve."  Am. Compl. ¶ 75.  Plaintiffs make similar allegations in their Supplemental Memorandum in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, ECF No. 34, to which memorandum Defendants will respond separately on or before November 28, 2017.  Plaintiffs' allegations are

evening of November 15, 2017—just two days before DoD's deadline to respond to Plaintiffs' Amended Complaint—Plaintiffs filed a Motion to Enforce Court Order, again alleging that DoD has not complied with the Court's preliminary injunction order.  *See* Pls.' Mot. to Enforce Ct. Order, ECF No. 35.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint.  "In ruling on a motion to dismiss for failure to state a claim, the court must accept as true all of the factual allegations contained in the complaint, and construe the complaint in favor of the plaintiff . . . ."  *Wells v. Hense*, 235 F. Supp. 3d 1, 6 (D.D.C. 2017) (citations and internal quotation marks omitted). However, a court should not draw inferences unsupported by the well-pleaded allegations, and need not accept legal conclusions cast as factual allegations.  *Id.*  Rather, to survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Summary judgment must be granted to a party who has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  In the ordinary civil case, the inquiry reduces to whether "the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law."  *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr., Inc.*, 191 F. Supp. 3d 13, 17 (D.D.C. 2016) (quoting *Anderson v.*

---

entirely baseless:  Defendants have complied with the Amended Order, as evidenced by their prompt dissemination of guidance through the chain of command, *see* Exhibits A & B, and by the MAVNI enlistees who have obtained signed Forms N-426 since the Amended Order issued.  *See* Declaration of COL Brian A. Thomas ¶ 12 (attached hereto as Exhibit C).

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, in the APA context, the district court's function is generally to determine whether the evidence in the certified administrative record permitted the agency to make the decision it did.  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 81, 89 (D.D.C. 2015).  Further, while in the ordinary civil case the plaintiff might be entitled to conduct discovery prior to summary judgment, *see* Fed. R. Civ. P. 56(d), discovery "typically is not available in APA cases," *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, No. 10-0804 (PLF), 2010 WL 8917910, at *2 (D.D.C. June 4, 2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011).

## ARGUMENT

## I. PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED AND CANNOT DEMONSTRATE THAT THE OCTOBER 13 POLICY VIOLATES THE APA

Plaintiffs' two central claims in this case are brought under the APA, and judgment in favor of Defendants is warranted as to both.  As an initial matter, both APA claims should be dismissed because DoD's decisions about how and when to certify honorable service of members of the Selected Reserve are committed to agency discretion by law.  Plaintiffs have not identified, and indeed cannot identify, a non-discretionary, ministerial obligation on DoD's part to certify honorable service for members of the Selected Reserve by a particular moment in time.  Plaintiffs' claim under § 706(1) of the APA thus fails.  Plaintiffs' claim pursuant to § 706(2) also fails because the October 13 Policy is not contrary to law, nor arbitrary and capricious, nor impermissibly retroactive.

**A.      Plaintiffs' APA claims fail because the decision whether to certify a soldier as having served honorably is committed to agency discretion by law**

As the Government has previously argued, the decision whether and when to certify a

soldier as having served honorably is committed to DoD's discretion pursuant to § 1440(a).  *See*

Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Opp'n") at 20, ECF No. 20; 5 U.S.C. § 701(a) ("This

[judicial review] chapter applies . . . except to the extent that . . . agency action is committed to

agency discretion by law.").[4]  The Court disagreed with this argument at the preliminary injunction

stage, concluding that "the nature of the administrative action involved, as well as 8 U.S.C.

§ 1440's statutory and regulatory regime, provide a meaningful standard for judging DOD's N-426

certification decisions."  *Kirwa*, 2017 WL 4862763, at *10.  In so ruling, the Court construed the

honorable-service requirement as taking account of a soldier's "*past service*," not DoD's "possible

future suitability determinations."  *Kirwa*, 2017 WL 4862763, at *10.  However, as explained

below and in the Declaration of Stephanie Miller, attached hereto as Exhibit D ("Third Miller

Decl."), those suitability determinations and the associated background investigations may reveal

facts that, had they been known at the time of recruitment, would have precluded a soldier from

---

[4] Action is committed to agency discretion where a statute is drawn in such a manner that a "'court would have no meaningful standard against which to judge the agency's exercise of discretion.' If no 'judicially manageable standard' exists by which to judge the agency's action, meaningful judicial review is impossible and the courts are without jurisdiction to review that action." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (citation omitted); *see also Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 718 F.3d 974, 976-77 (D.C. Cir. 2013) ("[A]gency action is committed to agency discretion by law and thus judicially unreviewable when there is 'no law to apply.'" (citation omitted)).  In determining whether an action is committed to agency discretion, courts consider "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action," taking account of formal and informal policy statements and regulations.  *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 81 (D.D.C. 2013) (quoting *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011)).

enlisting.  Nothing in § 1440(a) cabins the discretion of DoD and the Military Departments in considering such information.

As an initial matter, the statutory text and context of § 1440's references to honorable service strongly indicate that Congress left it to DoD's discretion to construe the phrase.  Nowhere in § 1440(a) or elsewhere in the Immigration and Nationality Act ("INA") did Congress set forth what it means to have "served honorably" in the Selected Reserve or on active duty.  Nor does the legislative history offer any clues as to the meaning of the phrase.  The use of this military term of art, decoupled from any explanatory or qualifying language, is a key signal that Congress delegated to DoD not only the perfunctory role of checking a box on an immigration form but also, more importantly, the underlying determination of whether a soldier had served honorably—and, by extension, what honorable service means.  *See Roberts v. Napolitano*, 792 F. Supp. 2d 67, 73-74 (D.D.C. 2011) (statute authorizing Global Entry program included general mandates but was "silent as to the criteria the Secretary of Homeland Security should apply in approving applications for entry into the . . . program," and such statutory silence "indicates that Congress committed to the [agency] the sole discretion to determine eligibility guidelines and evaluate applicants"); *cf. Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 143 (D.C. Cir. 1986) ("If a statute is silent or ambiguous, a court may assume that Congress implicitly delegated the interpretive function to the agency . . . ." (citing *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–44 (1984))).

To be sure, as the Court previously found, bad conduct by a soldier during the course of service could support a finding by DoD that the soldier had not served honorably.  But that is not the only circumstance under which DoD could make such a finding.  Rather, as set forth in the Third Miller Declaration, the background investigation and other suitability screenings to which MAVNI enlistees are presently subject could reveal preexisting circumstances that  "demonstrate

that an enlistee is either not qualified to serve in the military or presents an unmitigable security risk." Third Miller Decl. ¶ 5. If such adverse information is identified while the enlistee is in the Delayed Training Program, the enlistee would be "released from service under an uncharacterized entry level separation" and precluded from reenlisting. *Id.* ¶ 4. If such information is uncovered after the soldier has accessed to active service, the soldier could be discharged under "other than honorable circumstances." *Id.* ¶ 5. In either scenario, adverse facts relating to conduct or conditions predating the soldier's enlistment would preclude the soldier from engaging in honorable service. "DoD does not wish to vouch for the honorable service of a recruit who, in light of facts developed through the investigation, may not be qualified to serve or presents a national security risk." *Id.*

Congress, of course, could have supplied a narrow definition of honorable service that would exclude consideration of such preexisting facts, but it did not do so—indeed, it provided no definition at all. Congress left the construction of the term to the agency charged with making honorable-service determinations, a conclusion reinforced by the legislative history of the statute. The Nationality Act of 1940, which authorized naturalization for persons serving in the Armed Forces, required proof of honorable service "by duly authenticated copies of records of the executive departments having custody of the records of such service." Pub. L. No. 76-853, § 324(e), 54 Stat. 1137, 1150. Yet the INA, enacted in 1952, changed the rules: now, noncitizen soldiers were required to submit a certified statement from the executive department under which the soldiers served, affirming that their service was honorable (essentially the same rules that apply today). Pub. L. No. 82-414, §§ 328(b)(3), 329(b)(4), 66 Stat. 163, 249–50. This shift in the law reflects Congress's intent to give the Military Departments an active role in determining honorable service, and it undercuts any notion that the role is ministerial. If Congress had viewed the

honorable-service determination as *pro forma*, as Plaintiffs have characterized it in this litigation, Congress could have simply retained the straightforward proof-of-service requirement from the 1940 Act.

After a lengthy period of review, DoD has concluded that facts uncovered through an enlistee's background investigation may bear directly on the question whether that person has served honorably. "Because unmitigable adverse facts uncovered through the background check process may obviate otherwise seemingly honorable service, DoD cannot make an informed honorable service determination until it has completed and adjudicated those investigations." Third Miller Decl. ¶ 6. The agency should not be placed in the untenable position where it is forced to vouch for the honorable service of enlistees for whom it cannot yet make an informed determination, but that is precisely what Plaintiffs have demanded. In short, Plaintiffs have read the term "honorably" out of the statute: DoD can of course certify whether a soldier has or has not *enlisted*, but that certification is meaningless if DoD lacks adequate information to affirm whether the soldier's service has been *honorable*.[5]

In its preliminary injunction opinion, the Court observed that Army's past practice had been to sign off on Forms N-426 after a MAVNI recruit attended at least one drill. The Court also

---

[5] The Court previously noted that § 1440(c) authorizes revocation of citizenship where a soldier is separated from the Armed Forces under other than honorable conditions before the soldier has served honorably for five years. *Kirwa*, 2017 WL 4862763, at *10. Although that revocation mechanism exists as a possible way to rectify naturalization of MAVNI enlistees who are not suitable for military service, DoD's interests are still harmed if it is forced to verify as honorable the service of enlistees it has not yet thoroughly vetted. *See* Third Miller Decl. ¶¶ 14-16. Moreover, revocation is no simple administrative process: it may "only be accomplished by a federal judicial order," either through a full-fledged criminal proceeding or through a civil suit in which the government "carries a heavy burden of proof," *L. Xia v. Tillerson*, 865 F.3d 643, 650-51 (D.C. Cir. 2017) (citation omitted). The mere possibility of a successful revocation proceeding at some future point is not an acceptable substitute for DoD's discretion to make informed honorable-service determinations in the first instance.

cited an Army publication titled "The Soldier's Guide to Citizenship Application." This publication, which offers information of general application to all noncitizen soldiers (including lawful permanent residents), states that as a "general rule, a Soldier is considered to be serving honorably unless a decision has been made . . . to discharge him/her under less than honorable conditions." *Kirwa*, 2017 WL 4862763, at *11. But this "general rule" does not mean the Army's decision is any less discretionary. Indeed, even the "Soldier's Guide" shows that N-426 certification has never been strictly ministerial. The publication acknowledges "rare cases" in which the character of a soldier's service is questionable and provides that the "sole criterion for the decision" is whether, if discharged today, the soldier would be discharged under other than honorable conditions. That decision inherently requires an exercise of judgment on the part of the certifying official. Moreover, the Army's regulations recognize that a discharge under other than honorable conditions may be appropriate not only for "misconduct" but also for "fraudulent entry" or "security reasons." AR 635-200, § 3-7(c) (2016). In any event, as set forth in the Third Miller Declaration, DoD never authorized Army's practice of certifying Forms N-426 for enlistees in the Delayed Training Program who had not yet received final, favorable suitability adjudications. DoD's October 13 Policy was designed in part to ensure uniform execution of honorable-service determinations across each of the Military Departments. The Army's past practice does not deprive DoD of its discretion going forward.

The Court's preliminary injunction opinion also relied on *Cody v. Caterrisano*, No. 09-MJG-00687 (D. Md. May 12, 2009), an unpublished district court opinion from Maryland that addressed the narrow question of "whether, in the particular circumstances of [that] case," a particular Naval Academy student "can be, and should be, naturalized as a United States citizen." Slip op. at 8; *see also id.* ("The instant case presents a unique, unlikely to be repeated, set of

14

circumstances."). *Cody* is readily distinguishable. There, a Naval Academy official had certified the student's Form N-426, but USCIS took no further action on the student's naturalization petition, thus triggering 8 U.S.C. § 1447(b) ("If there is a failure to make a determination . . . before the end of the 120-day period after the date on which [an] examination is conducted . . . the applicant may apply to the United States district court . . . for a hearing on the matter."). After litigation ensued, the Naval Academy issued a revised Form N-426 at the summary judgment stage, stating that the student had never accessed into the Navy or served on active duty and that the prior certification was a clerical error. The Navy thus purported to "rescind[] and nullif[y]" the prior form. *Id.* at 11. The district court was skeptical of this purported nullification, which it viewed as an attempt by the Navy to salvage its litigating position. The court concluded that it could either enforce the prior certification or find that the student had served honorably on active-duty status in light of awards and letters he had received as well as "certifications, other letters of support, and a legal opinion documenting his active-duty status." *Id.* at 13.

*Cody* does not address § 1440(a)'s allocation of responsibility between USCIS and DoD; in fact, DoD was not even a party in *Cody*. Moreover, unlike the provisional class members here (MAVNI reservists in the Delayed Training Program who, prior to the injunction, had not received N-426 certifications), the plaintiff student in *Cody* received his form and had a separate statutory hook for his action—§ 1447(b), which authorizes judicial review of delayed action by USCIS. Moreover, *Cody* does not address whether honorable-service determinations are committed to agency discretion by law, particularly as to new recruits; it rather addresses a peculiar, even *sui generis* situation in which a Military Department has exercised its discretion, certified a Form N-426, and then attempted to retract that action. *Cody* offers minimal insight as to the factors the Military Departments can or should consider in determining whether a soldier has served

15

honorably.  In short, that case offers little guidance on the questions pending before the Court in this case.[6]

Finally, the Court noted in its prior opinion a statement made by Government counsel in *Nio v. U.S. Department of Homeland Security*, a related case also involving MAVNI enlistees. Counsel had stated that "DoD serves a ministerial role in determining if an individual is serving honorably."  ECF No. 19 at 36, No. 17-998 (ESH) (D.D.C.).  The Court suggested that "DOD is arguably judicially estopped from changing its position based on a change in litigation interests." *Kirwa*, 2017 WL 4862763, at *12 n.18.  However, judicial estoppel should not apply here because Government counsel's passing reference to a "ministerial role" was not an essential feature of the Government's argument in *Nio*, nor did the Court even address this point in denying the *Nio* plaintiffs' motion for a preliminary injunction, *see Nio v. U.S. Dep't of Homeland Sec.*, No. 17-998 (ESH), 2017 WL 3917006 (D.D.C. Sept. 6, 2017); *see also New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) ("[C]ourts regularly inquire whether the party [to be estopped] has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'  Absent success in a prior proceeding, a party's later inconsistent position introduces 'no risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." (citations omitted)); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996) (characterizing judicial estoppel as an "extraordinary" remedy); *cf. United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. 95-1231 (RCL), 2007 WL

---

[6] The Fourth Circuit's review of the district court's subsequent order denying the student's request for attorneys' fees is even less illuminating, as the court included no discussion as to the meaning of honorable service other than to note in passing that by "all accounts, Petitioner was a model midshipman who served honorably and received many awards," *Cody v. Caterisano*, 631 F.3d 136, 138-39 (4th Cir. 2011).

851871, at *1 (D.D.C. Mar. 14, 2007) ("[T]he doctrine of judicial admissions has never been applied to counsel's statement of his conception of the legal theory of the case.  When counsel speaks of legal principles . . . he makes no judicial admission and sets up no estoppel which would prevent the court from applying . . . the proper legal principles . . . ." (quoting *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963))).  Moreover, read in its full context, counsel's use of the term "ministerial" did not diminish DoD's institutional role under § 1440(a).  On the contrary, counsel wrote that "USCIS should *defer* to DoD to determine when an individual is serving honorably in the armed services, and the N-426 serves just that purpose."  ECF No. 19 at 36, No. 17-998 (ESH) (D.D.C.) (emphasis added).  Counsel's point simply was that USCIS has an independent responsibility to exercise its "own judgment to determine that it needs . . . specific, additional information from DoD in certain circumstances."  *Id.*  That argument, and the argument DoD presents here (*i.e.*, that DoD's honorable-service determinations are committed to the agency's discretion by law) are not in tension with one another.

Furthermore, as a general matter, courts should exercise great caution when adjudicating claims involving sensitive military and national-security matters.  *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 528 (1988) (security clearance adjudications committed to agency discretion by law); *Oryszak v. Sullivan*, 576 F.3d 522 (D.C. Cir. 2009) (same); *Conyers v. Rossides*, 558 F.3d 137 (2d Cir. 2009) (decision whether to utilize FAA personnel management system in hiring airport security screeners committed to agency discretion by law); *Merida Delgado v. Gonzales*, 428 F.3d 916, 920 (10th Cir. 2005) (denial of flight training to alien committed to agency discretion by law); *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Maritime Admin.*, 215 F.3d 37 (D.C. Cir. 2000) (transfer of vessel registry from United States to other countries committed to agency discretion by law); *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400

(D.C. Cir. 1990) (military base closure and realignment decisions committed to agency discretion by law); *Young Am.'s Found. v. Gates*, 560 F. Supp. 2d 39 (D.D.C. 2008) (DoD's decision whether to initiate enforcement proceedings under the Solomon Amendment committed to agency discretion by law), *aff'd*, 573 F.3d 797 (D.C. Cir. 2009).

The decision whether and when to certify that a MAVNI enlistee has served honorably is likewise committed to DoD's discretion by law. The October 13 Policy sets forth reasonable procedures for making that discretionary determination. Those procedures are not subject to judicial review under the APA.[7]

**B.    Plaintiffs cannot prevail under § 706(1) because § 1440(a) does not preclude Defendants from requiring soldiers to complete background investigations and serve for a period of time prior to obtaining honorable-service certifications**

Plaintiffs' claim under § 706(1) should be dismissed, or summary judgment should be granted to Defendants, for the additional reason that Plaintiffs cannot show that DoD has a non-discretionary, ministerial obligation to certify N-426 forms by a particular point in time or through a particular process. Under § 706(1), courts have the authority to "compel agency action unlawfully withheld or unreasonably delayed." As the Supreme Court explained in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), "the only agency action that can be compelled under the APA is action legally required," 542 U.S. 55, 63 (2004) (emphasis omitted), that is, "when the agency has failed to act in response to a clear legal duty," *Citizens for Responsibility and Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 148 (D.D.C. 2013) (citing *SUWA*, 542 U.S. at

---

[7] As discussed below, to the extent the Court reads 8 U.S.C. § 1440(a) as imposing an obligation on DoD to certify Forms N-426, any such obligation should extend only to soldiers in active service (e.g., active-duty personnel or reservists who have accessed to IET). The statute provides that the "executive department under which [a soldier] served shall determine whether [the soldier] served honorably in an active-duty status." By its plain terms, the statute does *not* extend that "shall determine" provision to soldiers in the Delayed Training Program (like the provisional class), which is an inactive, preliminary status.

63–64).  The D.C. Circuit has further explained that "[w]hen agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates." *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984). But such injunctive relief is only appropriate "if the court's study of the statute and relevant legislative materials cause[s] it to conclude that the defendant official ha[s] failed to discharge a duty that Congress intended him to perform." *Covelo Indian Cmty. v. Watt*, 551 F. Supp. 366, 381 (D.D.C. 1982), *aff'd as modified* (Dec. 21, 1982), *vacated as moot* (Feb. 1, 1983).

Importantly, "Section 706[(1)] does not provide a court with a license to substitute its discretion for that of an agency merely because the agency is charged with having unreasonably withheld action," *Am. Ass'n of Retired Pers. v. EEOC*, 823 F.2d 600, 605 (D.C. Cir. 1987), or because "a plaintiff is [] dissatisfied with the way an agency exercises its discretion," *Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687, 700 (S.D. Ill. 2004).  Rather, for a court to order an agency to act, there must exist a "ministerial or non-discretionary act" that the agency has failed to take.  *SUWA*, 542 U.S. at 64-65.  The D.C. Circuit views this requirement as imposing "strict limits on reviewable inactions."  *Pub. Citizen v. FERC*, 839 F.3d 1165, 1172 (D.C. Cir. 2016) (citation and internal quotation marks omitted).[8]

---

[8] Plaintiffs' Amended Complaint uses the same language in describing their claim under § 706(1) as does their original Complaint.  *Compare* Compl. ¶ 94 ("Defendants unlawfully have withheld and/or unreasonably delayed the issuance of Form N-426s and honorable service certifications to Plaintiffs and the Class contrary to the plain language of applicable law, including 8 U.S.C. § 1440), *with* Am. Compl. ¶ 109 (same).  Notably, in neither version of the complaint do Plaintiffs provide any further allegations about how DoD is purportedly unreasonably delaying any N-426 certifications.

Nevertheless, Plaintiffs have previously clarified that they are not bringing an unreasonable delay challenge to the October 13 Policy.  *See* Pls.' Reply Mem. of Points and Auth. in Supp. of Pls.' Mot. at 15, ECF No. 19; Pls.' Reply Mem. in Supp. of Pls.' Prelim. Inj. Mot. at 30 n.11, ECF No. 22.  Accordingly, although Defendants have previously explained why there is no

For reasons similar to those discussed above, there is no ministerial, non-discretionary obligation for DoD to certify the honorable service of MAVNI enlistees who, like Plaintiffs, have not completed the suitability screening requirements.  Although the first sentence of § 1440(a) states that any "alien or a noncitizen national of the United States" who has served honorably in the Selected Reserve or in active-duty status may be naturalized, the second sentence—which specifically addresses the role of DoD—provides that the relevant executive branch shall determine whether such a person "ha[s] served honorably in an *active-duty status*" and makes no mention of certifying members who have not served on active duty.  Section 1440(b)(3) also refers to DoD's role in the naturalization process, and it similarly is silent with respect individuals who lack active-duty status.[9]  *See* 8 U.S.C. § 1440(b)(3) ("[S]ervice in the military, air or naval forces of the United States shall be proved by a duly authenticated certification from the executive department under which the applicant served or is serving, which shall state whether the applicant served honorably in an active-duty status . . . .").  Thus, to the extent § 1440 can be read as imposing any ministerial obligation on DoD, that obligation would at most exist with respect to soldiers with active-duty service only.  The statute contains no clear directive to DoD to certify members of the

---

unreasonable delay in this case, *see* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. and Cross-Mot. for Summ. J. at 16-19, ECF No. 17, they do not repeat those arguments here.

[9] Previously in this case, Plaintiffs have attempted to attribute to a drafting error the fact that § 1440 refers to the Selected Reserve at only one of the three points where it discusses honorable-service certifications.  *See* Pls.' Reply in Supp. of Mot. for Prelim. Inj. at 21, ECF No. 19 (suggesting that § 1440 contains "legislative omission[s]").  Even if Congress had made such an error, it would not give this Court license to read into the statute an additional requirement to be imposed on DoD.  *See King v. Burwell*, 135 S. Ct. 2480, 2504-05 (2015) ("This Court . . . has no free-floating power 'to rescue Congress from its drafting errors,'" and "[o]nly when it is patently obvious to a reasonable reader that a drafting mistake has occurred may a court correct the mistake." (citation omitted)).

Selected Reserve who, like Plaintiffs, have not yet accessed to IET, much less to certify them prior to the completion of their background investigations and security screenings.

The statutory language of § 1440 further supports the conclusion that DoD has no ministerial obligation to certify as having served honorably MAVNI soldiers in the Selected Reserve without active-duty service.  Although the words "shall" and "may" can have mixed meanings, "when a statutory provision uses both . . . it is a fair inference that the writers intended the ordinary distinction." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (citing *Lopez v. Davis*, 531 U.S. 230, 241 (2001)).  Here, § 1440 uses the word "shall" only with respect to DoD's obligation to "determine whether persons have served honorably in an active-duty status."  *See* 8 U.S.C. § 1440(a), (b)(3).  By contrast, the statute uses the word "may" to describe the types of foreign-born soldiers who may be eligible to become naturalized, *i.e.*, persons who "served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status," *see* § 1440(a), but does not impose an obligation on DoD to certify all individuals so eligible.  No requirement regarding members of the Selected Reserve who lack active-duty service can be found.

Moreover, even though § 1440 states that DoD "shall" determine honorable service for persons with active-duty status, it contains no deadline by which DoD must act.  "The absence of a congressionally-imposed deadline or timeframe" for an agency to act suggests that Congress left to "administrative discretion" the pace of the agency's decision-making process.  *See Beshir v. Holder*, 10 F. Supp. 3d 165, 176 (D.D.C. 2014) (citation omitted); *see also Orlov v. Howard*, 523 F. Supp. 2d 30, 34 (D.D.C. 2007) ("If Congress intended to constrain the USCIS to adjudicate an application within a specific amount of time, this Court believes it would have provided a time limitation [in the statutory language].").  Indeed, § 1440 permits DoD to certify honorable service

even after a soldier has separated from the military. *See* 8 U.S.C. § 1440(a) (directing DoD to determine "whether separation from such service was under honorable conditions"). The lack of a statutorily imposed deadline reinforces the conclusion that no ministerial obligation exists.[10]

**C.    Plaintiffs' separate claims under APA § 706(2) are meritless because the October 13 Policy implements a reasonable mechanism for facilitating honorable-service certifications**

Plaintiffs' claims under § 706(2) likewise fail. That section of the APA permits a reviewing court to hold unlawful and set aside agency action found to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). As with their original Complaint, Plaintiffs' central contention under § 706(2) is that the October 13 Policy is contrary to statutory law. *See* Am. Compl. ¶ 113 ("The conditions imposed by the N-426 policies are *contrary* to the plain language of the statute, implementing regulations, and final rulemaking and *exceed* statutory authority and represent a departure from and change in the legal landscape vis-à-vis Defendants' prior N-426 policies and practices." (emphasis added)). But DoD's October 13 Policy is consistent with the dictates of § 1440, and judgment in favor of DoD is warranted as to Plaintiffs' § 706(2) claim.

---

[10] Plaintiffs overreach in their request for relief on their claim under § 706(1). In particular, Plaintiffs seek an injunction requiring Defendants to issue N-426s based on a soldier's conduct as reflected in the soldier's service record and "based on sufficient grounds generally applicable to all members of the military." Am. Compl. ¶ 114. But § 706(1) does not permit courts to compel agencies to take action beyond what is legally required of them. *See In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 634 (D.C. Cir. 2014) (holding that, even if the statute required the Internal Revenue Service to create a tax-refund procedure, it did not require the specific procedure sought by plaintiffs). Plaintiffs point to no authority for the Court to compel the specific standard for which they advocate. As discussed below, this form of relief is also not available under § 706(2).

1.      The October 13 Policy is not contrary to law or in excess of DoD's statutory authority

DoD's policy of requiring MAVNI soldiers who enlisted prior to October 13, 2017 to have completed background investigations and security screening in order to be eligible for honorable-service certification is a more-than-reasonable construction of the agency's authority under § 1440. Section 1440 imposes no obligation to certify a non-citizen's service as honorable within a specific time period, and neither the statute nor the legislative history contain any criteria about what it means to serve "honorably."  The statute makes two references to DoD's role in the naturalization process; in both places, Congress explicitly referred only to certifications for active-duty status. *See* 8 U.S.C. § 1440(a) ("The executive department under which such person served shall determine whether persons have served honorably in an active-duty status . . . ."); § 1440(b)(3) ("[S]ervice in the military, air or naval forces of the United States shall be proved by a duly authenticated certification from the executive department under which the applicant served or is serving, which shall state whether the applicant served honorably in an active-duty status . . . ."). "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion," *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013), and here, Congress left both the timing of and criteria used for honorable-service certifications within the absolute discretion of DoD, electing not to provide DoD either criteria by which service should be judged as "honorable" or a deadline for making certifications.  DoD's requirement that MAVNI soldiers have completed background checks and security screening in order to receive honorable-service certification is accordingly consistent with the express language of § 1440.

Plaintiffs note that DHS issued a regulation and other policy documents mirroring the "Selected Reserve of the Ready Reserve or in an active duty status" language from the first sentence of § 1440(a), *see* Am. Compl. ¶¶ 34-40, but these materials do not render DoD's policy

contrary to statutory law.  DHS's regulation implementing § 1440(a), for instance, is, by its own terms, limited to the criteria for the naturalization eligibility of alien and non-citizen soldiers.  *See* 8 C.F.R. § 329.2 (listing the criteria for a soldier "[t]o be eligible for naturalization under [8 U.S.C. § 1440(a)]," including that the applicant has served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status).  The regulation does not purport to define for DoD what constitutes "honorable" service, nor does it state that a soldier must receive honorable-service certification by a certain point in time.  Rather, the regulation merely states that, for purposes of DHS's adjudication of naturalization applications, certification of honorable service in either the Selected Reserve or in active-duty status is sufficient.  DoD still retains the discretion to determine what constitutes "honorable" service and when such a determination should be made.[11]

In any event, even if there were a direct conflict between DHS's regulation or other policy documents and DoD's current policy, that conflict would not be dispositive of Plaintiffs' § 706(2) claim here.  *See Am. Bar Ass'n v. FTC*, 671 F. Supp. 2d 64, 81 (D.D.C. 2009) ("[I]n the end, as instructive as it might be, one agency's interpretation of a congressional statute is not controlling on another agency's interpretation of that same statute." (citation omitted)), *vacated and remanded on other grounds*, 636 F.3d 641 (D.C. Cir. 2011); *see also Old Colony R. Co. v. Comm'r*, 284 U.S. 552, 562 (1932) (holding that the rules of accounting enforced by the now-defunct Interstate

---

[11] As they did previously in this case, Plaintiffs erroneously contend that the October 13 Policy imposes various pre-conditions to naturalization.  *See* Am. Compl. ¶ 61 (claiming that the policy imposes, among other things, an active-duty service requirement, a minimum-period-of-service requirement, a service "capacity" requirement, and a physical-presence requirement).  But these allegations are plainly not present on the face of the policy.  Indeed, Section II of the policy, which applies to Plaintiffs in this case, contains three criteria which must be met.  The other issues about which Plaintiffs complain may be the result of the amount of time currently necessary to perform suitability screening, but they are not dictates of the policy itself.

Commerce Commission are not binding upon the IRS).  Plaintiffs' reliance on any purported discord between DoD's policy and that of DHS as a basis for their § 706(2) claim is accordingly misplaced.  It is DoD that the statute charges with determining whether a soldier has served honorably.

2.      The October 13 Policy is not arbitrary and capricious[12]

In addition to being a valid exercise of DoD's statutory authority, the October 13 Policy has a reasoned basis.  When considering whether an agency's decision was arbitrary and capricious, a "reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (citation omitted).  "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Id.* (citation and internal quotation marks omitted).  As the Supreme Court has cautioned, a reviewing "court is not to substitute its judgment for that of the agency," and it should uphold even "a decision of less than ideal clarity" so long as "the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation and internal quotation marks omitted).  Ultimately, the question is whether the agency's decision is "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).

---

[12] Neither Plaintiffs' original nor amended complaints challenge DoD's policy as being arbitrary and capricious.  *See* Compl. ¶ 98; Am. Compl. ¶ 113.  This claim is thus not properly before the Court in this action.  *See Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 395 n.10 (D.D.C. 2008) (holding that claims not raised in a complaint "are not before the Court in the first instance"); *see also Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("The [well-pleaded-complaint] rule makes the plaintiff the master of the claim . . . .").  Nevertheless, because the Court *sua sponte* analyzed the October 13 Policy against the arbitrary-and-capricious-standard, *see Kirwa*, 2017 WL 4862763, at *12-13, Defendants address this issue here to explain why it too must fail.

Here, the October 13 Policy reflects DoD's desire to establish, for the first time, a clear and consistent process for N-426 certifications following a number of years in which the military was applying inconsistent standards for such determinations. Third Miller Decl. ¶ 11. The policy is consistent with DoD's longstanding intent; DoD has now simply formalized it. *Id.* ¶ 5. Requiring the completion of suitability screening prior to making an honorable-service determination, moreover, fulfills multiple goals for DoD. *Id.* ¶ 13. First, linking suitability screening to honorable-service certification ensures that DoD has sufficient information to determine whether the individual in question is suitable to be accessed into the military in the first place. *Id.* Information obtained during the screening process can include information about prior criminal history and counterterrorism threats presented by an individual MAVNI soldier, and DoD may learn about this information for the first time from a background check or other step in the suitability screening process. *Id.* If this information is discovered during that process and is not capable of being mitigated, DoD intends for the individual to be separated from the military. *Id.* The suitability screening thus gives DoD the opportunity to verify that an individual is qualified to be a soldier and that there does not exist any information to justify termination of the person's enlistment contract; only at that point in time is DoD to certify that the person has served honorably. *Id.* Although Plaintiffs and members of the provisionally certified class have already enlisted, they are participating in the Delayed Training Program and there is no way to know until their screenings are complete whether they will be found suitable to access and attend IET.

Second, the suitability screening process allows DoD to verify that an individual soldier did not enlist in the military under false pretenses. *Id.* ¶ 14. Certain information obtained from suitability screening may contradict representations made by MAVNI soldiers at the time they enlisted; if this is the case, then the individual may have enlisted using false information. *Id.* For

instance, DoD is aware of individuals who accessed into the military through the MAVNI program based on the receipt of fraudulent student visas and falsified transcripts from universities owned by a foreign national-security agency and a state-sponsored intelligence organization, as well as individuals who professed support for the 9/11 terrorists and allegiance to foreign nations. *Id.* Had DoD known about this information at the time of enlistment, these individuals would not have been permitted to enlist. *Id.* The suitability screening permits DoD to, among other things, identify individuals unqualified for service based on fraudulent representations. *Id.* DoD should not be required to certify that persons have "served honorably" before it has had the opportunity to confirm the veracity of the representations they made when they enlisted.

Plaintiffs' demand that DoD should certify individuals prior to the completion of suitability screening presents several concerns. To begin, only those MAVNI enlistees who are eligible to serve are able to apply for naturalization based on their service, but DoD must wait for the completion of the security screening to determine whether an individual is eligible to serve. *Id.* Nor is it consistent with DoD's mission to place the weight of its N-426 certification on persons who have not yet been found suitable for service, based in part on the military's desire not to mislead other federal agencies with respect to the character of service members who have not been thoroughly vetted. *Id.*

In light of these considerations, DoD's certification of N-426s represents a communication to USCIS that the military has determined, to the best of its knowledge, that a MAVNI soldier who has been certified as serving honorably does not present a security threat, either to the military or to the United States, and that the individual did not enlist under false pretenses. *Id.* ¶ 16. When DoD began its review of the N-426 certification process, USCIS was holding naturalization applications in abeyance pursuant to an informal inter-agency agreement that was subject to legal

challenge.  *Id*.  Were USCIS's informal policy to change, or were the agency found to be without legal authority to hold naturalization applications in abeyance, citizenship could be granted to persons based on their military service who have not completed a DoD background investigation or met other suitability requirements.  *Id*.  Furthermore, such an alternative scheme would upset the balance inherent in the central feature of the MAVNI program—the opportunity to seek naturalization in exchange for military service—by permitting some individuals to apply for naturalization even where it is ultimately determined that they cannot meet the basic suitability requirements for service.  *Id*. ¶ 15.  All of these considerations provide ample support and justification for DoD's October 13 Policy.

 3. The October 13 Policy is not impermissibly retroactive[13]

 Contrary to the Court's initial impression in its prior opinion, the October 13 Policy is not impermissibly retroactive.  When considering the retroactivity of a statute or regulation, courts assess whether the new source of law "impose[s] new duties with respect to transactions already completed."  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 158-59 (D.C. Cir. 2010)

---

[13] Again, Plaintiffs' original Complaint did not allege that DoD's policy is impermissibly retroactive, *see, e.g.*, Compl. ¶ 98, ECF No. 1, and their Amended Complaint refers only in passing to the policy's alleged retroactive effects, *see* Am. Compl. ¶ 113 (alleging that "Defendants' policies are unlawful on their face and otherwise are being unlawfully applied retroactively to Plaintiffs and the class").  This claim is thus not properly before the Court.  Nevertheless, because the Court on its own accord analyzed the October 13 Policy against retroactivity standards, *see Kirwa*, 2017 WL 4862763, at *13-14, Defendants here explain why there is no impermissible retroactivity.

 Furthermore, to the extent Plaintiffs' Amended Complaint could be construed as asserting a claim based on retroactivity, it does not meet the requisite pleading standard.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (holding that, although a complaint need not contain "detailed factual allegations," a complaint must consist of "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" to provide the grounds for "entitle[ment] to relief").  Plaintiffs' decision not to bring a retroactivity-based claim or an arbitrary-and-capricious claim is particularly noteworthy in light of the Court's lengthy analysis of both issues at the preliminary injunction stage.

(citation omitted).  The D.C. Circuit "has recognized a distinction between a rule that imposes new sanctions on past conduct, which is retroactive and invalid unless specifically authorized, and one that merely 'upsets expectations,' which is secondarily retroactive and invalid only if arbitrary and capricious."  *Id.* at 159.  A new rule operates retroactively where it "is substantively inconsistent with a prior agency practice and attaches new legal consequences to events completed before its enactment."  *Arkema, Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) (citation and internal quotation marks omitted).  "The critical question is whether the interpretation established by the new rule changes the legal landscape."  *Id.* (citation and internal quotation marks omitted).

No violation of these principles occurred in this case.  As an initial matter, the October 13 Policy on its face does not apply retroactively.  Section II of the policy—the section applicable to the Plaintiffs here—applies only to certifications made on or after October 13, 2017, not to any prior certification decisions.  The fact that Plaintiffs enlisted prior to the date of the new policy does not make the policy retroactive.  *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 280 (1994).  Plaintiffs, moreover, were put on notice and acknowledged at the time of their enlistment that "[l]aws and regulations that govern military personnel may change without notice to me.  Such changes may affect my status, pay, allowances, benefits, and responsibilities as a member of the Armed Forces REGARDLESS of the provisions of this enlistment/reenlistment document."  *See* Enlistment Document of Meenhallimath Santhosh at Partial Statement of Existing United States Laws ¶ 9, ECF No. 25-2; Enlistment Document of Viswanahan Ashok at Partial Statement of Existing United States Laws ¶ 9, ECF No. 25-3.  Plaintiffs have thus always been on notice that their status in the military and any attendant benefits are dependent upon the governing law at the time decisions concerning those aspects of their service are made.

The new policy also does not change the legal landscape.   Although no formalized process for N-426 certification existed prior to October 13, 2017, it had always been DoD's intent—since the creation of the MAVNI program—to require the completion of a suitability-for-service determination prior to a certification of honorable service, given the need to verify that an enlistee is qualified to serve.   *See* Third Miller Decl. ¶ 5.   Upon learning that its screening processes were not being implemented thoroughly, DoD undertook a review of the MAVNI program, one result of which was the issuance of the October 13 Policy, establishing a clear standardized process for making honorable-service determinations.   *Id.* ¶ 11.   The fact that some components and officials within DoD applied a different, non-formal process to N-426 certifications at certain points in time does not bind the entire military to that same process in the future.   *See, e.g.*, *Chan v. Reno*, 113 F.3d 1068, 1073 (9th Cir. 1997) (holding that informal adjudications such as unpublished decisions without the force of precedent do not have a binding effect on subsequent agency actions); *see also Kirwa*, 2017 WL 4862763, at *14 ("Admittedly, the jurisprudence relevant to retroactivity in the context of administrative law involves either rulemaking by notice and comment or adjudications . . . ."); *cf. Nat'l Petrochemical*, 630 F.3d at 158 (articulating standard for "whether a *statute* or *regulation* has retroactive effect").   As the Supreme Court has recognized, "regulatory agencies do not establish rules of conduct to last forever," and "an agency must be given ample latitude to adapt their rules and policies to the demands of the changing circumstances" so long as a new rule or policy is not arbitrary and capricious.   *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42-43 (1983).

Plaintiffs (and the Court in its prior decision) seem to suggest that the October 13 Policy is invalid because it breaks a promise made to Plaintiffs at the time of their enlistment.   *See, e.g.*, Am. Compl. ¶ 2; *see also Kirwa*, 2017 WL 4862763, at *13 (basing retroactivity analysis on

observation that "[w]hen they enlisted, the government told them that they would receive N-426s either after just one day of qualifying service . . . or within around 180 days when they shipped to basic training"); *id*. at *14 ("The Court is . . . convinced that DOD's application of the October 13th Guidance could result in serious inequities that are not counterbalanced by any significant statutory interests.").   But that concern is dependent upon an estoppel-based rationale, which applies to the Government narrowly, if at all.   *See, e.g.*, *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419, 422 (1990) (observing that from the Court's "earliest cases, [it has] recognized that equitable estoppel will not lie against the Government as it lies against private litigants," and further noting that the Court has "reversed every finding of estoppel that [it] ha[s] reviewed"); *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009) (requiring, among other things, "a definite representation to the party claiming estoppel" and "affirmative misconduct" by the Government).   Although Plaintiffs may have hoped that they would have received N-426 certification by this point in their military careers, the October 13 Policy at most "upsets expectations" premised on the prior practice of some DoD components.   *See Nat'l Petrochemical*, 630 F.3d at 159 (citation omitted).   As such, the October 13 Policy constitutes a legally permissible effort by DoD to set criteria for honorable-service certifications in the future and does not violate retroactivity principles.[14]

---

[14] In any event, Plaintiffs were provided notice stating that certification of their N-426s would not occur until, at a minimum, several months after they enlisted.  The MAVNI Information Paper signed by all three named Plaintiffs at the time of their enlistment clearly stated that there would be at least a 180-day waiting period before being shipped to basic training; that this amount of time could change depending on the status of their background investigations, *see* 2014 MAVNI Information Paper at 1, ECF No. 20-4; and that their N-426s would be signed at basic training, *see id*. at 4.

4.  <u>Plaintiffs cannot obtain many types of the relief they seek through their § 706(2) claim</u>

Even if the Court were to conclude that Plaintiffs should prevail on their claim under § 706(2), Plaintiffs would still not be entitled to the relief that they seek, which is incompatible with well-established principles of administrative law.  Unlike in a "garden variety civil suit," a district court in reviewing a final agency action "does not perform its normal role, but instead sits as an appellate tribunal." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (citation omitted).  Accordingly, "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end:  the case must be remanded to the agency for further action consistent with correct legal standards." *Id.* (citation omitted); *see also N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").  A district court lacks authority to order specific relief where it finds a § 706(2) violation. *Palisades Gen. Hosp.*, 426 F.3d at 403.

The Court is without authority to grant Plaintiffs at least two forms of relief that they request in their Amended Complaint.  Plaintiffs request that the Court (1) "enjoin[] Defendants from withholding issuance of N-426s and from refusing to certify honorable service except as related to the conduct of an individual soldier as reflected in that soldier's service record and based on sufficient grounds generally applicable to all members of the military" and (2) "enjoin[] Defendants from applying the policy to Plaintiffs and the class." Am. Compl. ¶ 114.  Yet these

are precisely the types of relief that are not available under § 706(2) and cannot be granted in the event Plaintiffs prevail on that claim only.

## II.     PLAINTIFFS' CLAIM FOR "CONSTITUTIONAL VIOLATIONS" FAILS

Plaintiffs allege for the first time in their Amended Complaint that Defendants have committed "Constitutional Violations." The contours of Plaintiffs' constitutional claim are poorly defined, and for that reason alone the Court should dismiss the claim. *See* Fed. R. Civ. P. 8(a) (requiring that pleadings contain a "short and plain statement of the claim showing that the pleader is entitled to relief"); *Julius v. Kirk*, No. 10 0009, 2010 WL 27404, at *1 (D.D.C. Jan. 6, 2010) ("The purpose of the minimum standard of Rule 8 is to give fair notice to the defendants of the claim being asserted, sufficient to prepare a responsive answer [and] to prepare an adequate defense . . . ."). Plaintiffs appear to allege two discrete constitutional "violations": the first arising under the "uniform Rule of Naturalization" clause in Article I, Section 8; the second arising under the Fifth Amendment's Due Process Clause. Both claims are meritless.

As for Plaintiffs' "Rule of Naturalization" theory, it is far from clear that Plaintiffs even have standing to assert such a claim. Clause 4 of Article I, Section 8, vests in Congress the power to "establish an uniform Rule of Naturalization," a grant that has been "read broadly to mean federal control over the status of aliens, not just criteria for citizenship." *Korab v. Fink*, 797 F.3d 572, 580 (9th Cir. 2014); *see also id.* at 581 (explaining that the uniformity requirement was a "response to the tensions that arose from the intersection of the Articles of Confederation's Comity Clause and the states' divergent naturalization laws"). The Clause does not on its face extend or preserve any particular rights belonging to individuals like Plaintiffs here. *See Flores v. City of Baldwin Park*, No. CV 14-9290-MWF (JCx), 2015 WL 756877, at *3 (C.D. Cal. Feb. 23, 2015) ("[T]his constitutional clause does not create a cause of action, nor does it set forth procedures and

remedies governing that cause of action . . . ."); *but see Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *7 (W.D. Wash. June 21, 2017) (denying motion to dismiss plaintiff's Rule of Naturalization claim.).

In any event, Plaintiffs have not plausibly alleged that Defendants have violated the Rule of Naturalization.  Congress enacted 8 U.S.C. § 1440(a), and the many other provisions of the INA, pursuant to its express constitutional authority.  Congress delegated to DoD (the "executive department" under which soldiers serve) the responsibility for honorable-service determinations, and Congress further delegated to the Secretary of Homeland Security the responsibility to administer and enforce most immigration laws, *see* 8 U.S.C. § 1103.  Neither the language of § 1440(a) nor any other provision of the INA precludes DoD from implementing sensible procedural rules, including background investigations, in connection with its honorable-service determinations.  Nor does any INA provision preclude USCIS from holding naturalization petitions in abeyance pending completion of DoD background screening, as this Court implicitly recognized in *Nio*. *See* 2017 WL 3917006, at *10.

As for Plaintiffs' due process theory, which appears to sound in procedural due process, that claim is largely duplicative of their 5 U.S.C. § 706(1) claim, and the Government's arguments with respect to that APA claim apply here as well.  DoD's inaugural N-426 policy does not violate any clear statutory duty or deprive Plaintiffs of any clear statutory entitlement.  Plaintiffs' due process claim fails for two additional reasons.  First, the October 13 Policy is not the type of agency action that even implicates the Due Process Clause.  Second, Plaintiffs lack a protected property or liberty interest in the mere possibility of a future grant of citizenship.

First, at this stage in these proceedings, Plaintiffs' challenge concerns the general procedural rules outlined in the October 13 Policy, not any discrete decision by DoD to certify or

refrain from certifying a particular Form N-426.  After all, as Plaintiffs concede, the three named

Plaintiffs have already received their signed forms pursuant to the preliminary injunction, *see* Am.

Compl. ¶¶ 68, 71, 74, and Plaintiffs have identified no particular provisional class member whose

certification request has been denied or delayed.  But categorical agency determinations do not

implicate the Due Process Clause.  There is no constitutional requirement that members of the

public receive notice and an opportunity to be heard before an agency may implement a new

policy.  As the Supreme Court explained over a century ago in *Bi-Metallic Inv. Co. v. State Board*

*of Equalization*, 239 U.S. 441, 445 (1915), where a "rule of conduct applies to more than a few

people, it is impracticable that everyone should have a direct voice in its adoption. . . . There must

be a limit to individual argument . . . if government is to go on."

Second, while Plaintiffs allege that they "cannot be denied immigration benefits . . . for

which they are eligible and seeking," ECF No. 33 at 35, Plaintiffs cannot claim a protected property

or liberty interest *now* in the mere possibility that they will eventually be deemed eligible for

citizenship and thereafter naturalized.  The relief Plaintiffs seek in this lawsuit involves just one

step in the naturalization process:  DoD's honorable-service determination pursuant to 8 U.S.C.

§ 1440(a).  Subsection (b) of that statute provides that noncitizen soldiers who qualify for

expedited naturalization under subsection (a) must still comply "in all other respects" with most

requirements enumerated in subchapter III of the INA.  Such soldiers must, for instance, be found

to be persons of "good moral character, attached to the principles of the Constitution of the United

States, and well disposed to the good order and happiness of the United States."  8 U.S.C.

§ 1427(a).  They must demonstrate an understanding of the English language as well as the

"fundamentals of the history, and of the principles and form of government, of the United States."

8 U.S.C. § 1423(a)(2).  And they must satisfy the associational requirements outlined in 8 U.S.C.

§ 1424.  Thus, even if they were to receive certified N-426s, Plaintiffs would still need to fulfill

the remainder of these requirements.

Further, this Court has previously affirmed the current USCIS policy pursuant to which

MAVNI enlistees must receive favorable DoD background check adjudications before USCIS will

act on the soldiers' naturalization petitions.  *See Kirwa*, 2017 WL 4862763, at *13 ("DHS/USCIS

is holding all MAVNI naturalization applications pending DOD's enhanced security screening so

no MAVNI enlistee will naturalize until DOD completes the screening."); *see also Nio*, 2017 WL

3917006, at *10 ("Because additional screening for national security risks does not plainly conflict

with the[] relevant factors for examination, and because no statute or regulation prohibits enhanced

security screening, this Court cannot conclude that plaintiffs are likely to succeed on their contrary-

to-law claim." (citation omitted)).  So long as USCIS maintains this policy, MAVNI enlistees must

satisfy a Tier 5 background check before they may qualify for naturalization, and the October 13

Policy does nothing to change that.  In this circumstance, it is simply implausible for Plaintiffs to

contend that the October 13 Policy deprives them of any protected property or liberty interest.[15]

The Court should dismiss their meritless claim for "Constitutional Violations."

### III.   PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF (COUNTS I AND II) ARE DERIVATIVE OF THEIR SUBSTANTIVE CLAIMS, AND THEIR CLAIM FOR MANDAMUS RELIEF (COUNT IV) IS IMPROPER

Though Plaintiffs have again pleaded separate counts for declaratory and injunctive relief

in their Amended Complaint, as the Court recognized in its prior opinion, those counts do not state

---

[15] To the extent Plaintiffs would characterize their protected interest not as the right to citizenship but rather as the "right to apply for naturalization," Am. Compl. ¶ 127, DoD's policy has not deprived them of any such "right."  The October 13 Policy does not bar a class of otherwise qualified noncitizen soldiers from requesting expedited naturalization; it simply imposes some procedural requirements to bring order and uniformity to the N-426 certification process.

distinct causes of action.  Plaintiffs would be entitled to equitable relief if, but only if, they were

to prevail on a substantive claim for which such relief is proper.

Even were the Court to conclude that the October 13 Policy is somehow deficient under

the APA, the correct redress would be a remand to the agency for further consideration and perhaps

another round of policymaking—not a permanent injunction or a declaratory judgment that would

have the effect of stripping DoD of its discretion in making honorable-service determinations

going forward.  *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999)

("Whether it is a court of appeals or a district court, '[u]nder settled principles of administrative

law, when a court reviewing agency action determines that an agency made an error of law, the

court's inquiry is at an end:  the case must be remanded to the agency for further action consistent

with the corrected legal standards.'" (citation omitted)); *Sierra Club v. Van Antwerp*, 719 F. Supp.

2d 77, 78 (D.D.C. Aug. 20, 2010) ("[B]oth the Supreme Court and the D.C. Circuit Court have

held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of

the APA."); *cf. Heartland Regional Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.D.C. 2009)

(explaining that, where an agency "may be able readily to cure a defect in its explanation of a

decision," remand *without* vacatur is warranted).[16]

Finally, as Defendants previously argued, *see* Opp'n at 29, Plaintiffs are not entitled to

invoke the Mandamus Act, 28 U.S.C. § 1361.  Mandamus is functionally coextensive with the

relief Plaintiffs seek under APA § 706(1).  Plaintiffs are either entitled to that relief or they are not,

but they cannot invoke mandamus as a fallback in the event that their core APA claim fails.  *See*

---

[16] Injunctive relief may be proper "where defendants have 'failed to discharge a duty which Congress has directed them to perform.'"  *Nat'l Coal. for the Homeless v. U.S. Veterans Admin.*, Civ. No. 88-2503-OG, 1988 WL 136958, at *6 (D.D.C. Dec. 15, 1988) (citations omitted).  For the reasons explained above, this is not a case in which DoD has failed to comply with any statutory duty.

*Orlov*, 523 F. Supp. 2d at 38 ("[A] court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is *no other adequate remedy* available to the plaintiff.'" (emphasis added) (citation omitted)); *cf. Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) ("The availability of a remedy under the APA technically precludes [litigant's] alternative request for a writ of mandamus . . . ."); *accord Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 53 (D.D.C. 2008).

## CONCLUSION

The Court should dismiss Plaintiffs' Amended Complaint with prejudice or, in the alternative, enter judgment as a matter of law in Defendants' favor with respect to all of Plaintiffs' claims.

Dated: November 17, 2017   Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*s/ Nathan M. Swinton*
NATHAN M. SWINTON
JOSEPH C. DUGAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Tel: (202) 305-7667
Fax: (202) 616-8470
Email: Nathan.M.Swinton@usdoj.gov

*Attorneys for Defendants*